No. 23-40076

# In the United States Court of Appeals for the Fifth Circuit

R.J. REYNOLDS TOBACCO COMPANY; SANTA FE NATURAL TOBACCO COMPANY, INCORPORATED; ITG BRANDS LLC; LIGGETT GROUP LLC; NEOCOM, INCORPORATED; RANGILA ENTERPRISES, INCORPORATED; RANGILA LLC; SAHIL ISMAIL, INCORPORATED; IS LIKE YOU, INCORPORATED,
*Plaintiffs-Appellees,*

*v.*

FOOD & DRUG ADMINISTRATION; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT M. CALIFF, COMMISSIONER OF FOOD AND DRUGS; XAVIER BECERRA, SECRETARY, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES,
*Defendants-Appellants.*

On Appeal from the U.S. District Court for the Eastern District of Texas, No. 6:20-CV-00176

**BRIEF OF ALTRIA GROUP, INC. AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS-APPELLEES**

LISA S. BLATT
SARAH M. HARRIS
   *Counsel of Record*
WHITNEY D. HERMANDORFER
ROHIT P. ASIRVATHAM
WILLIAMS & CONNOLLY LLP
   *680 Maine Avenue S.W.*
   *Washington, DC 20024*
   *(202) 434-5000*
   *sharris@wc.com*

*Counsel for Amicus Curiae*

## SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

In addition to the interested parties listed in Plaintiff-Appellees' certificate of interested persons, the undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These supplemental disclosures are made pursuant to this Court's Rules 28.2.1 and 29.2 in order that the judges of this court may evaluate possible disqualification or recusal.

1.      Undersigned counsel certifies that amicus curiae **Altria Group, Inc.** is a publicly traded Virginia corporation. Altria Group, Inc. does not have a parent corporation, and no person or entity owns more than 10% of Altria Group, Inc.'s stock.

2.      Amicus curiae **Altria Group, Inc.** is represented in this Court by **Lisa S. Blatt**, **Sarah M. Harris**, **Whitney D. Hermandorfer**, and **Rohit P. Asirvatham** of **Williams & Connolly LLP**, 680 Maine Avenue S.W., Washington, DC 20024.

3.      The remaining parties and their counsel are:

| Plaintiffs-Appellees | Counsel |
|---|---|
| R.J. Reynolds Tobacco Company; Santa Fe Natural Tobacco Company, Incorporated; Neocom, Incorporated; Rangila Enterprises, Incorporated; | Ryan J. Watson Christian G. Vergonis Alex Potapov JONES DAY |

Rangila LLC;
Sahil Ismail, Incorporated;
Is Like You, Incorporated

51 Louisiana Avenue, N.W.
Washington, DC 20001
(202) 879-3939

**Plaintiff-Appellee**

**Counsel**

ITG Brands LLC

Philip J. Perry
Andrew D. Prins
LATHAM & WATKINS LLP
555 Eleventh Street, N.W.,
Suite 1000
Washington, DC 20004
(202) 637-2200

Nicholas L. Schlossman
LATHAM & WATKINS, LLP
300 Colorado Street
Austin, TX  78701
(737) 910-7300

**Plaintiff-Appellee**

**Counsel**

Liggett Group LLC

Constantine Pamphilis
KASOWITZ BENSON
TORRES LLP
1415 Louisiana Street,
Suite 2100
Houston, TX 77002
(713) 220-8852

Meaghan VerGow
Scott A. Harman-Heath
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, DC 20037
(202) 383-5504

| **Defendants-Appellants** | **Counsel** |
|---|---|
| United States Food & Drug Administration;<br>United States Department of Health and Human Services;<br>Robert M. Califf, Commissioner of Food & Drugs;<br>Xavier Becerra, Secretary, U.S. Department of Health and Human Services | Lindsey E. Powell<br>U.S. Department of Justice<br>950 Pennsylvania Avenue, N.W.<br>Washington, DC 20530<br><br>Catherine Meredith Padhi<br>Mark Bernard Stern<br>U.S. Department of Justice<br>Civil Division, Appellate Section<br>950 Pennsylvania Avenue, N.W.<br>Washington, DC 20530<br><br>Stephen Michael Pezzi<br>U.S. Department of Justice<br>Civil Division<br>1100 L Street, N.W.<br>Washington, DC 20530 |

| ***Amicus Curiae*** | **Counsel** |
|---|---|
| Public Citizen | Nandan M. Joshi<br>Allison Zieve<br>Public Citizen Litigation Group<br>1600 20th Street, N.W.<br>Washington, DC 20009<br>(202) 588-1000 |

| ***Amicus Curiae*** | **Counsel** |
|---|---|
| Public Health Law Center | Agatha M. Cole<br>BEVERLY, P.L.L.C.<br>43 W. 43rd Street,<br>Suite 159<br>New York, NY 10036<br>(917) 524-8055 |

| *Amici Curiae* | **Counsel** |
| --- | --- |
| American Academy of Pediatrics; American Cancer Society; American Cancer Society Cancer Action Network; American Heart Association; American Lung Association; American Medical Association; Campaign for Tobacco-Free Kids; Children's Hospital Association of Texas; National Association of Hispanic Nurses; Texas Academy of Family Physicians; Texas Hospital Association; Texas Medical Association; Texas Nurses Association; Texas Pediatric Society; Texas PTA; The Cooper Institute; Truth Initiative Foundation; Bruce C. Carter, M.D.; David Lakey, M.D. | Scott P. Lewis<br>Austin P. Anderson<br>ANDERSON & KREIGER, LLP<br>50 Milk Street, Floor 21<br>Boston, MA<br>(617) 621-6576 |

# TABLE OF CONTENTS

INTEREST OF *AMICUS CURIAE* ..................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................2

BACKGROUND ................................................................................................4

ARGUMENT .....................................................................................................9

I.    All of FDA's Warnings Unlawfully Compel Manufacturer Speech ........9

    A.    The Rule Does Not Compel Accurate, Purely Factual, Uncontroversial Speech ......................................................................9

    B.    The Rule Cannot Withstand Any Level of First Amendment Scrutiny ........................................................................20

II.   This Court Should Vacate the Entire Rule .............................................25

    A.    Severance Cannot Cure the Rule's Legal Problems ...................25

    B.    Limiting Relief to the Parties Would Contravene Precedent and Upend FDA's Consumer-Facing Warning Regime ...........................................................................................30

CONCLUSION ................................................................................................35

# TABLE OF AUTHORITIES

Page

## CASES

*303 Creative LLC v. Elenis*, 143 S. Ct. 2298 (2023) .......................................2, 19

*Am. Acad. of Pediatrics v. FDA*,
    2019 WL 1047149 (D. Mass. Mar. 5, 2019) ......................................................6

*Am. Meat Inst. v. U.S. Dep't of Agric.*,
    760 F.3d 18 (D.C. Cir. 2014) (en banc)............................................................19

*BNSF Ry. Co. v. Fed. R.R. Admin.*, 62 F.4th 905 (5th Cir. 2023) ...................29

*Calcutt v. FDIC*, 143 S. Ct. 1317 (2023)................................................................29

*Cream Wipt Food Prods. Co. v. Fed. Sec. Adm'r*,
    187 F.2d 789 (3d Cir. 1951) ..............................................................................31

*Data Mktg. P'ship v. U.S. DOL*, 45 F. 4th 846 (5th Cir. 2022).............28, 31, 32

*Dep't of Homeland Sec. v. Regents*, 140 S. Ct. 1891 (2020)................................31

*Edenfield v. Fane*, 507 U.S. 761 (1993)................................................................22

*Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421 (5th Cir. 2021) .........................30

*Ibanez v. Fla. Dep't of Bus. & Pro. Reg.*, 512 U.S. 136 (1994) .........................22

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990)...........................................25

*Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518 (D.C. Cir. 2015) ..............................19

*Nat'l Inst. of Fam. & Life Advoc. v. Becerra*, 138 S. Ct. 2361 (2018) ....9, 20, 22

*R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205 (D.C. Cir. 2012).......*passim*

*United States v. Arthrex*, 141 S. Ct. 1970 (2021)................................................26

*Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*,
    985 F.3d 472 (5th Cir. 2021)..............................................................................34

Page

Cases—continued:

*Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985) ........... *passim*

## CONSTITUTION, STATUTES, REGULATIONS, AND RULES

5 U.S.C. § 706 ................................................................25, 28, 31, 32

15 U.S.C. § 1333 & note ........................................................5, 26, 27

15 U.S.C. § 4402 ...........................................................................21

21 U.S.C. § 387 note ................................................................26, 32

Tobacco Control Act, Pub. L. No. 111-31 § 201, 123 Stat. 1779 (2009) ..............4

81 Fed. Reg. 28,974 (May 10, 2016) .......................................................21

84 Fed. Reg. 42,754 (Aug. 16, 2019) ......................................................13

85 Fed. Reg. 15,638 (Mar. 18, 2020) ................................................ *passim*

Fed. R. App. P. 29 .........................................................................1

## OTHER AUTHORITIES

Black's Law Dictionary 1612 (3d ed. 1933) ...............................................31

Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 950, 1012 (2018). ......................................................31

*Modified Risk Tobacco Products*, U.S. FDA (Mar. 16, 2023), https://tinyurl.com/2yspfdme .........................................................34

## INTEREST OF *AMICUS CURIAE*[1]

Altria Group, Inc. manages various companies that manufacture tobacco products for U.S. adult consumers.  Altria's holdings include Philip Morris USA Inc., the leading manufacturer of cigarettes in the United States since 1983, and Nat Sherman, which sells super-premium cigarettes and cigars.  Altria remains committed to ensuring adult consumers receive accurate, non-misleading health information about the risks of tobacco products.  These companies' cigarette packaging and advertising have long displayed text-only warnings the Surgeon General developed regarding smoking-related health risks.  Those warnings have informed consumers about common health consequences of smoking.

FDA's Rule, however, compels cigarette manufacturers to disparage their own products with inflammatory and misleading graphic warnings.  In 2020, Philip Morris and Nat Sherman challenged the Rule in the U.S. District Court for the District of Columbia under the APA and the First Amendment. *See Philip Morris USA Inc. v. FDA*, No. 1:20-cv-01181 (D.D.C. May 6, 2020).

---

[1] All parties have consented to Altria's filing of this *amicus* brief.  No counsel for any party authored this brief in whole or in part and no person other than Altria or its counsel made a monetary contribution to fund the preparation or submission of this brief.  *See* Fed. R. App. P. 29(a)(4)(E).

1

That district court paused that challenge after FDA and plaintiffs-appellees agreed to a nationwide stay of the Rule. After the U.S. District Court for the Eastern District of Texas set aside the Rule for violating the First Amendment, Philip Morris and Nat Sherman voluntarily dismissed their suit without prejudice to promote judicial economy and avoid further litigation against a rule no longer in effect. Altria thus has a significant interest in this case.

## INTRODUCTION AND SUMMARY OF ARGUMENT

"[T]he government may not compel a person to speak its own preferred messages." *303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2312 (2023). Yet FDA's Rule compels manufacturers to mislead and repulse would-be buyers of their products by parading images of amputated toes, bloody urine, and men shamed by erectile dysfunction. FDA's inflammatory and misleading messages fall far outside the government's leeway to require "purely factual and uncontroversial" disclosures to correct consumer deception under *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985). FDA's defense—that because it did not *intend* to trigger or assess emotional reactions, the graphics are "purely factual"—would give agencies carte blanche so long as they blinded themselves to consumers' gut-wrenching reactions.

FDA's shock-and-awe approach fails any standard of First Amendment scrutiny by regulating too much speech without sufficiently advancing FDA's asserted consumer-education interest.  The Rule seizes 50% of manufacturers' packaging and 20% of advertisements without justifying the need for that massive footprint.  Meanwhile, the warnings themselves disturb, confuse, and mislead consumers rather than educate them.  The district court correctly held that all of FDA's warnings suffer insurmountable First Amendment flaws.  FDA faults the district court for discussing only selected warnings in depth.  But the district court made findings as to "each warning," ROA.10205-06, and the rulemaking record confirms that cross-cutting First Amendment problems pervade FDA's Rule and all the warnings.

As for the remedy, the district court correctly held that FDA's First Amendment violations require vacating the Rule in its entirety.  This Court has never endorsed FDA's counter-proposal to sever only select warnings or images.  Regardless, no severance approach could cure the Rule's unlawful size-and-placement requirements, and not one graphic survives First Amendment scrutiny.  FDA's piecemeal proposal would otherwise produce a Frankenstein rule involving warning combinations that FDA never considered—and that risk even greater consumer confusion.

Nor should this Court limit relief to the parties. As FDA acknowledges, this Court's precedents require total vacatur of the Rule. It would be especially perverse to take a party-by-party approach to a rule, like this one, requiring consumer-facing warnings. Under FDA's approach, some manufacturers and retailers would have to blanket cigarette packaging nationwide with graphic warnings; others would not, even though the products carry materially identical health risks. That result would turn the Rule's consumer-education aim on its head. This Court should affirm.

## BACKGROUND

1. In 2009, Congress passed the Tobacco Control Act (TCA), which overhauled health-warning requirements for cigarette packaging and advertisements. *See* Pub. L. No. 111-31, § 201(a), 123 Stat. 1776 (2009). As relevant here, the TCA replaces the text-only Surgeon General's warnings with a regime that seizes significant portions of manufacturers' packaging and advertising for the display of government-generated graphic health warnings. The TCA spells out the text of nine health warnings—covering addiction, harm to children, smoker and nonsmoker lung disease, cancer, strokes and heart disease, fetal harm, death, and quitting benefits—and directs FDA to "issue reg-

ulations that require color graphics depicting the negative health conse-
quences of smoking to accompany the[se] label statements."   15 U.S.C.
§ 1333(a)-(d).  FDA may modify a warning's text if doing so would "promote
greater public understanding of the risks associated with the use of tobacco
products."  *Id.* § 1333(d)[2].  Each warning's text-and-image must comprise
"the top 50 percent of the front and rear panels of the package," *id.*
§ 1333(a)(2), and "at least 20 percent of the area of [any] advertisement" in a
"prominent format and location at the top," *id.* § 1333(b)(2).

2.  In 2012, the D.C. Circuit invalidated FDA's first graphic-warnings
rule, which had selected inflammatory images aimed at making consumers
"depressed, discouraged, or afraid" to buy tobacco products.  *See R.J. Reyn-*
*olds Tobacco Co. v. FDA*, 696 F.3d 1205, 1209 (D.C. Cir. 2012) (citation omit-
ted).  The First Amendment barred FDA from compelling manufacturers to
carry those graphic warnings, which were not purely factual and instead
"evoke[d] an emotional response" and "could be misinterpreted by consum-
ers."  *Id.* at 1216.

Thereafter, FDA struggled to generate another graphic-warnings rule.
After organizations sued to speed up FDA's rulemaking, a district court or-
dered FDA to issue a new rule on an expedited timeline that was almost two

years shorter than what FDA considered feasible to satisfy what the agency called an "unprecedented" graphic-warnings mandate.  Reynolds Br. 12; *Am. Acad. of Pediatrics v. FDA*, 2019 WL 1047149, at *4 (D. Mass. Mar. 5, 2019).

3.  In the ensuing rulemaking, FDA's only asserted interest was to "promot[e] greater public understanding of the negative health consequences of smoking," "focus[ing] on less-known health consequences"—not to discourage smoking. 85 Fed. Reg. 15,638, 15,638, 15,640.  FDA decided early on to modify the TCA's default warning statements, including by focusing on four new health risks—amputation, blindness, diabetes, and erectile dysfunction.  FDA never explained its focus on these risks versus others.

FDA conducted internal studies to support the Rule, yet repeatedly selected warnings that tested poorly.  Consumers found FDA's textual statements misleading or thought they did not provide "any new information."[2] And consumers deemed FDA's images emotionally disturbing and unclear,[3] creating a risk that the warnings could repel or fail to inform smokers.[4]  FDA nonetheless edited images to increase their "attention-grabbing" emotional

---

[2] *E.g.*, ROA.1363, ROA.1370, ROA.1372, ROA.1377, ROA.1393.
[3] *E.g.*, ROA.1393, ROA.1395, ROA.1400, ROA.1403, ROA.1410-11.
[4] ROA.7839-40.

content, 85 Fed. Reg. at 15,665, while maintaining images consumers found confusing, *infra* p. 15-19. FDA then finalized textual statements and text-image pairings that fared significantly worse than the existing Surgeon General's warnings or the TCA's default warning statements on FDA's chosen measures of warning efficacy (namely informativeness, accuracy, and believability). ROA.1464-68.

Further, FDA declined to ask key questions. FDA's quantitative studies avoided testing whether the final graphic warnings evoked the same emotional responses that rendered its first rule invalid. 85 Fed. Reg. at 15,668. FDA did not assess whether the warnings were misleading, asking instead whether consumers reported that they learned something new (even if that knowledge was inaccurate). *Id.* at 15,685. FDA never tested whether "smaller or differently placed warnings"—*i.e.*, warnings that take up less than 50% of manufacturers' packaging and 20% of advertising—could advance FDA's consumer-education goals. *Id.* at 15,650. Nor did FDA test images that might provoke less-emotional reactions. Finally, FDA never tested how well consumers understood text-only warnings, even though FDA (at 61-62) now claims it always intended the Rule's graphics requirement to be severable from the text.

FDA also withheld significant information.  FDA held back a devastating peer-review report evaluating FDA's studies until the Final Rule.  Peer reviewers identified serious issues with FDA's approach, ranging from FDA's "arbitrary" and "odd" approach for measuring warning efficacy to FDA's failure to assess the "crucially important" issue of whether consumers found the warnings credible.  ROA.1503, ROA.1515-16, ROA.1521, ROA.1528.  Yet FDA deprived commenters of the ability to cite that feedback during notice-and-comment.  Reynolds Br. 49.  FDA likewise withheld raw quantitative study data until litigation.  *Id.* at 49-50.  That data revealed that many graphic warnings—covering harm to children, nonsmoker lung disease, fetal harm, and chronic obstructive pulmonary disease—performed the same or worse than the Surgeon General's text-only carbon-monoxide warning.  Vansickel Decl. ¶ 23, *Philip Morris USA Inc.*, ECF 22-2.

4.  The district court concluded that this Rule, like FDA's unconstitutional earlier effort, still impermissibly forces manufacturers to speak information that is not purely factual and uncontroversial; that the Rule is not sufficiently tailored to its stated goal; and that the Rule cannot be saved by severing out some of the requirements.  ROA.10204-13.  Applying settled circuit precedent, the district court set aside the Rule in its entirety.

8

## ARGUMENT

### I.    All of FDA's Warnings Unlawfully Compel Manufacturer Speech

FDA's Rule rests on a textbook First Amendment violation:  The government cannot force private parties to condemn their own products by displaying sensationalist, burdensome, and misleading warnings.  FDA cannot claim the lesser scrutiny for compelled "disclosure[s] of purely factual and uncontroversial information."  *Nat'l Inst. of Fam. & Life Advoc. v. Becerra*, 138 S. Ct. 2361, 2372 (2018) (*NIFLA*) (quoting *Zauderer*, 471 U.S. at 651).  FDA's own studies confirm the graphic warnings are emotionally fraught and trumpet an ideological anti-smoking message.  The Rule nonetheless fails *Zauderer* and all other arguable tests by unjustifiably and unduly commandeering massive portions of packages and advertising without any meaningful benefit.

#### A.    The Rule Does Not Compel Accurate, Purely Factual, Uncontroversial Speech

FDA (at 25-34, 41-53) and its amici insist that this Rule fits within the more-deferential *Zauderer* standard of review for non-misleading, factually accurate, and uncontroversial speech.  *See NIFLA*, 138 S. Ct. at 2373.  That approach would eviscerate *Zauderer*'s limitations.  The Rule compels potentially misleading, inflammatory, and emotional speech, not straightforward smoking-related facts.  Reynolds Br. 17-29.

9

1. **The Warnings Are Misleading.** *Zauderer* does not apply to speech susceptible to misinterpretation, and this Rule would compel misleading speech. The warnings could be "reasonably understood" as conveying unintended, inaccurate messages, inviting "consumer misinterpretation." ROA.10204-08. Specifically:

| | |
|---|---|
|  | • The district court explained that while some might "view the image as showing a stylized, exaggerated representation of neck cancer," others "might view the image as showing a typical representation of the sort of neck cancer caused by smoking." ROA.10205. Both cannot be true. Indeed, an FDA study recommended deleting an earlier, similar version of the image since "[i]t wasn't clear what the message was even when the tumor was identified." ROA.1420.<br><br>• Alternatively, the district court noted that some "might interpret the depicted person's gaze, in conjunction with the text, as expressing regret at her choice to smoke or the message that smoking is a mistake." ROA.10205. |
|  | • The district court concluded that "[c]onsumers may reasonably interpret the image in this warning as indicating that open-heart surgery, whose scars are shown, is the most common treatment for heart disease"—an inaccurate takeaway. ROA.10206-07.<br><br>• FDA's study of an earlier, similar image confirmed confusion: "The image struck partic- |

| | |
|---|---|
| | ipants as 'unclear'"; "[s]ome thought the subject might have lung cancer, while others thought the subject needed heart surgery." ROA.1403. |
|  | • The district court explained that some viewers might understand the graphic to depict what someone with cataracts looks like, while others might take it as an illustration of blindness. ROA.10207. Others "may reasonably interpret the image as depicting the most common result of cataracts"—which is false. ROA.10207. |

FDA (at 47) faults the district court for failing to point out similar flaws in every other warning. But the district court highlighted cross-cutting problems that affected "each warning," ROA.10205-06, and FDA's internal studies confirm the court could easily have provided a similar analysis for each warning. *See* ROA.1300-07. For example:

| | |
|---|---|
|  | • Some consumers might take away that the manufacturer believes erectile dysfunction is shameful; others might conclude that erectile dysfunction leads to "depression" or "a strained relationship," ROA.1443.<br>• Study participants agreed "it was difficult to know what the image was depicting" and gave a "wide variety of interpretations for this image." ROA.1443. |

| | |
|---|---|
|  | • Some consumers might conclude that the image depicts a healthy lung, while others conclude that it depicts an unhealthy one. Study participants were confused about whether the lungs depicted "had just been removed or were going to be put in someone's body." ROA.4393. |
|  | • Study participants found an earlier, similar version of the image "confusing," with one noting that the image depicts "[u]nhealthiness," but "I have no idea why" or "how." ROA.4295. |

The warnings are misleading in other ways, too. FDA's warnings generally state that smoking "causes" all the conditions FDA highlights, suggesting that *all* of FDA's targeted risks, from diabetes to bladder cancer, stand on the same footing. *See* ROA.7853-54. FDA's warnings further conflate rare conditions (like bladder cancer) with more frequent conditions (like lung disease). ROA.7853-54. FDA's warnings feature chronic, non-fatal conditions (like erectile dysfunction and diabetes) alongside conditions with high mortality rates (like head and neck cancer). ROA.7830. Requiring that manufacturers rotate the warnings "equal[ly]," 85 Fed. Reg. at 15,686, compounds that misimpression by suggesting that all conditions are equally likely.

12

FDA (at 29-31) denies that omitting information about causation or relative risk renders its warnings misleading.  But FDA did not assess *what* health information consumers drew from its graphic warnings, *infra* p. 23, much less whether their takeaways were accurate.  Indeed, the "most prevalent finding" of an internal FDA study was that consumers questioned the accuracy of FDA's causal formulations.  ROA.1380.  Study participants "reasoned" that "statements of the type 'X causes Y'" "are not true"—they cited other causal factors besides smoking.  84 Fed. Reg. 42,754, 42,767; *see* ROA.1377-80.  Moreover, FDA's warnings emphasize extreme, relatively unlikely consequences of a given condition.  ROA.10206-08.  Disclosures are not "purely factual" if they may reasonably be interpreted to convey inaccurate information.

2. **The Warnings Are Provocative.**  FDA's required disclosures are not "purely factual" because they trigger emotion, not comprehension.  *See R.J. Reynolds*, 696 F.3d at 1216.  FDA by its own admission sought to create "attention-grabbing" graphic warnings, 85 Fed. Reg. at 15,665, which FDA's own study defined as warnings that "elicit[] a visceral reaction."  ROA.4188.  FDA's cited "scientific literature" (at 32, 38) likewise links warnings' "communicative value" to prompting "extremely uncomfortable" reactions and "[n]egative

13

emotions," with "fear" and "shock" being "particularly important" outcomes.[5] As one peer reviewer of FDA's studies put it: "The goal of putting graphic warning labels on cigarette packaging is that the image will continue to generate an emotive response…." ROA.1499. Creating an "emotional response" (or "stoking emotion," PHLC Br. 3), was the point, not one "possibl[e]" side effect. *Contra* FDA Br. 17, 52; Pub. Citizen Br. 13, 16-17.

FDA could hardly have missed these responses. Excerpts from FDA's internal research transcripts (released only in litigation) revealed viewers' reactions to revolting concepts like disease, dismemberment, and harming children: "Basically, it sounds like a bunch of scare tactics to keep people from smoking." ROA.5132. Many others commented similarly. *E.g.*, ROA.4752 ("Well, they're trying to scare you. Right …. They're doing a good job."); ROA.4947 ("It's a scare tactic. It's misleading."); ROA.5072 ("It's the fear factor."). As R.J. Reynolds' survey confirmed, more than 80% of survey participants believed that FDA's warnings were "trying to make people feel afraid" and "shock[ed]." ROA.136. FDA does not dispute these figures.

---

[5] *E.g.*, FDA Ref. 42, at 2, https://tinyurl.com/3hu38b6j; FDA Ref. 43, at 331-32, https://tinyurl.com/yr2ravs6.

FDA (at 52) agrees that depicting persons "crying, grimacing, or making … other expression[s] indicative of a strong emotion" might reflect a "value-laden message that smoking is a mistake." Yet FDA finalized images with features that "disturb[ed]," "disgust[ed]," and "creep[ed]…out" viewers. ROA.1407, ROA.1411; *contra* PHLC Br. 21-34; Med. Grps. Br. 9-12. The district court accordingly concluded that the warnings are "provocative" and "value-laden," rather than "purely factual" and "uncontroversial." ROA.10205-06. This trend pervaded the warning regime:

| | |
|---|---|
|  | • FDA's final qualitative study report noted "[t]he idea of losing limbs scares some participants and grabs their attention." ROA.1441.<br><br>• Study participants called an earlier similar image "very attention-grabbing … due to the startling image of a subject with missing toes," and repeatedly reacted to the image because it was "gross," "powerfully disturbing," and had "shock value." ROA.1409-11.<br><br>• One study participant requested not to be shown the earlier version of the image: "[I]t's just nasty. I just want to gag…. Yes, this is disgusting. Really, it's repulsive so I don't want to see it any more." ROA.5437. |

| | |
|---|---|
|  | • Study participants said that a similar earlier iteration of the image was "creepy," "scary," and provoked a "hair-raising experience." ROA.5360-61.<br><br>• Study "[p]articipants were particularly affected by" the earlier image's "harsh depiction of a body organ in the palms of a surgeon," and found the image "attention-grabbing because of its gruesome depiction and implication of death." ROA.1395. The final image maintained those features. |
|  | • An FDA study reported, with respect to an earlier, similar version of the image, that "[t]he sadness expressed in the subject's eyes and the oxygen mask grabbed participants' attention" and that participants described the image as "scary," "cruel[]," and provoking "despair." ROA.1302. FDA's final warning maintained those features. |
|  | • Study participants described an earlier similar image as "heartbreaking" and "sadden[ing]," with one stating that the image "would really creep me out." ROA.1306. FDA's study recommended keeping this image because "[p]articipants clearly demonstrated an emotional connection." ROA.1421. |
|  | • Participants reported that an earlier, similar image was "especially attention-grabbing" because of "the man's miserable expression and external oxygen aids." ROA.1399. As one put it, it "makes you [feel] uncomfortable." ROA.4210. |

FDA (at 42-46, 51-52) counters that because the agency did not study or intend its warnings' emotional impact, any emotional response is beside the point. But if an agency could immunize compelled disclosures by blinding itself to readers' emotional response, every compelled-disclosure regime could be recast as "purely factual and uncontroversial." Pictures of severed fingers on steak knives, vomit on alcohol, open heart surgery on red meat, deadly car crashes on cell phones, or paralyzed children on trampolines would all be fair game, so long as the government disclaims awareness of consumer reactions.

Regardless, FDA study data confirms FDA fully knew of—and sought to heighten—its warnings' emotional impact:

| | |
|---|---|
|  | • When FDA's initial erectile-dysfunction warning image generated uniform confusion, FDA revamped it to "[m]ake it clear that the man's emotion is shame." ROA.1422. |
|  | • After an initial qualitative study assessing potential images found the "woman's facial expression" of sadness in a similar image to be attention-grabbing, FDA "[m]aintain[ed] the look of sadness/despair" on the woman's face in its final graphic. ROA.1400, ROA.1420. |

17

| | |
|---|---|
|  | • FDA altered the "harm to children" graphic to make the child look sicker, while following the study's recommendation to "[m]aintain the look of dismay (e.g., sadness in the eyes)" to grab attention.  ROA.1417. |
|  | • FDA decided to "[m]ake the blood on the gloves" in the already "gruesome" lung-disease image "more discernible," and to "[k]eep the surgeon/coroner's hands in the picture, as they convey the realism of the resulting death rather than a 'medical text-book' image."  ROA.1395, ROA.1418. |
|  | • FDA put more emphasis on the "attention-grabbing" incision in the final heart disease and strokes image to increase gruesomeness.  ROA.1405. |
|  | • FDA apparently followed recommendations to heighten emotional aspects of the diabetes image by making the "blood … more discernible" and "the finger appear somewhat less 'healthy'" than an earlier, similar image.  ROA.1423. |

FDA (at 52) writes off emotional responses as reflecting consumers' "improved understanding" of the "serious, and sometimes deadly outcomes of cigarette smoking."  But the record does not support that assertion, for FDA never tested less emotionally evocative images.  If anything, the record shows

FDA advanced attention-grabbing warnings, even when they befuddled consumers or imparted no new health information. *See, e.g.*, ROA.1433-34, ROA.1443.

3. **The Warnings Are Value-Laden and Controversial.** FDA's warnings also fall outside *Zauderer* because they are not "uncontroversial" or "non-ideological." *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 529-30 (D.C. Cir. 2015). They seek to "skew public debate" by compelling manufacturers to convey the government's viewpoint that consumers should shun their products. *Id.* at 530. A whopping 74.5% of people viewing FDA's proposed warnings believed that the warnings were conveying the view that smoking is a mistake. ROA.7468. But the government cannot force anyone "to utter what is not in her mind about a question of political … significance." *303*, 143 S. Ct. at 2318 (cleaned up). *Zauderer* "does not leave the state free to require corporations to carry [its] messages," especially where "the messages themselves are biased against or are expressly contrary to the corporation's views." *Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 27 (D.C. Cir. 2014) (en banc).

### B.  The Rule Cannot Withstand Any Level of First Amendment Scrutiny

Regardless, the Rule violates any First Amendment framework by commandeering too much manufacturer speech for too little consumer-education benefit.  Reynolds Br. 40-43.

1.  "Even under *Zauderer*, a disclosure requirement cannot be unjustified or unduly burdensome." *NIFLA*, 138 S. Ct. at 2377 (citation omitted).  But this Rule does not merely compel manufacturers to "provide somewhat more information than they might otherwise be inclined to present." *Zauderer*, 471 U.S. at 650; *contra* Pub. Citizen Br. 6-10.  FDA seeks to commandeer *half* of a manufacturer's packaging and 20% of advertisements to display the government's message.  FDA's unprecedented incursion would remove manufacturers' ability to speak in the very places where manufacturers have the greatest interest in conveying their own messages and where consumers are likely to look.  Courts have repeatedly invalidated warning regimes for seizing far less speech.  Reynolds Br. 47 (citing cases).  If those more minimal invasions of speech present First Amendment problems, FDA's size-and-placement requirements are not a close call.  This problem requires invalidating all warnings.

2.  FDA's refusal to consider less-restrictive alternatives independently dooms its Rule under any standard of scrutiny.  Reynolds Br. 43-46.  FDA "disagree[d]" that the agency even needed to "consider[] smaller or differently placed warnings." 85 Fed. Reg. at 15,650.  FDA (at 38) reasons that increasing the warnings' size "increases the likelihood that the warning messages will be noticed."  But under that logic, FDA could commandeer 99.9% of packaging.  FDA (at 32, 38) adds that "the scientific literature strongly supports that larger warnings … are necessary to ensure that consumers" pay attention.  *See* 85 Fed. Reg. at 15,650-51.  But no FDA study supports that warnings as big as the Rule's are needed to vindicate FDA's interests.  Nor does FDA's bigger-is-always-better reasoning fly when Congress (in the TCA) and FDA (in another rulemaking) decided that much *smaller*, text-only warnings would be effective to warn consumers about other tobacco products.[6]

FDA also failed to exhaust alternative approaches to educating consumers.  As the district court explained, FDA could have "take[n] advantage of other strategies such as increasing funding for anti-smoking advertisements,"

---

[6] *See* 15 U.S.C. § 4402(a)(2)(A) (30%, text-only requirement for smokeless tobacco); 81 Fed. Reg. 28,974, 28,988 (May 10, 2016) (30%, text-only requirement for cigars).

"for speakers and school instruction," and for "anti-smoking resources in the government's own communications." ROA.10210. FDA also could have simply paid to display these warnings as its own speech wherever cigarettes are sold. FDA's failure to exhaust less speech-restrictive alternatives invalidates every warning.

3. Further, under any arguable standard, FDA must "demonstrate" its compulsion is "reasonably necessary" to materially advance its goal of educating consumers about the "less known" risks of smoking. *See NIFLA*, 138 S. Ct. at 2377; *accord Ibanez v. Fla. Dep't of Bus. & Pro. Reg.*, 512 U.S. 136, 142 (1994); *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993).

FDA cannot make that showing. FDA justified the Rule as necessary to address "gaps in public understanding," FDA Br. 36, by warning consumers of "less-known health consequences of smoking," 85 Fed. Reg. at 15,653. But the record shows consumers already universally appreciated several warning risks. *E.g.*, ROA.4196, ROA.4204, ROA.4209. For example, *0%* and *2.6%* of adults, respectively, found the warnings "[s]moking during pregnancy can stunt your baby's growth" and "[t]obacco smoke can harm your children" to contain new information. ROA.1369-72. Yet FDA plowed ahead.

Warnings that consumers do not believe or cannot understand are not reasonably necessary to educate consumers. Yet FDA ignored red alerts that consumers considered its sensational warnings less credible. The "most prevalent finding" of an initial FDA study was participants' rejection of warnings with definitive causal statements (*i.e.*, "X causes Y"). *Supra* p. 13. Yet FDA retained that language in many warnings. Another FDA study showed that the new textual warning statements struck consumers as significantly *less* factual and *less* believable than the TCA-mandated warnings. *Supra* p. 7. And the erectile dysfunction warning was significantly *less* likely to prompt participants to think about the relevant health risk. ROA.9417.

Similar issues plagued the final text-plus-image warnings. *Seven* of the finalized warnings "were perceived as factual statistically significantly less than the Surgeon General's warnings," 85 Fed. Reg. at 15,660. As peer reviewers noted, these dismal results undermine the warnings' "legitimacy and utility" and suggest that FDA's warnings "may not be accepted by the target audience." ROA.1513, ROA.1520. And FDA's final study inexplicably declined to assess "crucially important" measures of believability—a move FDA's peer reviewers critiqued as "arbitrary," "not convincing," and "odd." ROA.1503, ROA.1513-16.

FDA also ignored glaring indicators that consumers will not understand the required warnings. Study participants found FDA's final warning images confusing, unclear, or unhelpful for myriad reasons:

| | |
|---|---|
|  | • FDA's study found the image of amputated toes and diseased feet "unclear" and "confusing on its own." ROA.1440. An FDA study deemed a previous, similar image "unclear" and ineffective in communicating health risks. ROA.1410, ROA.4300; *see* ROA.1423. |
|  | • Only "[s]ome" study participants "said that there was blood in the urine," and then, only after seeing an image of "blood in a toilet, which may have influenced responses." ROA.4387. |
|  | • "Many" study participants "were confused about the scar and the tubes" and the "type of surgery" involved. ROA.1438. An FDA study characterized a similar precursor image as a "[h]igh confusion image[]" that "received 'low' scores on both subject and message clarity." ROA.4328. |
|  | • FDA's study of an earlier, similar iteration of the image concluded that "[a] large number" of viewers "could not glean any health consequences from the image," leading to "'low' scores on both subject and message clarity." ROA.1414, ROA.4328. |

FDA cannot justify compelling disclosures that mystify rather than ed-

ucate consumers about product risks.

## II.    This Court Should Vacate the Entire Rule

Courts must "hold unlawful and set aside agency action … found to be"

invalid.  5 U.S.C. § 706(2).  The APA and this Court's precedents thus require

vacatur of unlawful agency rules *in toto*:  A successful "challenge[] under the

APA" "affect[s]" "the entire" agency action.  *Lujan v. Nat'l Wildlife Fed'n*,

497 U.S. 871, 890 n.2 (1990).  The D.C. Circuit accordingly vacated FDA's first

graphic-warnings rule in its entirety.  *R.J. Reynolds*, 696 F.3d at 1222.  This

Court should likewise reject FDA's request (at 58-65) to rewrite the Rule by

severing any unlawful portions and limiting relief to the challengers here.

### A.    Severance Cannot Cure the Rule's Legal Problems

FDA cannot point to any instance where this Court has saved an uncon-

stitutional rule via severance.  This is not the place to break new ground.  The

TCA does not allow FDA to short-circuit traditional severance principles,

which foreclose severance where—as here—any leftover portions of the Rule

would remain unlawful.

1.  FDA (at 59-60) misreads the TCA's boilerplate severance provision

to support severing only the unconstitutional part of the Rule while enforcing

25

"the remainder." 21 U.S.C. § 387 note. But courts can only engage in severance if there is some valid part of a rule to salvage; severance involves "disregarding the problematic portions" of a given law "while leaving the remainder intact." *United States v. Arthrex*, 141 S. Ct. 1970, 1986 (2021) (citation omitted). Even the TCA's severance provision permits enforcement only "to the fullest extent possible," 21 U.S.C. § 387 note, meaning only lawful provisions may remain post severance. Here, no amount of slicing and dicing of the Rule would leave a lawful version.

For starters, severance cannot save the Rule's invalid size-and-placement requirements, which are inherently overburdensome. *Supra* pp. 20-21. Moreover, FDA neither tested nor discussed an alternative to these requirements, and this Court cannot conjure new size-and-placement requirements from thin air.

FDA's suggestion (at 60, 62) to jettison the graphics requirement and keep the text is a nonstarter. Congress in the TCA "direct[ed] that graphics and text must accompany each other," ROA.10213, including by enacting particular provisions linking the graphics and text.[7] Text-only warnings would

---

[7] *E.g.*, 15 U.S.C. § 1333(d)[1] (power to adjust warning format to ensure visibility of "both the graphics and the accompanying label statements");

thus contradict Congress's graphic-warnings scheme.  When confronted with similarly unconstitutional graphics in *R.J. Reynolds*, the D.C. Circuit thus vacated rather than severed the warning requirements.  696 F.3d at 1222.

The textual statements also suffer independent First Amendment defects.  Internal FDA studies highlighted the textual statements' tendency to mislead or repel consumers by conveying definitive causal links between smoking and certain health outcomes that overstate risk.  *Supra* p. 13.  FDA's studies showed that the textual statements performed poorly on key measures—like believability and perceived factual accuracy—that capture warning efficacy, or else failed FDA's aim of imparting new health information.  *Supra* p. 23.  All of those findings raise First Amendment problems with FDA's chosen text, independent of the graphics.

Nor does FDA's argument (at 61-62) that the Court could sever certain graphics and leave others work.  *All* of FDA's graphics suffer significant First Amendment flaws—because they are misleading, inflammatory, unhelpful, or all three—as the district court concluded and the rulemaking record confirms.

---

*id.* § 1333 note (TCA's textual statements cannot go into effect until FDA promulgates graphics).

*Supra* p. 12.  There is no lawful subset of graphic warnings that could function constitutionally, let alone "sensibly."  FDA Br. 59 (citation omitted).

2.  Even were some skeleton set of warnings lawful, accepting FDA's scattershot severance approach would exacerbate the Rule's tendency to mislead and contradict the APA.  FDA's severance position would compound compelled-speech problems by conveying misleading impressions about cigarette risks.  A regime warning of only a few health outcomes might suggest those warned-of risks are more salient than they are.  Likewise, rewriting the Rule to require some warnings to be paired with images, but others to appear graphic free, would leave consumers in the dark about the significance of that differential treatment.  Do graphics signify greater relative risks?  Greater severity of the warned-against health outcome?  Something else?  The health meaning of FDA's mix-and-match warnings would be anyone's guess, creating the very risk of misinterpretation that supported invalidating the warnings in the first place.

FDA's position also conflicts with the APA.  5 U.S.C. § 706(2) requires agencies promulgating rules to "reasonably consider[] the relevant issues and reasonably explain[] th[eir] decision."  *Data Mktg. P'ship v. U.S. DOL*, 45 F. 4th 846, 855 (5th Cir. 2022) (citations omitted).  That duty includes the directive

to "examine the relevant data and articulate a satisfactory explanation for its actions." *BNSF Ry. Co. v. Fed. R.R. Admin.*, 62 F.4th 905, 910 (5th Cir. 2023).

FDA (at 59) insists it intended every provision of the Rule to be severable, but the agency did not provide adequate support for severance under the APA. FDA's discussion wrongly presumed that the TCA required severance, *see* 85 Fed. Reg. at 15,696, which is mistaken for reasons already discussed, *supra* p. 25-26. This Court cannot supplement an agency's "inadequate" analysis by piecing together new rationales as a basis for "affirm[ing]" agency action. *Calcutt v. FDIC*, 143 S. Ct. 1317, 1321 (2023). FDA must do its own homework to defend the severed version of the Rule without a judicial bailout.

Moreover, FDA's chief severance proposal (at 62)—that the Court could sever only the graphics—controverts FDA's stated justifications for the Rule. Throughout the rulemaking and in its brief, FDA leaned on the presence of graphics to defend the Rule's efficacy and exorbitant costs to industry. When commenters critiqued FDA's proposal by citing studies, FDA dismissed the studies because they did "not capture information that is conveyed in the image depicting the negative health outcome, but rather only focus[ed] on … [t]he textual warning statement." 85 Fed. Reg. at 15,655. Elsewhere, FDA

insisted that "the image[s] aid[] in understanding … the textual warning statement[s], and vice versa." *See id.* at 15,684.

Even now, FDA agrees (at 39-40, 43) that "warnings *accompanied by concordant images* are needed to promote public understanding of the risks of smoking"—*i.e.*, that the text and images are a package deal. (Quoting 85 Fed Reg. at 15,670) (emphasis added); *accord* Pub. Citizen Br. 19-20; Med. Grps. Br. 7-9, 21-23. No surprise that when FDA undertook the required cost-benefit analysis, it considered only the benefits of "[p]ictorial cigarette health warnings," 85 Fed. Reg. at 15,697-98—a "serious flaw" rendering FDA's analysis unreasonable if the Rule does not require pictorial warnings. *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 452 (5th Cir. 2021) (citations omitted). The APA bars FDA from resting on graphics to defend the Rule's warnings while irrationally insisting, without explanation, that a severed no-graphics regime would work just as well.

## B.   Limiting Relief to the Parties Would Contravene Precedent and Upend FDA's Consumer-Facing Warning Regime

As FDA (at 64) acknowledges, this Court's precedents support vacating the Rule. A case involving generally applicable, consumer-facing warnings is the last place to reverse course.

1.    As the district court observed, "binding" Fifth Circuit precedent treats "'set aside' in § 706 of the APA as meaning the remedy of vacatur"—*i.e.*, the rule must be vacated, not merely enjoined as to the parties in the case. ROA.10219.  Vacatur is the "default rule." *Data Mktg.*, 45 F.4th at 859.  And the Supreme Court has repeatedly affirmed decisions vacating administrative actions. *E.g. Dep't of Homeland Sec. v. Regents*, 140 S. Ct. 1891, 1901 & 1916 n.7 (2020).

FDA (at 64-65) argues that § 706(2) simply "direct[s] court[s] to decline to give effect to an unlawful agency action in deciding the case at hand."  But "set aside" was understood at the time of the APA's passage to mean "to cancel, annul, or revoke."  Black's Law Dictionary 1612 (3d ed. 1933).  Unsurprisingly, the Third Circuit soon after the APA's adoption interpreted § 706(2) as "affirmatively provid[ing] for vacation of agency action." *Cream Wipt Food Prods. Co. v. Fed. Sec. Adm'r*, 187 F.2d 789, 790 (3d Cir. 1951).

FDA (at 65) notes that courts do not usually "vacate" unconstitutional provisions of statutes when holding them unconstitutional.  But "the [APA] establishes a unique form of judicial review that differs from judicial review of statutes." Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 950, 1012 (2018).  Section 706 "extends beyond the mere non-enforcement

31

remedies available to courts that review the constitutionality of legislation, as it empowers courts to 'set aside'—*i.e.*, formally nullify and revoke—an unlawful agency action." *Data Mktg.*, 45 F.4th at 859 (citation omitted).

FDA (at 65) claims that vacatur is unavailable because the TCA's general severability provision overrides § 706(2). *See* 21 U.S.C. § 387 note. The D.C. Circuit implicitly rejected that position by vacating FDA's previous rule *in toto*, *R.J. Reynolds*, 696 F.3d at 1222, and this Court should not break ranks by adopting FDA's novel reading here. The TCA's severability provision merely provides that, if "the application of" the TCA or related regulation "to any person … is held to be invalid," the "application of such provisions to any other person or circumstance shall not be affected." 21 U.S.C. § 387 note. At most, that provision means that when a court *holds a provision unlawful as applied* to certain people, that holding does not stop FDA from enforcing the provision against others. But section 706(2) directs courts to both "hold unlawful *and* set aside" unlawful agency actions. (Emphasis added). Vacatur—setting aside unlawful agency action—"formally nullif[ies] and revoke[s]" the agency action. *Data Mktg.*, 45 F.4th at 859.

2. Limiting relief to the parties here would make a mockery of FDA's asserted interest in educating consumers. R.J. Reynolds' cigarettes would

32

come in normal packages without any new warnings. Altria's and other man-ufacturers' would come in packages bearing unconstitutional graphic warn-ings—except when on the petitioner-retailers' shelves, where old packaging would remain. A consumer in a convenience store would see packs of Newport with the smaller, text-only Surgeon General's warning side by side with packs of Marlboro bearing inflammatory graphic warnings. Down the street at a petitioner retailer, the consumer would confront the same Marlboros with the Surgeon General's warning. This head-scratching pattern would repeat for advertisements, where a consumer viewing a magazine page would see a text-only cigarette warning, then turn the page and see FDA's graphic versions.

This hodgepodge would explode the Rule's justification and First Amendment limits by misleadingly conveying that certain cigarettes are somehow safer. The Rule insists that existing Surgeon General's warnings are effectively "invisible," which has "result[ed] in significant portions of the pop-ulation that misunderstand or underestimate the health risks of smoking." 85 Fed. Reg. at 15,640, 15,665; *accord* Med. Grps. Br. 19-20. Spotting FDA its premise, its remedial position contradicts its asserted consumer-education aim: By enshrining a dual-track warning scheme for R.J. Reynolds and other

manufacturers, FDA's proposal would allow consumers' alleged misperceptions to persist for cigarettes exempt from FDA's new graphic warnings. Indeed, in other contexts, FDA has strictly limited Altria and other tobacco manufacturers' rights to make claims that their products carry reduced health risks. *E.g.*, *Modified Risk Tobacco Products*, U.S. FDA (Mar. 16, 2023), https://tinyurl.com/2yspfdme. Yet FDA's differing-warnings remedy risks imparting rampant misimpressions about product risk.

Failing to vacate the Rule across the board would also create significant arbitrariness. "[B]edrock" administrative law principles mean FDA "must provide an adequate explanation to justify treating similarly situated parties differently." *Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 479 (5th Cir. 2021) (citations omitted). Here, FDA never considered—let alone addressed—how limited application of its warnings would mislead consumers.

3. FDA's approach threatens unnecessary, overlapping litigation that would sap parties' and courts' resources. Any affected cigarette manufacturers, distributors, and retailers would risk being saddled with unlawful warnings if they stayed on the litigation sidelines. Courts across the country would resolve the same issues countless times, risking warring rulings and injunctions. Applying warnings differently party by party and place by place is a

34

recipe for chaos, not effectively educating consumers of smoking risks. Whatever the merits of tailored relief in other APA contexts, the answer here cannot be upending the marketplace by cavalierly imposing wildly different warnings requirements on products that carry the same underlying health risks.

## CONCLUSION

This Court should affirm.

JULY 19, 2023

Respectfully submitted,

/s/ *Sarah M. Harris*
LISA S. BLATT
SARAH M. HARRIS
*Counsel of Record*
WHITNEY D. HERMANDORFER
ROHIT P. ASIRVATHAM
WILLIAMS & CONNOLLY LLP
  *680 Maine Avenue S.W.*
  *Washington, DC 20024*
  *(202) 434-5000*
  *sharris@wc.com*

  *Counsel for Amicus Curiae*
  *Altria Group, Inc.*

35

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Sarah M. Harris, counsel for amicus curiae Altria Group, Inc. and a member of the Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B), that the attached Brief for Amicus Curiae Altria Group, Inc. in Support of Plaintiffs-Appellees is proportionately spaced, has a typeface of 14 points or more, and contains 6,492 words.

/s/ *Sarah M. Harris*

July 19, 2023

## CERTIFICATE OF SERVICE

I, Sarah M. Harris, counsel for amicus curiae Altria Group, Inc. and a member of the Bar of this Court, certify that, on July 19, 2023, a copy of the attached Brief for Amicus Curiae Altria Group, Inc. in Support of Plaintiffs-Appellees was filed with the Clerk and served on the parties through the Court's electronic filing system. I further certify that all parties required to be served have been served.

/s/ *Sarah M. Harris*

July 19, 2023