# JONES DAY

51 LOUISIANA AVENUE, N.W. • WASHINGTON, DC 20001.2113

TELEPHONE: +1.202.879.3939 • JONESDAY.COM

Direct Number: +1.202.879.3809
RWATSON@JONESDAY.COM

November 28, 2023

CM/ECF

Lyle W. Cayce
Clerk of the Court
United States Court of Appeals for the Fifth Circuit
600 S. Maestri Place
New Orleans, LA 70130-3408

  Re: *R J Reynolds Tobacco Company, et al. v. Food & Drug Administration, et al.*,
   No. 23-40076

Dear Mr. Cayce:

  Plaintiffs-Appellees submit this Rule 28(j) letter regarding *Chamber of Commerce v. SEC*, No. 23-60255 (5th Cir. Oct. 31, 2023) (Exhibit A). *Chamber*, which considered an SEC rule requiring certain disclosures, Op. 3, reinforces Plaintiffs-Appellees' position.

  *First*, *Chamber* holds that "forcing a company to 'explain the reason' for its actions is a purely factual disclosure" subject to review under *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985). Op. 7 (quoting and applying *NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 485 (5th Cir. 2022)). Here, by contrast, FDA seeks to force Plaintiffs-Appellees to promulgate *FDA's* own value-laden message. Appellees' Br. 17-29.

  *Second*, *Chamber* confirms that, even in administrative-record cases, the Court "review[s] constitutional issues *de novo*." Op. 4; *see* Appellees' Br. 43. It also underscores that, under *Zauderer*, the *government* "bears the burden of showing that [a compelled disclosure] is neither unjustified nor unduly burdensome." Op. 10 (citing *Nat'l. Inst. Fam. & Life Advocs. v. Becerra* ("*NIFLA*"), 138 S. Ct. 2361, 2377 (2018)); *see* Appellees' Br. 26.

  *Third*, *Chamber* held that the SEC's disclosure requirements are not unduly burdensome and do not "drown[] out" protected speech because they are "privately crafted" and limited to "the narrow confines of SEC filings." Op. 12. They therefore

AMSTERDAM • ATLANTA • BEIJING • BOSTON • BRISBANE • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS
DETROIT • DUBAI • DÜSSELDORF • FRANKFURT • HONG KONG • HOUSTON • IRVINE • LONDON • LOS ANGELES • MADRID
MELBOURNE • MEXICO CITY • MIAMI • MILAN • MINNEAPOLIS • MUNICH • NEW YORK • PARIS • PERTH • PITTSBURGH
SAN DIEGO • SAN FRANCISCO • SÃO PAULO • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

**JONES DAY**

Lyle W. Cayce
November 28, 2023
Page 2

impose "a far lesser burden" than the law in *NIFLA*, which required "a lengthy message" emphasized through a method such as larger text. *Id.* Here, the *government-crafted* graphic warnings—which are large, grotesque, and prominently placed, not limited to "narrow confines"—are *more* burdensome than even the requirements in *NIFLA*, and *do* drown out protected speech. Appellees' Br. 41.

*Fourth*, *Chamber* is consistent with Plaintiffs-Appellees' position that informational interests alone cannot support a compelled disclosure, but must instead affect real-world outcomes. Appellees' Br. 33-35. *Chamber* endorsed, for *Zauderer* purposes, the SEC's interest in addressing an "asymmetry in information" facing investors. Op. 11. And as the government explained in its *Chamber* brief (Exhibit B at 20), that informational interest connects to several real-world effects, including "strengthening investor protection, improving market efficiency, and facilitating capital formation." Here, FDA cannot demonstrate *any* real-world benefit. Appellees' Br. 34.

Respectfully submitted,

*/s/ Ryan J. Watson*
Ryan J. Watson
Counsel for Plaintiffs-Appellees

Enclosure

cc:    All counsel (via CM/ECF)

## CERTIFICATE OF COMPLIANCE

I hereby certify that the body of this Letter pursuant to Fed. R. App. P. 28(j), beginning with the first word after the salutation and ending with the last word before the complimentary close, contains 349 words according to the word-processing software used to prepare this Letter. This Letter complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it was prepared in proportionally spaced typeface using Microsoft Word for Microsoft Office 365, in 14-point Garamond font.

## CERTIFICATE OF SERVICE

I also certify that on November 28, 2023, I served a copy of the foregoing on all counsel of record by CM/ECF.

Dated: November 28, 2023

*/s/ Ryan J. Watson*
Ryan J. Watson

# EXHIBIT A

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 31, 2023

Lyle W. Cayce
Clerk

No. 23-60255

───────────────

Chamber of Commerce of the United States of America;
Longview Chamber of Commerce;
Texas Association of Business,

*Petitioners*,

*versus*

United States Securities and Exchange Commission,

*Respondent.*

───────────────

Appeal from an Order of
the Securities and Exchange Commission
Agency Nos. 34-97424,
88 Fed. Reg. 36002, IC-34906

───────────────

Before Smith, Southwick, and Higginson, *Circuit Judges*.

Jerry E. Smith, *Circuit Judge*:

The Securities and Exchange Commission ("SEC") adopted a rule requiring issuers to report day-to-day share repurchase data once a quarter and to disclose the reason why the issuer repurchased shares of its own stock. We consider a challenge to that rule by petitioners Chamber of Commerce of the United States, Longview Chamber of Commerce, and Texas Association of Business ("petitioners").

No. 23-60255

## I.

Publicly traded companies have a responsibility to their shareholders to allocate capital in the most efficient way possible. One way in which companies fulfill this responsibility is by reinvesting capital in themselves by repurchasing their own shares. Such repurchases are common and occur whenever an issuer of securities ("issuer") purchases its own stock.

There are many different reasons why a company might repurchase its shares. Some of those reasons are for the benefit of shareholders, as when a company repurchases its own shares because it believes they are undervalued. Others could make investors less likely to buy or retain shares, as where a repurchase is motivated by a desire to achieve accounting metrics or to impact executive compensation.

In response to increasing public skepticism of share repurchases, the SEC conducted a study on buybacks and why issuers repurchase their own shares. The study concluded that repurchasing shares can be an efficient use of capital and may indicate that an issuer's shares are undervalued.

The SEC, however, still believed investors could benefit from enhanced repurchase disclosures designed to address supposed information asymmetries between investors and issuers as to why an issuer was repurchasing its shares. The SEC's rationale was that, because a share repurchase could signal either that the issuer's shares were undervalued (and hence an attractive investment) or that the company was attempting to boost its metrics (and hence a poor investment), shareholders, in order to make fully informed investment decisions, needed to know why a company was repurchasing its shares.

No. 23-60255

The SEC proposed a rule to address that concern.[1]  The proposed rule required issuers to report certain repurchase data within one business day of the repurchase and to disclose the reason why the issuer was repurchasing its shares.  The proposed rule stated that the SEC was unable to quantify most of the economic effects of the proposed amendments.  Thus, the SEC relied primarily on a qualitative assessment of the rule's potential effects, while encouraging commenters to provide information that could help quantify the costs and benefits of the proposed rule.  The SEC solicited comments on the proposed rule during a 45-day comment period, which was reopened briefly to account for a technical difficulty in submitting comments.[2]  The comment period was again reopened, this time for 30 days, to allow for new comments regarding the impact of an excise tax imposed by the Inflation Reduction Act.[3]

During the comment period, petitioners submitted guidance explaining how the SEC could quantify the proposed rule's effects.  Specifically, petitioners alerted the SEC to empirical data from academic sources and information available in existing SEC disclosures that could be used to quantify the economic effects of the proposed rule.

The SEC adopted the final rule on May 3, 2023.  As with the proposed

---

[1] The SEC issued this rule under the Exchange Act of 1934, Pub. L. No. 73-291, 48 Stat. 881 (1934) (codified as amended at 15 U.S.C. § 78a *et seq.*), and the Investment Company Act of 1940, Pub. L. No. 76-768, 54 Stat. 789 (1940) (codified as amended at 15 U.S.C. § 80a-1 *et seq*).  No party disputes the SEC's statutory authority to promulgate the final rule.

[2] Resubmission of Comments and Reopening of Comment Periods for Several Rulemaking Releases due to a Technological Error in Receiving Certain Comments, 87 Fed. Reg. 63016, 63016–17 (Oct. 18, 2022).

[3] Reopening of Comment Period for Share Repurchase Disclosure Modernization, 87 Fed. Reg. 75975, 75975–77 (Dec. 12, 2022).

rule, the final rule requires issuers to disclose their reasons for repurchasing shares ("the rationale-disclosure requirement"). The final rule also requires issuers to collect repurchase data on a day-to-day basis, but in contrast to the proposed rule, issuers need file this day-to-day data only once per quarter ("the daily-disclosure requirement").

Despite petitioners' comments, however, the SEC maintained that many of the effects of the daily-disclosure requirement could not be quantified. The SEC did, however, perform a cost-benefit analysis for both the rationale-disclosure requirement and the daily-disclosure requirement. The agency continued to believe that the final rule would help investors evaluate whether a share repurchase was intended to increase the value of the issuer's shares or, instead, was undertaken for a purpose unrelated to the market value of the issuer's shares.

On May 12, 2023, petitioners filed a petition for review of the final rule with this court. *See* 15 U.S.C. § 80a-42(a). They assert that (1) the rationale-disclosure requirement violates the First Amendment by impermissibly compelling their speech; (2) the SEC acted arbitrarily and capriciously in adopting the final rule by not considering their comments or conducting a proper cost benefit analysis; and (3) the SEC did not provide the public with a meaningful opportunity to comment.

## II.

We review the SEC's answers to purely legal questions *de novo*. *Tex. Clinical Labs, Inc. v. Sebelius*, 612 F.3d 771, 775 (5th Cir. 2010). Factual findings the SEC has "identified . . . as the basis, in whole or part, of the rule" are "conclusive" if "supported by substantial evidence." 15 U.S.C. § 78y(b)(4). "We review constitutional issues *de novo*." *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 434 (5th Cir. 2021).

The Administrative Procedure Act ("APA") requires us to "set

aside" agency actions found to be "arbitrary [or] capricious," "contrary to constitutional right," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)–(B), (D); *see also* 15 U.S.C. § 78y(b)(4). Arbitrary-and-capricious review requires this court to scrutinize the record to determine whether the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up). We "may not supply a reasoned basis for the agency's decision that the agency itself has not given." *Id.* Finally, we "must set aside any action premised on reasoning that fails to account for relevant factors or evinces a clear error of judgment." *Univ. of Tex. M.D. Anderson Cancer Ctr. v. U.S. Dep't of Health & Hum. Servs.*, 985 F.3d 472, 475 (5th Cir. 2021) (cleaned up).

## III.

We turn first to petitioners' claim that the rationale-disclosure requirement violates the First Amendment by impermissibly compelling their speech. The First Amendment "includes both the right to speak freely and the right to refrain from speaking." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). Thus, laws compelling speech normally trigger strict scrutiny and "may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Nat'l Inst. Fam. & Life Advocs. v. Becerra* ("*NIFLA*"), 138 S. Ct. 2361, 2371 (2018) (cleaned up). But lesser scrutiny applies when the government compels disclosures in the context of commercial speech because "the extension of First Amendment protection to commercial speech is justified principally by the value to consumers of the information such speech provides." *See Zauderer v. Off. Disciplinary Couns. Sup. Ct. Ohio*, 471 U.S. 626, 651 (1985).

This means that "[s]tates may require commercial enterprises to dis-

close 'purely factual and uncontroversial information' about their services" so long as those disclosures are "reasonably related to a legitimate state interest" and not "unjustified or unduly burdensome."[4] The SEC's primary defense to petitioner's constitutional challenge is that the rationale-disclosure requirement is governed by *Zauderer* and that it can survive the lower level of scrutiny. Therefore, we must determine whether *Zauderer* applies because the rationale-disclosure requirement compels issuers to disclose "purely factual and uncontroversial information" in the context of commercial speech. *See Zauderer*, 471 U.S. at 651.[5] If so, the rationale-disclosure requirement is constitutionally permissible so long as it "reasonably relate[s] to a legitimate state interest" and is not "'unjustified or unduly burdensome.'" *See NetChoice*, 49 F.4th at 585 (quoting *Zauderer*, 471 U.S. at 651).

*1. Zauderer applies because the rationale-disclosure requirement compels the disclosure of factual and uncontroversial information in the context of commercial speech.*

First, *Zauderer's* lower level of scrutiny applies only to compelled disclosures that are "purely factual." *See* 471 U.S. at 651. Petitioners assert that the rationale-disclosure requirement compels issuers to disclose their reasons for repurchasing stock and that by its very nature, an issuer's subjective

---

[4] *See NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 485 (5th Cir. 2022) (quoting *Zauderer*, 471 U.S. at 651), *cert. granted*, 2023 WL 6319650 (Sept. 29, 2023). The grant of certiorari does not change the fact that *NetChoice* remains binding precedent unless and until the Supreme Court says otherwise. *See Wicker v. McCotter*, 798 F.2d 155, 157–58 (5th Cir. 1986).

[5] The parties do not dispute that the rationale-disclosure requirement compels disclosures only where issuers engage in commercial speech, so we need only determine whether the rationale-disclosure requirement compels purely factual, uncontroversial speech.

opinion about the business benefits of its actions cannot be a purely factual disclosure. Essentially, petitioners urge that any compelled disclosure that requires an issuer to explain why it is repurchasing stock cannot be a purely factual disclosure. That contention, however, is foreclosed by *NetChoice*.

*NetChoice* dealt with a First Amendment challenge to Texas Business & Commerce Code § 120.103(a)(1), which regulates large social media platforms. That provision "obligate[d] the Platforms to explain their content removal decisions."[6] *NetChoice* analyzed the constitutionality of Section 120.103(a)(1) under *Zauderer* and held that forcing social media platforms to explain their reasons for removing content compelled "disclosures that consist of purely factual and uncontroversial information." *See NetChoice,* 49 F.4th at 485–88 (cleaned up).

*NetChoice* stands for the proposition that forcing a company to "explain the reason" for its actions is a purely factual disclosure. *See id.* at 446, 485. If forcing a social media company to explain why it removed posts compels a purely factual disclosure, it follows that forcing issuers to explain why they are repurchasing their shares also compels a purely factual disclosure.

Although petitioners' reply brief all but concedes that *NetChoice* applies, they instead attempt to minimize the opinion's impact. They assert that this part of *NetChoice* was *dictum* because NetChoice supposedly did not dispute that its reasons for removing content constituted purely factual information. But that is not so: Though NetChoice's brief could have done a better job at articulating *Zauderer*'s standard, it did repeatedly contend that

---

[6] *NetChoice,* 49 F.4th at 485; Tex. Bus. & Com. Code § 120.103(a)(1) ("[T]he social medial platform shall . . . notify the user who provided the content of the removal and explain the reason the content was removed.").

*Zauderer* did not apply because the Texas statute compelled disclosures that were not purely factual, uncontroversial information.[7]  Therefore, determining that *Zauderer* applied was "necessary to the holding of the case" and thus was not *dictum*.  *Cf. FDIC v. Enventure V*, 77 F.3d 123, 125 (5th Cir. 1996).  And since *NetChoice* could not determine whether *Zauderer* applied without deciding whether § 120.103(a)(1) compelled purely factual and uncontroversial information, its holding in this respect was also authoritative.  *See NetChoice,* 49 F.4th at 485–88.

In sum, petitioners do not try to distinguish this matter from *NetChoice*.  Nor can they, for we held there that a law requiring companies to explain the reasons behind their actions compelled the disclosure of purely factual information.  Here too, the rationale-disclosure requirement compels issuers to explain their reasons for repurchasing shares.  That is a purely factual disclosure under *NetChoice*.

Second, even if a compelled disclosure is purely factual, *Zauderer*'s lower level of scrutiny applies only to compelled disclosures concerning "uncontroversial information."  *See Zauderer*, 471 U.S. at 651.  Petitioners contend that *Zauderer* cannot apply because the rationale-disclosure requirement forces the issuers to opine on share repurchases, a topic they consider to be one of the most controversial corporate decisions an issuer can make.

---

[7] *See, e.g.*, Brief of Appellees, at 16, *NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 485–87 (5th Cir. 2022) (No. 21-51178) ("Nor can [the Texas law] be saved under the (inapposite) commercial-speech doctrine or the limited *Zauderer* doctrine, which applies only to non-burdensome, purely factual commercial disclosure requirements."); *id.* at 52 ("This case, therefore, is not governed by the *Zauderer* test for compelled speech in commercial advertising.").  *NetChoice* also recognized that the platforms disputed whether *Zauderer* applied.  *See NetChoice,* 49 F.4th at 487 ("[T]he platforms claim the *Zauderer* standard does not apply to disclosure laws that implicate the editorial process—that is, laws requiring publishers to disclose their editorial policies or explain how they exercise editorial discretion.").

No. 23-60255

That contention is also foreclosed by *NetChoice*.

As explained above, *NetChoice* held that forcing social media platforms to explain their reasons for removing content compelled "disclosures that consist of purely factual and uncontroversial information." *See* 49 F.4th at 485 (cleaned up). It is hard to think of a more controversial topic in current public discourse than content moderation and social media censorship. If a social media company's reason for removing user content was uncontroversial in *NetChoice*, then an issuer's reason for repurchasing its own shares is uncontroversial here.

Petitions rely on *NIFLA* to contend that the rationale-disclosure requirement is controversial. Their reliance is misplaced. *NIFLA* held that *Zauderer* was inapplicable to clinics that were forced to disclose information about state-sponsored abortion services, a topic that the Supreme Court described as "anything but . . . uncontroversial." *NIFLA*, 138 S. Ct. at 2372 (cleaned up). All *NIFLA* says is that abortion is too controversial a topic for *Zauderer* to govern compelled speech relating to it. *See id.* The case is consistent with *NetChoice's* determination that a social media company's reasons for removing content are uncontroversial. Petitioners, in essence, invite us to hold that the reasons behind a share repurchase are so much more controversial than the reasons behind social media censorship that they engender a similar level of controversy as does abortion. We decline that invitation. *NetChoice* governs and requires us to hold that the rationale-disclosure requirement compels only uncontroversial information.

In summary, then, the rationale-disclosure requirement compels issuers to disclose "purely factual and uncontroversial information" in the context of commercial speech, and its constitutionality is governed by *Zauderer*.

No. 23-60255

*2. The rationale-disclosure requirement satisfies Zauderer because the rule is justified, is reasonably related to a legitimate state interest, and does not burden petitioners' protected speech.*

*Zauderer* allows "[s]tates [to] require commercial enterprises to disclose 'purely factual and uncontroversial information' about their services" so long as those disclosures are not "'unjustified or unduly burdensome'" and are "reasonably related to a legitimate state interest." *NetChoice*, 49 F.4th at 485 (quoting *Zauderer*, 471 U.S. at 651). The SEC bears the burden of showing that the rationale-disclosure requirement is neither unjustified nor unduly burdensome. *NIFLA*, 138 S. Ct. at 2377.[8] The SEC has satisfied that burden.

First, a compelled disclosure cannot be permitted if it is "unjustified." *Zauderer*, 471 U.S. at 651. That means the disclosure must be "reasonably related to a legitimate state interest" such that it "remed[ies] a harm that is potentially real not purely hypothetical." *NetChoice*, 49 F.4th at 485; *NIFLA*, 138 S. Ct. at 2377 (internal quotation marks omitted). A compelled disclosure is reasonably related to a legitimate state interest when it is "no broader than reasonably necessary" to further that interest. *See NIFLA*, 138 S. Ct. at 2377 (internal quotation marks omitted).

In contrast, a compelled disclosure has purely hypothetical benefits when the government "points to nothing" supporting its interest. *See id.*

---

[8] Despite language in *NetChoice* that could be read as describing the reasonable-relation requirement as a separate prong of *Zauderer*, the opinion makes clear that assessing whether a compelled disclosure is reasonably related to a legitimate state interest is how we determine whether a compelled disclosure is justified. *See NetChoice*, 49 F.4th at 485 ("Texas argues—and the Platforms do not dispute —that Section 2 advances the State's interest . . . Therefore, the only question is whether the State has carried its burden to show that the three categories of disclosures required by Section 2 are not unduly burdensome.").

Any assumptions the government makes in justifying the compelled disclosure must be more than "speculative." *Zauderer*, 471 U.S. at 652.

The SEC has a legitimate interest in promoting the free flow of commercial information. *See Lamar Outdoor Adver. Inc., v. Miss. State Tax Comm'n*, 701 F.2d 314, 323 (5th Cir. 1983). The rationale-disclosure requirement is reasonably related to that interest. The SEC adopted the requirement because of a supposed asymmetry in information surrounding the reasons issuers repurchase their shares. The SEC cited empirical evidence demonstrating that issuers could have many different reasons for repurchasing shares. Some, such as increasing the value of the shares, are beneficial to investors. Others, such as a desire to achieve accounting metrics or impact executive compensation, could make purchasers less inclined to invest.

The stated purpose of the rationale-disclosure requirement is to allow investors to separate out and assess the different motivations behind, and impacts of, share repurchases. In the SEC's view, when investors know why a company is repurchasing its shares, they can better evaluate whether a share repurchase was intended to increase the value of the issuer or, instead, represented an inefficient deployment of capital. *Contra NIFLA*, 138 S. Ct. at 2377 ("California points to nothing" supporting its interest).

These rationales may not be enough to survive APA review—*see infra* part IV—but they are more than enough to satisfy this prong of *Zauderer*. The SEC has demonstrated that the information asymmetry surrounding share repurchases is a "potentially real not purely hypothetical" harm to investors. *See NIFLA*, 138 S. Ct. at 2377 (internal quotation marks omitted). The rationale-disclosure rule reaches no broader than necessary to address this harm because the only speech it compels relates directly to alleviating the information asymmetry.

We need not be persuaded by the SEC's reasoning to hold that the

benefits of the rationale-disclosure rule are more than purely hypothetical. Therefore, the rationale-disclosure rule is justified as that word is used in *Zauderer*.

Second, even if a compelled commercial disclosure is justified, it still violates the constitution if it "unduly burden[s]" a speaker's "protected commercial speech." *NetChoice*, 49 F.4th at 486 (cleaned up). In *NIFLA*, the Court held that a California statue compelling a provider of pregnancy-related services to include a government-sponsored message in promotional materials was unduly burdensome. *See* 138 S. Ct. at 2377–78. The statute required the inclusion of a lengthy message emphasized "by some method such as larger text or contrasting type or color." *Id.* at 2378. That was unduly burdensome because it "drown[ed] out the facility's own message." *Id.*

Here, in contrast, the rationale-disclosure requirement neither burdens issuers' protected speech nor drowns out their message. The issuer is free to speak (or not) however and whenever it wishes apart from a privately crafted explanation of its reasons for repurchasing shares. That is a far lesser burden than was the California law the Court found unduly burdensome in *NIFLA*, which mandated a "29-word statement from the government, in as many as 13 different languages." *See id.* A requirement that compels speech solely within the narrow confines of SEC filings is not the type of forced disclosure that would meaningfully "chill protected commercial speech." *NetChoice*, 49 F.4th at 486 (cleaned up).

In sum, the rationale-disclosure requirement is not unduly burdensome, and because both elements of the *Zauderer* test are met, the requirement passes constitutional muster.

## IV.

Petitioners claim that the final rule violates the APA. They aver the SEC acted arbitrarily and capriciously when it failed to (1) quantitatively

analyze the economic implications of its proposed rule whenever feasible, (2) respond to petitioners' comments about the agency's economic implications analysis adequately, and (3) substantiate the proposed rule's benefits adequately.[9]

### 1. *The SEC is not required to quantify economic implications generally.*

The Exchange Act and the Investment Companies Act ("ICA") require the SEC to consider "whether [an] action will promote efficiency, competition, and capital formation" whenever it engages in rulemaking and is "required to consider or determine whether an action is "necessary or appropriate in the public interest," 15 U.S.C. § 78c(f), or "consistent with the public interest," *id.* § 80a-2(c). Those two statutory commands, petitioners urge, require the SEC to "determine as best it can the economic implications of the rule it has proposed." *Chamber of Com. of U.S. v. SEC*, 412 F.3d 133, 143 (D.C. Cir. 2005). According to petitioners, quantitative data is the "best" data, so they adduce the SEC cannot rely merely on qualitative analyses without first explaining why a rule's costs and benefits "could not be quantified." In other words, petitioners contend that a qualitative economic impact analysis will satisfy SEC's statutory obligation only where it is unable feasibly to conduct any quantitative analysis.

The SEC disagrees, positing that it is duty-bound only to conduct a "reasonable and reasonably explained" analysis. *Huawei*, 2 F.4th at 452

---

[9] Petitioners raise three additional reasons the rule is arbitrary and capricious. Specifically, they contend the SEC (1) failed to consider adequately whether the additional disclosures would overwhelm retail investors and disincentivize information collection efforts; (2) ignored fixed costs in its analysis of the share repurchase excise tax; and (3) did not consider all costs and benefits it identified in its analysis of the rule's overall effect. But as we explain in the main text, each of petitioners' primary contentions justifies granting the petition for review. It is therefore unnecessary for us to resolve petitioners' additional theories.

(internal quotation marks omitted). The agency states that it "need not base its every action upon empirical data and may reasonably conduct a general analysis based on informed conjecture." *Nasdaq Stock Mkt. L.L.C. v. SEC*, 34 F.4th 1105, 1111 (D.C. Cir. 2022) (cleaned up).

We agree with the SEC that, as a general matter, it is not required to undertake a quantitative analysis to determine a proposed rule's economic implications. The relevant statutory provisions providing the SEC with rule-making authority do not stipulate such a requirement—they merely command the SEC to "consider . . . whether the action will promote efficiency, competition, and capital formation." 15 U.S.C. §§ 78c(f), 80a-2(c). Per the text, the agency is only told to "consider," and that term—shorn of modifiers or limiters—does not restrict the universe of otherwise permissible methods by which the SEC can analyze the economic implications of a proposed rule.

Nor do the statutorily stipulated objects of consideration lend any support to petitioners' position. A rigorous quantitative cost-benefit analysis is one way—but not the only way—to determine whether a proposed rule "promote[s] efficiency, competition, and capital formation." *Id.* Accordingly, there is no textual basis to conclude that the SEC must analyze economic impacts using quantitative methods whenever it is feasible.[10]

Petitioners, citing *Business Roundtable v. SEC*[11] and *Chamber of Commerce*, maintain the D.C. Circuit has concluded to the contrary. Not so.

---

[10] Nor could such a quantitative analysis requirement be read into the relevant statutory provisions. "Where Congress has required 'rigorous, quantitative economic analysis,' it has made that requirement clear in the agency's statute." *Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 379 (D.C. Cir. 2013) (quoting *Am. Fin. Servs. Ass'n v. FTC*, 767 F.2d 957, 986 (D.C. Cir. 1985)); *see, e.g.*, 2 U.S.C. § 1532(a)(2) (mandating "a *qualitative and quantitative* assessment of the anticipated costs and benefits" (emphasis added)). No such statutory requirement is imposed here.

[11] 647 F.3d 1144 (D.C. Cir. 2011).

Neither lends support to their theory that the Exchange Act and ICA require the SEC to conduct a quantitative economic analysis whenever feasible.

In *Chamber of Commerce*, the D.C. Circuit held that difficulties in determining a rule's precise costs "d[id] not excuse the [SEC] from its statutory obligation" because the agency could still have provided a "range within which [the] cost . . . will fall." 412 F.3d at 143. And *Business Roundtable* held that SEC's failure adequately to "quantify the certain costs or to explain why those costs could not be quantified" was one basis justifying vacatur. 647 F.3d at 1149. But in *Chamber of Commerce*, SEC "stopped" its cost analysis after asserting "it had no 'reliable basis for estimating those costs.'"[12] Similarly, in *Business Roundtable*, SEC's prediction "had no basis beyond mere speculation" and was functionally equivalent to no economic impact analysis at all. 647 F.3d at 1150.

Neither case restricts the SEC's ability to rely on a qualitative analysis for its determination of economic impact.[13] Neither *Chamber of Commerce* nor *Business Roundtable* supports petitioners' reasoning. It is within the agency's discretion[14] to determine the mode of analysis that most allows it "to determine as best it can the economic implications of the rule it has

---

[12] 412 F.3d at 144 (quoting Investment Company Governance, 69 Fed. Reg. 46378, 46387 n.81 (Aug. 2, 2004)).

[13] *See Nasdaq*, 34 F.4th at 1113 (distinguishing *Business Roundtable* since SEC "explained in detail why [the rule's effect on] competition would ultimately benefit investors").

[14] Such discretion is still bounded by default APA requirements. First, the SEC cannot act arbitrarily and capriciously in choosing the mode of analysis that it uses to analyze the economic implications of its proposed rule. Second, regardless of the mode of analysis chosen, the agency "must cogently explain why it has exercised its discretion in a given manner and must offer a rational connection between the facts found and the choice made." *Corrosion Proof Fittings v. EPA*, 947 F.2d 1201, 1214 (5th Cir. 1991) (cleaned up) (quoting *Chem. Mfrs. Ass'n v. EPA*, 899 F.2d 344, 359 (5th Cir. 1990).

No. 23-60255

proposed." *Chamber of Commerce*, 412 F.3d at 143.

### 2. The SEC failed to respond to petitioners' comments.

Petitioners contend that the SEC failed to respond to their comments about the proposed rules' economic implications. Under the arbitrary-and-capricious standard, the SEC must show that it has "reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). That requires the agency to consider all relevant factors raised by the public comments and provide a response to significant points within. *See Huawei*, 2 F.4th at 449. Comments the agency must respond to include those that "can be thought to challenge a fundamental premise underlying the proposed agency decision"[15] or include points that "if true and adopted would require a change in an agency's proposed rule."[16]

The SEC, in its proposed rule, stated that "[m]any of the [economic] effects . . . cannot be quantified." Share Repurchase Disclosure Modernization, 87 Fed. Reg. 8443, 8451 (Feb. 15, 2022). That prompted the agency to do two things: First, it "encourage[d] commenters to provide data and information that would help quantify the benefits, costs, and the potential impacts of the proposed amendments on efficiency, competition, and capital formation." *Id.* Second, for the economic effects the SEC asserted it was "unable to quantify," the agency "provide[d] a qualitative assessment." *Id.* Indeed, in both the proposed and final rule, the SEC claimed that it provided quantified economic effects "wherever possible." *Id.*; Share Repurchase

---

[15] *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019) (cleaned up) (quoting *MCI WorldCom, Inc. v. FCC*, 209 F.3d 760, 765 (D.C. Cir. 2000)).

[16] *Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 971 (5th Cir. 2023) (cleaned up) (quoting *Huawei*, 2 F.4th at 449).

Disclosure Modernization, 88 Fed. Reg. 36002, 36029 (June 1, 2023). Petitioners maintain—and we agree—that is not so.

Petitioners point to three suggestions they submitted to the SEC that explained how the agency could quantify the proposed rule's effects. They suggested the SEC should quantify

1. "the percentage of issuers' annual and long-term incentive plans that is tied to [earnings per share] and how it correlates with buybacks" based on readily available "academic databases" that "provide detailed data on executive compensation";

2. "how many issuers used share repurchases to trigger an executive bonus that would not have been earned without repurchasing shares" and "the total executive compensation awarded from potentially opportunistic buybacks." They note a British study had conducted such an estimate for U.K. issuers, and the SEC could just "replicate the threshold analysis" of that study using preexisting U.S. data;

3. "the incremental benefits of potential reductions in asymmetric information stemming from the proposed amendments" by (i) "examin[ing] how investors react to more frequent repurchase disclosure" in other jurisdictions; (ii) using existing studies to "compare liquidity measures of similarly sized issuers operating in the same industry that conduct buybacks across countries" with different disclosure frequencies; or (iii) examining the movement of stock prices on days that repurchases are disclosed in jurisdictions with daily reporting.

The SEC admits it never considered any of petitioners' suggestions.[17]

---

[17] Oral argument was the first time the SEC attempted to engage with the substance of petitioners' suggestions. That's too late. We don't evaluate *post-hoc* justifications, given that "an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *BNSF Ry. Co. v. Fed. R.R. Admin.*, 62 F.4th 905, 910–11 (5th Cir. 2023) (cleaned

On appeal, it instead blames petitioners for failing to (1) "identify any specific [data] already available that the Commission should have used," and (2) raise points which, if true and adopted, would require a change in an agency's proposed rule. *See Huawei*, 2 F.4th at 449, 453. There is no merit to either of the SEC's *post-hoc* justifications:

The first justification—that the suggestions did not identify data—is demonstrably false. Petitioners' first suggestion flagged academic databases containing datasets from the Incentive Lab by Institutional Shareholder Services. The second suggestion points to *existing SEC* disclosures. And the last expressly references existing academic studies with similar empirical analyses. Such datasets and academic studies are a far cry from the comments at issue in *Huawei* that failed to "identify relevant cost data the agency ignored." 2 F.4th at 453 (emphasis removed). The *Huawei* comments were "asserted without evidence," "speculative," and devoid of any "factual basis." *Id.* at 453–54. Petitioners' suggestions, in contrast, include specific references to readily available data as well as explanations on "how the SEC could use these data to quantify the [r]ule's effects."

The agency's second justification—that petitioners' suggestions did not raise points that, if true and adopted, would require a change in the proposed rule—is also meritless. The SEC, relying on *Prometheus*, avers that "[t]he APA imposes no general obligation on agencies to conduct or commission their own empirical or statistical studies." 141 S. Ct. at 1160.

The SEC's reliance on *Prometheus* is misplaced. There, the FCC had "repeatedly asked for data" but "received no data" other than the materially incomplete dataset it already possessed and ultimately relied upon. 141 S. Ct. at 1159 (cleaned up). That is not so with the rulemaking at issue in this case:

---

up).

The SEC *did* receive new data in response to its solicitation. Indeed, in the proposed rule, the SEC expressly asked for and "encourage[d]" commentators to provide "data and information that would help quantify the benefits, costs, and the potential impacts of the proposed rule on efficiency, competition, and capital formation." 87 Fed. Reg. at 8451. And that's exactly what petitioners did—provide data that was either readily accessible to, or already in the possession of, the SEC.

It is hard to fault petitioners for giving the SEC exactly what it had asked for. And that factual distinction makes all the difference: Critical to the holding in *Prometheus* was the FCC's reliance on both "the data it had" and "the absence of any countervailing evidence." 141 S. Ct. at 1159. *Prometheus* thus stands for the proposition that an agency need not create data that doesn't already exist. It offers no support for the SEC's decision to ask for— and then ignore—already-existing data it did not want to consider.

Undeterred, the SEC then characterizes petitioners' comments as mere "recommendation[s] to conduct new studies that [they] contend might produce useful data." That is incorrect. All three suggestions address costs and benefits the SEC identified in the proposed rule, such as the loss of economically efficient buybacks and increased litigation costs for issuers.

The first suggestion is relevant because it addresses the prevalence of improperly motivated buybacks—the very concern motivating the SEC's instant rulemaking. Two of the "incentives for value-destroying or opportunistic repurchases" the agency identified in the proposed rule were "[s]hare price- or EPS-tied compensation arrangements [which] can . . . incentivize executives to undertake repurchases, in an attempt to maximize their compensation, even if such repurchases are not optimal from the shareholder value maximization perspective," 87 Fed. Reg. at 8457, 8454–55. Similarly, the second suggestion sheds light on the strength of the incentives

underlying such opportunistic repurchases.  And the third suggestion strikes at the heart of the proposed rule's purported benefit by examining the marginal effect of additional disclosures on regulated entities' behaviors.[18]

All three suggestions provide quantification of the rule's expected costs and benefits—the very same costs and benefits the SEC asserts "cannot be quantified."[19]  That destroys the only basis the agency supplied in support of its decision to conduct a qualitative analysis.[20]  The SEC—by continuing to insist that the rule's economic effects are unquantifiable in spite of petitioners' suggestions to the contrary—has failed to demonstrate that its conclusion that the proposed rule "promote[s] efficiency, competition, and capital formation"[21] is "the product of reasoned decisionmaking."[22]

*3. The SEC failed adequately to substantiate the rule's benefits and costs.*

"[A] regulation is arbitrary and capricious if the agency 'failed to consider an important aspect of the problem.'" *Mexican Gulf Fishing*, 60 F.4th at 973 (quoting *State Farm*, 463 U.S. at 43). That "includes, of

---

[18] More disclosure isn't always better. *See, e.g.*, Eugene G. Chewning, Jr. & Adrian M. Harrell, *The Effect of Information Load on Decision Makers' Cue Utilization Levels and Decision Quality in a Financial Distress Decision Task*, 15 Acct. Org. & Soc'y 527, 539–40 (1990); Kevin Lane Keller & Richard Staelin, *Effects of Quality and Quantity of Information on Decision Effectiveness*, 14 J. Consumer Res. 200, 211–12 (1987).

[19] 87 Fed. Reg. at 8451 (proposed rule); 88 Fed. Reg. at 36029 (final rule).

[20] *See* 87 Fed. Reg. at 8451 ("[W]e have, wherever possible, attempted to quantify the economic effects expected from these amendments . . . .  Where we are unable to quantify the economic effects of the final amendments, we provide a qualitative assessment."); 88 Fed. Reg. at 36029 (same).

[21] 15 U.S.C. §§ 78c(f), 80a-2(c).

[22] *State Farm*, 463 U.S. at 52; *see also Huawei*, 2 F.4th at 452 ("An agency's decision to rely on a cost-benefit analysis as part of its rulemaking can 'render the rule unreasonable' if the analysis rests on a 'serious flaw.'" (quoting *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012)).

course, considering the costs and benefits associated with the regulation." *Id.*
And as part of that cost-benefit analysis, the agency must identify benefits
that "bear a rational relationship to the . . . costs imposed." *Id.* (citing *Pub.
Citizen v. EPA*, 343 F.3d 449, 455 (5th Cir. 2003)).[23]

The SEC contends the rule primarily helps investors "better evaluate
whether a share repurchase was intended to increase the value of the firm"
or for an improper purpose such as "providing additional compensation to
management." 88 Fed. Reg. 36008. The agency also avers that the rule
promotes price discovery.[24] But while the rule's purported benefits may be
more than purely hypothetical, *see supra* part III.2, neither is adequately
substantiated.

Petitioners insist the first benefit is inadequately substantiated be-
cause the agency "never substantiated the threshold proposition that im-
properly motivated buybacks are actually a problem." And while the SEC
concedes it never substantiated that proposition in either the proposed or the
final rule,[25] the agency nevertheless maintains the rule's first benefit is ade-

---

[23] *See R.J. Reynolds Vapor Co. v. FDA*, 65 F.4th 182, 189 (5th Cir. 2023) ("At a bare
minimum, '[w]hen an agency changes its existing position, it . . . must at least display
awareness that it is changing position and show that there are good reasons for the new
policy.'" (quoting *Encino Motorcars LLC v. Navarro*, 579 U.S. 211, 221 (2016))).

[24] *See* 88 Fed. Reg. at 36033 ("The additional quantitative and qualitative disclos-
ures we are adopting are further expected to enhance the information about share repur-
chases, providing clearer insights into how and why the issuers undertake repurchases and
the extent to which they are related to temporary undervaluation of issuer shares, tem-
porary cash windfalls that cannot be deployed to positive-net present value (NPV) invest-
ment projects, or other objectives.").

[25] Indeed, the SEC contends in its briefing that "the rule was explicitly *not* prem-
ised on th[e] notion" that "'improperly motivated buybacks regularly occur' in 'significant
numbers.'" *See* 88 Fed. Reg. at 36007 ("[I]t is not necessary to find that opportunism
drives the timing of most issuer share repurchases to conclude that it is appropriate for
investors to have more useful information about such repurchases.").

quately substantiated. That's because, according to the SEC, investors can be uncertain about the true motivations underlying a buyback so long as there exists an opportunity for—and thus possibility of—opportunistic or improperly motivated buybacks.[26]

We agree with petitioners. If opportunistic or improperly motivated buybacks are not genuine problems, then there is no rational basis for investors to experience any of the uncertainty the SEC now claims warrants the rule. Concern about uncertainty positively scales with the magnitude and probability of the matter for which one is uncertain. A reasoned response to uncertainty about matters of low probability or low magnitude should be markedly different from those of high probability and magnitude. And that only makes common sense: Tolerance of uncertainty varies depending on considerations of likelihood and severity.

It's no different when it comes to the proposed rule. The rule's benefit scales with the degree of investor uncertainty in the *status quo*, and that degree of uncertainty is tied to the magnitude and probability of opportunistic or improperly motivated buybacks. The SEC must therefore show that opportunistic or improperly motivated buybacks are a genuine problem even under its theory of investor uncertainty. Because the agency has not done so, the first benefit is inadequately substantiated.

The rule's second benefit—promoting price discovery—fares no better than the first. The SEC theorizes that "more comprehensive and disaggregated, granular information about recent repurchases and prices of such

---

[26] *See, e.g.*, *id.* ("[W]e believe all of the quantitative and qualitative disclosure requirements that we are adopting in this release together will serve to alert investors *to the possibility of* repurchases being motivated, at least in part, by goals unconnected to increasing shareholders value or signaling the issuer's view that its stock is undervalued." (emphasis added)).

repurchases should be useful to investors in inferring the management's evolving beliefs about the company's underlying value and, in conjunction with other disclosures, [thereby] improving price discovery." 88 Fed. Reg. 36032–33.

The SEC's theory is internally contradictory and thus fails adequately to substantiate the rule's price-discovery benefit.[27] That theory rests on the notion that the rule's additional disclosure requirements will mitigate sub-optimal voluntary disclosure levels by providing investors with valuable new information. The SEC reasons that these voluntary disclosure levels are sub-optimal in the *status quo* because issuers currently withhold information from investors on account of the "the potential costs of leaking valuable private information to competitors." 88 Fed. Reg. 36036. But the agency soon changes tack. In its discussion of the rule's general costs, the SEC adopts the opposite—and contradictory—position: In concluding that costs of disclosing "significant proprietary information" would be "relatively modest for most issuers," the SEC asserts the new disclosures would *not* contain valuable information. 88 Fed. Reg. 36040.

The SEC cannot have it both ways. It is illogical for the rule simultaneously to accept and to reject the reasoning underlying the price discovery benefit. The rule's price discovery benefit is therefore unsubstantiated.[28]

The price-discovery benefit would still be inadequately substantiated even if we were to disregard the fact that the SEC's theory is internally contradictory. First, the agency fails to demonstrate that it considered rele-

---

[27] *See Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1021 (5th Cir. 2019) ("[A]n agency's action is arbitrary and capricious if illogical on its own terms." (cleaned up)).

[28] *See R.J. Reynolds Vapor Co.*, 65 F.4th at 189 ("[W]hen an agency changes its existing position, it . . . must . . . show that there are good reasons for the new policy." (quoting *Encino*, 579 U.S. at 222) (cleaned up)).

vant factors in concluding the rule's additional disclosures would impose "relatively modest [costs] for most issuers." 88 Fed. Reg. 36040. Looking at the rule's disclosure requirements explains why that is the case. Plainly put: The rule's requirements are clear as mud. Issuers are instructed not to "rely[] on boilerplate language" but are offered no guidance except a non-exclusive and non-exhaustive list compiling myriad suggestions from commentators.[29] Worse still, there is no safe harbor even for issuers whose disclosures discuss all the rule's suggestions. And even when pressed at oral argument, counsel for the SEC offered little in the way of clarifying what disclosures the rule *actually* mandated. The price-discovery benefit is not the product of reasoned decisionmaking.

Regardless, the rule cannot be sustained on the price-discovery rationale even if we were to assume that the price-discovery benefit is adequately substantiated. Under the harmless-error doctrine, a challenged rule survives judicial review notwithstanding error only if such error "clearly had no bearing on the procedure used or the substance of the decision reached."[30]

As explained above, the rule's primary benefit—decreasing investor uncertainty about motivations underlying buybacks—is inadequately sub-

---

[29] These suggestions direct issuers to discuss: (1) "other possible ways to use the funds allocated for the repurchase and [to] compar[e] the repurchase with other investment opportunities that would ordinarily be considered by the issuer, such as capital expenditures and other uses of capital"; (2) "the expected impact of the repurchases on the value of remaining shares"; (3) "factors driving the repurchase, including whether their stock is undervalued, prospective internal growth opportunities are economically viable, or the valuation for potential targets is attractive"; and (4) "the sources of funding for the repurchase, where material, such as, for example, in the case where the source of funding results in tax advantages that would not otherwise be available for a repurchase." 88 Fed. Reg. at 36024.

[30] *Sierra Club v. U.S. Fish & Wildlife Serv.*, 245 F.3d 434, 444 (5th Cir. 2001) (quoting *U.S. Steel Corp. v. EPA*, 595 F.2d 207, 215 (5th Cir. 1979); *see* 5 U.S.C. § 706 ("due account shall be taken of the rule of prejudicial error").

stantiated. Almost every part of the SEC's justification and explanation of the rule reflects the agency's concern about opportunistic or improperly motivated buybacks. That error permeates—and therefore infects—the entire rule. Consequently, we cannot conclude that error in the SEC's substantiation of the first benefit clearly had no bearing on the remainder of the rule.

Because the SEC acted arbitrarily and capriciously in failing adequately to (1) respond to petitioners' comments and (2) substantiate the rule's benefits, we grant the petition for review.

## V.

Petitioners contend the SEC did not provide adequate opportunity for notice and comment. Under the APA, agencies must "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(c).

We disagree with petitioners. They aver the SEC's initial forty-five-day comment period should "raise red flags" because it was shorter than sixty days. But the APA generally requires only a minimum thirty-day comment period.[31] And "while interested parties should be able to participate meaningfully in the rulemaking process, the public 'need not have an opportunity to comment on every bit of information influencing an agency's decision.'" *Tex. Off. of Pub. Util. Couns. v. FCC*, 265 F.3d 313, 326 (5th Cir. 2001) (quoting *Texas v. Lyng*, 868 F.2d 795, 800 (5th Cir. 1989)). We cannot conclude that the initial comment period was so short as to deprive petitioners

---

[31] *Chem. Mfrs. Ass'n*, 899 F.2d at 347. *See also Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1117 (D.C. Cir. 2019) ("[A] 30-day comment period is generally the shortest time period sufficient for interested persons to meaningfully review a proposed rule and provide informed comment." (internal citations omitted)).

of a meaningful opportunity to comment on the proposed rulemaking. Petitioners may have hoped for more time, but it is not for us to decide whether an agency has chosen a maximally net beneficial comment period.

Accordingly, the SEC's notice and comment period satisfies the APA's requirements.

## VI.

The SEC acted arbitrarily and capriciously, in violation of the APA, when it failed to respond to petitioners' comments and failed to conduct a proper cost-benefit analysis. We recognize that "there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so." *Texas v. United States*, 50 F.4th 498, 529 (5th Cir. 2022) (quoting *Texas Ass'n of Mfrs. v. US. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389–90 (5th Cir. 2021)). Short of vacating the rule, we therefore afford the agency limited time to remedy the deficiencies in the rule.

Because, for the reasons explained, the SEC's adoption of the Share Repurchase Disclosure Modernization Rule is arbitrary and capricious, the petition for review is GRANTED, and this matter is REMANDED with direction to the SEC to correct the defects in the rule within 30 days of this opinion. This is a limited remand. This panel retains jurisdiction to consider the decision that is made on remand.

# EXHIBIT B

No. 23-60255

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA;
LONGVIEW CHAMBER OF COMMERCE; TEXAS ASSOCIATION OF
BUSINESS,

*Petitioners*,

v.

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

*Respondent.*

---

On Petition for Review of an Order of the
Securities and Exchange Commission

---

## BRIEF OF RESPONDENT
## SECURITIES AND EXCHANGE COMMISSION

---

MEGAN BARBERO
*General Counsel*

MICHAEL A. CONLEY
*Solicitor*

DOMINICK V. FREDA
*Assistant General Counsel*

THEODORE J. WEIMAN
*Senior Appellate Counsel*

EZEKIEL L. HILL
*Appellate Counsel*

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
202.551.7724 (Hill)
hillez@sec.gov

# CERTIFICATE OF INTERESTED PERSONS

*Chamber of Commerce of the United States of America et al. v. SEC*,
No. 23-60255

The undersigned counsel of record certifies that the following listed persons
and entities as described in the fourth sentence of Rule 28.2.1 have an interest in
the outcome of this case. These representations are made in order that the judges
of this Court may evaluate possible disqualification or recusal.

1. *Petitioners*: Chamber of Commerce of the United States of America,
   Longview Chamber of Commerce, and Texas Association of Business,
   each of which represents that it has no parent corporation and no
   publicly held corporation owns 10% or more of its stock.

   *Counsel for Petitioners*: Noel J. Francisco, Brian C. Rabbitt, Brinton
   Lucas, Charles E.T. Roberts, Ryan M. Proctor, and Alexander V.
   Maugeri of Jones Day; and Tara S. Morrissey, Tyler S. Badgley, and
   Kevin R. Palmer, of U.S. Chamber Litigation Center.

2. *Respondent*: The United States Securities and Exchange Commission.

   *Counsel for Respondent*: Megan Barbero, Michael A. Conley,
   Dominick V. Freda, Theodore J. Weiman, and Ezekiel L. Hill.

3. *Amicus Curiae* Investor Choice Advocates Network (Nicolas Morgan,
   president), which represents that it is a nonprofit organization that has no
   parent corporation and that no publicly held corporation owns 10% or
   more of its stock.

   *Counsel for Amicus Curiae* Investor Choice Advocates Network:
   Angela Laughlin Brown of Gray Reed & McGraw LLP and Nicolas
   Morgan of Paul Hastings LLP.

4. *Amicus Curiae* Manhattan Institute, which represents that it is a
   nonprofit corporation that has no parent corporation and that no publicly
   held corporation owns 10% or more of its stock.

i

Counsel for Amicus Curiae Manhattan Institute:  Helgi C. Walker and Jeffrey Liu of Gibson, Dunn & Crutcher LLP; Jennifer L. Mascott and R. Trent McCotter of Separation of Powers Clinic, Antonin Scalia Law School; and Ilya Shapiro of Manhattan Institute.

5.  Amici Curiae S.P. Kothari and James Overdahl.

Counsel for Amici Curiae Kothari and Overdahl:  Megan Brown, Thomas M. Johnson, Jr., Kevin Muhlendorf, and Michael J. Showalter of Wiley Rein LLP.


/s/ Ezekiel L. Hill
Attorney of Record for Respondent

## STATEMENT REGARDING ORAL ARGUMENT

The Securities and Exchange Commission believes that oral argument is unnecessary for this Court's consideration of this appeal because the issues presented are controlled by settled law and adequately presented in the briefs and the record.  But the Commission stands ready to present oral argument if argument would aid the Court in considering the issues.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ......................................................... i

STATEMENT REGARDING ORAL ARGUMENT ............................................. iii

TABLE OF AUTHORITIES ............................................................................... vii

INTRODUCTION ................................................................................................. 1

COUNTERSTATEMENT OF JURISDICTION ................................................... 4

COUNTERSTATEMENT OF THE ISSUES ........................................................ 4

COUNTERSTATEMENT OF THE CASE ........................................................... 5

      A.    Background ................................................................................... 5

           1.    Information regarding an issuer's share repurchases is important for investors. ........................................................... 5

           2.    Existing disclosure requirements provide limited information about share repurchases. ........................................ 6

      B.    Proceedings before the Commission ......................................... 7

           1.    Proposed Rule and comment period ...................................... 7

           2.    Adoption of the Repurchase Rule .......................................... 9

STANDARD OF REVIEW ................................................................................. 11

SUMMARY OF ARGUMENT ........................................................................... 12

ARGUMENT ...................................................................................................... 13

I.    The Repurchase Rule complies with the First Amendment. ...................... 13

      A.    The rule is analyzed under *Zauderer*. ................................... 14

           1.    The rule requires "purely factual" disclosure. ...................... 16

           2.    The disclosure is uncontroversial. ........................................ 19

# TABLE OF CONTENTS (cont'd)

**Page**

B.     The rule satisfies *Zauderer*. ............................................................ 20

    1.     The disclosure requirement is reasonably related to a legitimate government interest................................................ 20

    2.     The disclosure requirement is not "unjustified or unduly burdensome" ........................................................................ 24

C.     The rule would survive more exacting scrutiny. .............................. 26

    1.     The rule satisfies *Central Hudson*. ........................................ 26

    2.     Petitioners are wrong in arguing that *Central Hudson* is inapplicable and, in any event, misstate what strict scrutiny would require**.** ...................................................................... 27

D.     The First Amendment challenge does not implicate any other disclosure requirements of the rule. .................................................. 30

II.    The Commission reasonably considered the rule's costs, benefits, and overall economic effects. ............................................................................ 32

A.     The Commission's qualitative analysis was reasonable. .................. 32

B.     The Commission reasonably identified the rule's potential costs. .... 34

C.     The Commission reasonably identified the rule's benefits. .............. 35

    1.     The Commission explained that the rule will strengthen investor protection, improve market efficiency, and facilitate capital formation. ...................................................... 35

    2.     Petitioners' arguments are premised on their misperception that the rule is intended solely to expose opportunistic repurchases. ............................................................................. 38

    3.     The Commission substantiated its conclusions concerning the potential for opportunistic behavior. ................................. 39

    4.     The Commission appropriately considered the impact of the Rule 10b5-1 amendments................................................... 40

# TABLE OF CONTENTS (cont'd)

**Page**

  5.  The Commission's analysis of the information asymmetries addressed by the rule is sound. ................................................. 41

  6.  The Commission reasonably evaluated the risk that the required disclosures could overwhelm investors. ..................... 42

  7.  The Commission reasonably considered whether reducing information asymmetries will disincentivize information collection. ............................................................................... 44

 C.  The Commission reasonably assessed the effect of the share repurchase excise tax. ........................................................... 45

 D.  The Commission reasonably evaluated the rule's overall economic effects. ................................................................. 49

 E.  The Commission complied with all other statutory requirements in promulgating the rule. ....................................................... 51

III.  The Commission provided sufficient opportunity to comment on the Proposed Rule. ............................................................... 52

 A.  The comment period was more than adequate ................................... 52

 B.  Any deficiency in the comment period was harmless ...................... 57

CONCLUSION ...................................................................... 58

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE AND FILING

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*303 Creative v. Elenis*,
    143 S. Ct. 2298 (2023) ...................................................................14, 28, 29

*Am. Hosp. Ass'n v. Azar*,
    983 F.3d 528 (D.C. Cir. 2020) ................................................................24, 48

*Am. Meat Inst. v. Dep't of Agric*,
    760 F.3d 18 (D.C. Cir. 2014)...................................................................26

*Barr v. Am. Ass'n of Political Consultants*,
    140 S. Ct. 2335 (2020) ...........................................................................31

*Bd. of Trs. of the State Univ. of N.Y. v. Fox*,
    492 U.S. 469 (1989) ...........................................................................26, 27

*Boeta v. FAA*,
    831 F.3d 636 (5th Cir. 2016) ................................................................12

*Bus. Roundtable v. SEC*,
    647 F.3d 1144 (D.C. Cir. 2011) ..............................................................47

*Cath. Legal Immigr. Network, Inc. v. Exec. Off. for Immigr. Review*,
    2021 WL 3609986 (D.D.C. Apr. 3, 2021) .....................................................57

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*,
    447 U.S. 557 (1980) ..............................................15, 16, 20, 26, 27, 28, 30

*Centro Legal de la Raza v. Exec. Off. for Immigr. Review*,
    524 F. Supp. 3d 919 (N.D. Cal. 2021) ..........................................................57

*Chamber of Com. of U.S. v. SEC*,
    412 F.3d 133 (D.C. Cir. 2005) ...................................................................34

*Chem. Mfrs. Ass'n v. EPA*,
    899 F.2d 344 (5th Cir. 1990) ...................................................................52

*City of Arlington v. FCC*,
    668 F.3d 229 (5th Cir. 2012) ...................................................................57

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*CTIA - The Wireless Ass'n v. City of Berkeley*,
928 F.3d 832 (9th Cir. 2019) .......................................................................19

*Disc. Tobacco City & Lottery, Inc. v. United States*,
674 F.3d 509 (6th Cir. 2012) .......................................................................28

*Dun & Bradstreet v. Greenmoss Builders*,
472 U.S. 749 (1985) ....................................................................................14

*Dunagin v. City of Oxford*,
718 F.2d 738 (5th Cir. 1983) .......................................................................15

*Ent. Software Ass'n v. Blagojevich*,
469 F.3d 641 (7th Cir. 2006) .......................................................................28

*Express Oil Change, L.L.C. v. Miss. Bd. of Licensure*,
916 F.3d 483 (5th Cir. 2019) .......................................................................16

*FCC v. Prometheus Radio Project*,
141 S. Ct. 1150 (2021) ................................................................................33

*Full Value Advisors, L.L.C. v. SEC*,
633 F.3d 1101 (D.C. Cir. 2011) ..................................................................14

*Hill Dermaceuticals, Inc. v. FDA*,
709 F.3d 44 (D.C. Cir. 2013) .......................................................................55

*Huawei Techs. USA, Inc. v. FCC*,
2 F.4th 421 (5th Cir. 2021) ..........................................................32, 34, 35

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*,
515 U.S. 557 (1995) ..............................................................................29, 30

*Just. for All v. Faulkner*,
410 F.3d 760 (5th Cir. 2005) .......................................................................30

*Lindeen v. SEC*,
825 F.3d 646 (D.C. Cir. 2016) ....................................................................33

*Milavetz, Gallop & Milavetz, P.A. v. United States*,
559 U.S. 229 (2010) ....................................................................................25

# TABLE OF AUTHORITIES (cont'd)

Page(s)

*Nasdaq Stock Mkt. L.L.C. v. SEC*,
    34 F.4th 1105 (D.C. Cir. 2022) ....................................................32

*Nat'l Ass'n for Surface Finishing v. EPA*,
    795 F.3d 1 (D.C. Cir. 2015) .............................................................3

*Nat'l Ass'n of Mfrs. v. SEC*,
    800 F.3d 518 (D.C. Cir. 2015) ...............................................19, 25

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
    138 S. Ct. 2361 (2018) ............................................14, 24, 28, 29

*Nat'l Lifeline Ass'n v. FCC*,
    921 F.3d 1102 (D.C. Cir. 2019) ....................................................52

*Nat'l Wildlife Fed'n v. EPA*,
    286 F.3d 554 (D.C. Cir. 2002) .....................................................52

*NetChoice, L.L.C. v. Florida*,
    34 F.4th 1196 (11th Cir. 2022) ....................................................18

*NetChoice, L.L.C. v. Paxton*,
    49 F.4th 439 (5th Cir. 2022) ........................................3, 18, 20, 24

*N.Y. State Rest. Ass'n v. N.Y.C. Bd. of Health*,
    556 F.3d 114 (2d Cir. 2009) ........................................................20

*Ohralik v. Ohio State Bar Ass'n*,
    436 U.S. 447 (1978) .............................................................14, 16

*Omnipoint Corp. v. FCC*,
    78 F.3d 620 (D.C. Cir. 1996) ................................................54, 58

*Pac. Gas & Elec. Co. v. Pub. Utils. Com.*,
    475 U.S. 1 (1986) ........................................................................29

*Pangea Legal Servs. v. U.S. Dep't of Homeland Sec.*,
    501 F. Supp. 3d 792 (N.D. Cal. 2020) .........................................56

*Paris Adult Theatre I v. Slaton*,
    413 U.S. 49 (1973) ......................................................................14

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Portland Cement Ass'n v. EPA*,
    665 F.3d 177 (D.C. Cir. 2011) .......................................45

*Pub. Citizen, Inc. v. La. Att'y Disciplinary Bd.*,
    632 F.3d 212 (5th Cir. 2011) ...............................15, 27

*R.J. Reynolds Tobacco Co. v. FDA*,
    696 F.3d 1205 (D.C. Cir. 2012) ...................................26

*Riley v. Nat'l Fed'n of the Blind*,
    487 U.S. 781 (1988) .......................................15

*RTM Media, L.L.C. v. City of Houston*,
    584 F.3d 220 (5th Cir. 2009) .......................................26

*SEC v. Wall St. Pub. Inst., Inc.*,
    851 F.2d 365 (D.C. Cir. 1988) ...............................14, 21, 30

*Serafine v. Branaman*,
    810 F.3d 354 (5th Cir. 2016) .......................................16

*U.S. Telecom Ass'n v. FCC*,
    400 F.3d 29, 41 (D.C. Cir. 2005).......................................58

*United States v. Johnson*,
    632 F.3d 912, 933 (5th Cir. 2011).......................................58

*United States v. Wenger*,
    427 F.3d 840 (10th Cir. 2005) ...............................16, 20

*White Buff. Ventures, L.L.C. v. Univ. of Tex. at Austin*,
    420 F.3d 366 (5th Cir. 2005) .......................................16

*Wooley v. Maynard*,
    430 U.S. 705 (1977) ...............................29, 30

*Zauderer v. Off. of Disciplinary Counsel of Supreme Court of Ohio*,
    471 U.S. 626 (1985) .................... 3, 12, 15, 16, 18, 19, 20, 23, 24, 25, 26

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

**Statutes, Laws, Regulations, Rules, and Other Authorities**

17 C.F.R. § 22.17 ................................................. 17

17 C.F.R. § 227.201 ............................................. 17

17 C.F.R. § 229.10 .............................................. 17

17 C.F.R. § 229.303 ............................................. 17

17 C.F.R. § 229.407 ............................................. 17

17 C.F.R. § 229.1006 ........................................... 17

17 C.F.R. § 240.13d-101 ....................................... 17

Administrative Procedure Act

    5 U.S.C. § 553 ............................................. 52

    5 U.S.C. § 706.............................................. 11

*Business and Financial Disclosure Required by Regulation S-K,*
    Rel. No. 33-10064 (Apr. 13, 2016), 81 Fed. Reg. 23915
    (Apr. 22, 2016) ............................................ 6

Inflation Reduction Act of 2022,
    Pub. L. 117-169, 136 Stat. 1818 (2022) ...................... 8

*Insider Trading Arrangements and Related Disclosures*,
    Rel. No. 33-11138 (Dec. 14, 2022), 87 Fed. Reg. 80362
    (Dec. 29, 2022) ........................................... 40

Investment Company Act of 1940, 15 U.S.C. § 80a-1, *et seq.*

    Section 2(c), 15 U.S.C. § 80a-2(c) ........................... 32

## TABLE OF AUTHORITIES (cont'd)

Page(s)

Section 42, 15 U.S.C. § 80a-42 ............................................................. 4, 11

*Purchases of Certain Equity Securities by the Issuer and Others*,
Rel. No. 33-8335 (Nov. 10, 2003), 68 Fed. Reg. 64952
(Nov. 17, 2003) ............................................................................ 5-6

*Response to Congress: Negative Net Equity Issuance* (Dec. 23, 2020),
https://www.sec.gov/files/negative-net-equity-issuance-dec-2020.pdf. ....... 6

*Resubmission of Comments and Reopening of Comment Periods for
Several Rulemaking Releases Due to a Technological Error in
Receiving Certain Comments*,
Rel. No. 34-96005 (Oct. 7, 2022), 87 Fed. Reg. 63016 (Oct. 18, 2022).........8

*Reopening of Comment Period for Share Repurchase Disclosure Modernization*,
Rel. No. 34-96458 (Dec. 7, 2022), 87 Fed. Reg. 75975 (Dec. 12, 2022) .......9

Securities Exchange Act of 1934, 15 U.S.C. 78a, *et seq.*

Section 3(f), 15 U.S.C. § 78c(f) .................................................... 32

Section 13(a), 15 U.S.C. § 78m(a) ............................................... 51

Section 23(a)(2),15 U.S.C. § 78w(a)(2) ................................ 32, 51

Section 25(a), 15 U.S.C. § 78y(a)(4) ........................................ 11

*Share Repurchase Disclosure Modernization*,
Rel. No. 34-93783 (Dec. 15, 2021), 87 Fed. Reg. 8443
(Feb. 15, 2022) ...........................................................................7, 8

*Share Repurchase Disclosure Modernization*,
Release No. 34-97424 (May 3, 2023), 88 Fed. Reg. 36002
(June 1, 2023) ..................................................................... *passim*

Tex. Bus. & Com. Code § 120.103(a)(1)............................................. 18

# INTRODUCTION

In the rule under review ("Repurchase Rule"), respondent Securities and Exchange Commission ("Commission" or "SEC") adopted enhanced disclosure requirements for issuers (and affiliated purchasers) subject to reporting requirements under the Securities Exchange Act of 1934 ("Exchange Act") that repurchase shares of the issuer's stock. *Share Repurchase Disclosure Modernization*, Rel. No. 34-97424 (May 3, 2023), 88 Fed. Reg. 36002 (June 1, 2023). Since 2003, such issuers have been required to disclose share repurchase data, aggregated by month, in periodic reports filed with the Commission. In the years that followed, the Commission requested public comment concerning the adequacy of those disclosures and, in response to a directive from Congress, Commission staff studied the effects of repurchases on investment and economic growth. Then, in 2021, the Commission issued a proposed rule calling for enhanced disclosure, requesting comments during a 45-day comment period that was subsequently extended by another 44 days. And the Commission considered all comments received at any point between the proposed rule's publication on the Commission's website and the adoption of the Repurchase Rule.

After considering the more than 170 unique and 3,200 form comment letters received, along with other materials and submissions, the Commission adopted the Repurchase Rule on May 3, 2023. Among other things, the rule requires reporting

issuers to disclose, in quarterly and semi-annual reports, daily share repurchase data and the "objectives or rationales" of the corresponding repurchase. In promulgating the rule, the Commission extensively analyzed its costs, benefits, and overall economic effects, concluding that the rule is likely to benefit investors while imposing only limited and justified costs, and that it may have positive overall effects on efficiency, competition, and capital formation.

Despite this modest amendment to existing disclosure requirements, petitioners erroneously characterize the Repurchase Rule as an unjustified attack on repurchases themselves that is allegedly driven by the sole aim of exposing repurchases intended to increase executive compensation. The Commission's actual rationale for adopting the rule is clear, reasonable, and supported by substantial evidence: whether a particular repurchase is undertaken to maximize shareholder value or for other reasons, the rule's required disclosure will help investors assess the repurchase and its impact on the value of the issuer and its securities.

Petitioners also argue that the required disclosure of a repurchase's "objectives or rationales" fails strict scrutiny and thus violates the First Amendment. But petitioners apply the wrong test, as courts have long held that securities regulations are subject to lesser scrutiny. Because the challenged requirement solicits purely factual and uncontroversial information about

repurchases, it is subject to review under *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio,* 471 U.S. 626 (1985).  It passes muster under that standard and would withstand even heightened scrutiny.

Petitioners further misapply governing precedent in arguing that a required disclosure is non-factual if it might reflect subjective opinion and controversial if it relates to a topic of public debate.  Indeed, in *NetChoice, L.L.C. v. Paxton*, 49 F.4th 439 (5th Cir. 2022), this Court applied *Zauderer* review to a Texas law requiring social media platforms to disclose the "reason" for moderation decisions—a disclosure that would reflect the platform's subjective opinion and a topic that is undisputedly a subject of public debate.  *Id.* at 485.  The disclosure here fits even more clearly within the *Zauderer* framework, as it concerns the objectives or rationales for purely commercial securities transactions.

Finally, although petitioner Chamber of Commerce of the United States of America ("Chamber") submitted six comment letters and met with Commissioners and staff five times over the course of nearly a year, petitioners claim that the Commission should have given them even more time to comment on the proposed rule.  But the comment period—initially 45 days and then extended by another 44 days—is more than sufficient under the relevant precedent, and nothing more was required.  Moreover, the Commission considered all comments submitted before

3

adoption, and petitioners fail to substantiate their claim that they could not fully respond within the time provided.

## COUNTERSTATEMENT OF JURISDICTION

The Commission issued the Repurchase Rule under the Exchange Act and the Investment Company Act of 1940 ("Investment Company Act").  R.178.[1]  This Court has jurisdiction under Section 43(a) of the Investment Company Act over petitioners' timely filed petitions for review.  15 U.S.C. § 80a-42(a).

## COUNTERSTATEMENT OF THE ISSUES

1.      Whether the Repurchase Rule, which requires issuers that undertake a share repurchase to disclose certain information about the repurchase, complies with the First Amendment.

2.      Whether the Commission reasonably considered the rule's potential costs, benefits, and economic effects.

3.      Whether the comment period, which exceeded the amount of time courts have indicated is generally sufficient to elicit meaningful comment, complied with the Administrative Procedure Act, and, in any event, any purported deficiency was harmless.

---

[1] "R._" refers to the page number in the Repurchase Rule.  While the Repurchase Rule release on the Commission's website has been repaginated to conform with the Federal Register, petitioners' brief and record excerpts use the original pagination.  For consistency, citations here reference the original pagination.

## COUNTERSTATEMENT OF THE CASE

### A.  Background

#### 1.  Information regarding an issuer's share repurchases is important for investors.

In a share repurchase, or "buyback," an issuer repurchases shares of its own stock.  R.12-13.  Share repurchases, typically enacted through open market transactions, are common, and their impact on the securities markets is significant.  R.13.  In 2021, for example, U.S.-listed companies repurchased about $950 billion of their shares.  *Id.*

An issuer's repurchases "can be efficient and aligned with shareholder value maximization."  R.110.  Repurchases are commonly used to return capital to investors and can have tax and other advantages over dividends.  R.13-14.  Other reasons include signaling management's view that the stock is undervalued, deploying excess cash in the absence of better investment opportunities, readjusting the issuer's capital structure, and providing stock price support when selling pressure is high.  R.13-14, 110-12.  There is also evidence "that opportunistic insider behavior and agency conflicts, rather than firm value maximization, can motivate repurchases."  R.112.  This can occur where executive compensation or certain accounting metrics are tied to the issuer's share price.  R.14-15, 22-23, 112.

Because of the implications of an issuer's decision to repurchase shares, "[i]nformation about past repurchases is valuable to investors" in assessing the issuer and its shares.  R.107.  Information that allows investors to understand the purpose of a repurchase is significant whether the repurchase is undertaken to maximize shareholder value or for other reasons.  R.107-10, 119, 127

### 2. Existing disclosure requirements provide limited information about share repurchases.

This is not the first time that the Commission has adopted a rule requiring share repurchase disclosures.  In 2003, the Commission adopted a rule "to enhance the transparency of … repurchases," which the Commission concluded would, among other things, "allow investors to make better-informed investment decisions" and "bolster investor confidence in [the] securities markets."  *Purchases of Certain Equity Securities by the Issuer and Others*, Rel. No. 33-8335 (Nov. 10, 2003), 68 Fed. Reg. 64952 (Nov. 17, 2003).  Under that rule, issuers must disclose in their periodic filings information including the total number of shares repurchased each month, the average price paid per share, and information about share repurchase plans or programs.  *See* R.5-6.[2]

In 2016, the Commission issued a concept release addressing certain business and financial disclosures, including share-repurchase disclosure, and

---

[2] Certain information regarding share repurchases is also required to be disclosed in issuer financial statements.  R.5 n.6.

requested comments on whether the Commission should "require more granular information" about share repurchases. *Business and Financial Disclosure Required by Regulation S-K*, Rel. No. 33-10064 (Apr. 13, 2016), 81 Fed. Reg. 23915 (Apr. 22, 2016). A number of commenters recommended enhancing those requirements. *See, e.g.*, *Share Repurchase Disclosure Modernization*, Rel. No. 34-93783, at 9, 23 (Dec. 15, 2021), 87 Fed. Reg. 8443 (Feb. 15, 2022) ("Proposed Rule"). In January 2020, Congress directed Commission staff to study, among other things, the history and effects of non-financial issuers repurchasing their securities and the effects of those repurchases on investment, corporate leverage, and economic growth. *See Response to Congress: Negative Net Equity Issuance* (Dec. 23, 2020), https://www.sec.gov/files/negative-net-equity-issuance-dec-2020.pdf.

### B.    Proceedings before the Commission

#### 1.    Proposed Rule and comment period.

On December 15, 2021, the Commission proposed enhancements to share-repurchase disclosure requirements. The Commission explained that, particularly with share repurchases increasing, investors could benefit from enhanced repurchase disclosures that would "help address … information asymmetries" between issuers and investors. Proposed Rule at 10. Among other things, the Proposed Rule was intended to help investors "[b]etter understand the extent of an

issuer's activity in the market" and "an issuer's motivation for its share repurchases." *Id.* To that end, the Proposed Rule would have required issuers to report certain repurchase data within one business day of the repurchase and to disclose the objective or rationale for share repurchases in their periodic filings. *Id.* at 13, 22.

The Commission requested that comments on the Proposed Rule be submitted by April 1, 2022—45 days after it was published in the Federal Register and 107 days after it was published on the Commission's website. Proposed Rule at 1. On October 7, 2022, the Commission reopened the comment period for 14 additional days because certain comments were potentially affected by a technological error in an online form. *Resubmission of Comments and Reopening of Comment Periods for Several Rulemaking Releases Due to a Technological Error in Receiving Certain Comments*, Rel. No. 34-96005 (Oct. 7, 2022), 87 Fed. Reg. 63016 (Oct. 18, 2022) ("First Reopening"). The Commission did not restrict comments during the reopening to the resubmission of comments affected by the technological error. *Id.* at 4.

On December 7, 2022, the Commission again reopened the comment period for 30 additional days after Congress enacted a new share repurchase excise tax in the Inflation Reduction Act of 2022 ("Inflation Reduction Act"), Pub. L. 117-169, 136 Stat. 1818 (2022), which was signed into law after the Proposed Rule was

8

issued.  *Reopening of Comment Period for Share Repurchase Disclosure Modernization*, Rel. No. 34-96458 (Dec. 7, 2022), 87 Fed. Reg. 75975 (Dec. 12, 2022) ("Second Reopening").  Again, the Commission did not restrict comments during the reopening to any specific topic.  *Id*. at 7-8.

In total, the comment period for the Proposed Rule was 89 days, after which the Commission concluded that "an additional extension of the comment period [was not] necessary."  R.8.  The Commission received and considered over 170 unique and 3,200 form comment letters, including six from the Chamber.  *Id.*; *see* Admin. Dkt. 26, 68, 70, 107, 136, 168.

### 2.    Adoption of the Repurchase Rule.

The Commission adopted the Repurchase Rule on May 3, 2023.  The Commission found that because "issuers repurchase shares for multiple reasons," "an investor's ability to assess the impact of a given repurchase depends in part on having the information necessary to evaluate the purposes for which the repurchase was undertaken."  R.19, 22.  As the Commission observed, "an issuer's purpose in undertaking a particular repurchase is significant information that can aid investors in assessing the repurchase, including its purposes and impacts on the firm and the issuer's value."  R.79-80.  The Commission thus concluded that "[c]urrent repurchase disclosure requirements, which do not require the issuer to provide quantitative daily repurchase information or state the objectives or rationales for its

repurchases and are reported in the aggregate at the monthly level, provide investors with insufficient insight into the efficiency, purposes, and impacts of an issuer's share repurchases," which "frustrates the ability of investors to separate out and assess the different motivations and impacts of share repurchases." R.19-20. Having "determined that additional disclosures are needed to remedy these market failures," the Commission adopted the rule "to improve the information investors receive to better assess the efficiency of, and motives behind, an issuer repurchase." R.20-21.

The rule requires issuers to disclose daily share repurchase data to "assist investors in understanding the purposes and effects of repurchases." R.25, 44-45. However, in a change from the Proposed Rule, and in response to comments, such disclosures are not required to be made within one business day of the repurchase, but instead must be made in quarterly or semi-annual filings. *Id.* "For example," the Commission explained, "these data will help investors to identify repurchases undertaken close in time to the date on which an accounting measure, such as [earnings per share], is likely to trigger other effects," whereas "[i]n many cases, repurchase data aggregated at the monthly level would not be sufficiently detailed to shed light on these patterns." R.25. The Repurchase Rule also requires issuers to disclose "[t]he objectives or rationales for each repurchase plan or program" in

order "to improve the ability of investors to assess the shareholder value implications of the issuer's repurchase policy." R.74-75, 127.

In promulgating the rule, the Commission examined the market baseline; the rule's benefits and costs; the rule's effects on efficiency, competition, and capital formation; and reasonable alternatives to the rule. R.97-155. The Commission explained that it anticipated that the rule "will give rise to benefits by strengthening investor protection, improving market efficiency, and facilitating capital formation," and that it "expect[s] that the [rule] may have positive overall effects on … competition." R.119, 143. The Commission found that cost concerns raised by some commenters would be greatly "alleviated," and in some cases "largely eliminated," by the change in frequency of disclosures from daily to periodic. R.139-40.

## STANDARD OF REVIEW

Under the Administrative Procedure Act ("APA"), the rule may be set aside only if "arbitrary [or] capricious," "contrary to constitutional right," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (B), (D). "The findings of the Commission as to the facts, if supported by substantial evidence, are conclusive." 15 U.S.C. § 78y(a)(4); 15 U.S.C. § 80a-42(a). Substantial evidence is "more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Boeta v. FAA*, 831 F.3d 636, 641 (5th Cir. 2016) (cleaned up).  Legal questions are reviewed *de novo*.  *Id.*

## SUMMARY OF ARGUMENT

1.      The Repurchase Rule's requirement that issuers who undertake a repurchase disclose its "objectives and rationales" complies with the First Amendment.  Petitioners mistakenly assume that this requirement is subject to strict-scrutiny review like content-based, non-commercial mandated disclosures that compel expression of a particular viewpoint.  But disclosures in the commercial context—and pursuant to securities regulations in particular—are subject to limited First Amendment scrutiny.  Because a repurchase's aim is purely factual and uncontroversial information, its required disclosure is subject to review under *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio,* 471 U.S. 626 (1985).  And the disclosure requirement here passes muster under that— or any—level of scrutiny:  the reason for a particular repurchase is significant information for investors assessing the repurchase and what it means for valuing the issuer's stock, and disclosing that information directly advances the Commission's well-established interests in investor and market protection.

2.      The Commission engaged in a thorough, reasoned analysis of the rule's costs, benefits, and economic effects.  Petitioners' scattershot attempts to find contradictions or holes in the Commission's analysis are largely predicated on

mischaracterizations of the Commission's statements, which reflect sound analysis that satisfies all statutory requirements.

3.    The Commission provided a sufficient opportunity for comment.  The initial 45-day comment period exceeded the 30 days generally recognized as sufficient to elicit meaningful comment, and the Commission nearly doubled that amount for a total of 89 days.  And the comment period *did* elicit meaningful comment, resulting in the submission of thousands of comments, including six from the Chamber, which suggested a change in the reporting frequency required under the rule that the Commission adopted.  In any event, any deficiency was harmless to petitioners.  They received notice of the proposal when it was published on the Commission's website—two months before it was published in the Federal Register—and the Chamber met with Commissioners and staff twice during that time (and three more times thereafter).  Moreover, the Commission considered all comments submitted between publication on the Commission's website and the rule's adoption.

## ARGUMENT

## I.    The Repurchase Rule complies with the First Amendment.

In this pre-enforcement, facial challenge, petitioners argue that requiring issuers to disclose the "objectives or rationales" of repurchases violates the First Amendment.  Br. 21-34.  But they mistakenly assume that disclosure requirements

presumptively "trigger[] strict scrutiny" (*id.* 22), while their own authority makes clear that such a presumption applies only to "content-based" restrictions on "noncommercial" speech (*Nat'l Inst. of Fam. & Life Advocs. v. Becerra* ("*NIFLA*"), 138 S. Ct. 2361, 2371, 2374 (2018)) that are "nothing like" the content-neutral, commercial disclosure requirements of the rule (*303 Creative v. Elenis*, 143 S. Ct. 2298, 2318 (2023)).  *See* Br. 22 (conceding that "more deferential scrutiny" applies to "mandatory disclosures of neutral commercial facts").  In any event, the rule passes muster under the appropriate—or any—level of scrutiny.

### A.   The rule is analyzed under *Zauderer*.

Courts have long recognized that "regulation of the exchange of information regarding securities is subject only to limited First Amendment scrutiny."  *SEC v. Wall St. Pub. Inst., Inc.*, 851 F.2d 365, 373 (D.C. Cir. 1988).  That is because "[s]peech relating to the purchase and sale of securities … forms a distinct category of communications in which the government's power to regulate is at least as broad as with respect to the general rubric of commercial speech."  *Id.*; *see Full Value Advisors, LLC v. SEC*, 633 F.3d 1101, 1109 (D.C. Cir. 2011); *see also Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 64 (1973); *Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 456 (1978); *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc,* 472 U.S. 749, 758 n.5 (1985).

14

Commercial speech "merits only a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, allowing modes of regulation that might be impermissible in the realm of noncommercial expression." *Pub. Citizen Inc. v. La. Att'y Disciplinary Bd.*, 632 F.3d 212, 217–18 (5th Cir. 2011) (cleaned up); *Centr. Hudson Gas & Elect. Corp. v. Pub. Serv. Comm'n of N.Y*, 447 U.S. 557, 562-63 (1980) ("The Constitution … accords a lesser protection to commercial speech than to other constitutionally guaranteed expression."). As this Court has explained, "unlike other areas of First Amendment protection, the commercial speech doctrine is concerned primarily with the level and quality of information reaching the listener." *Dunagin v. City of Oxford*, 718 F.2d 738, 752 (5th Cir. 1983).

Even within the commercial speech context there are "material differences between disclosure requirements and outright prohibitions on speech"; the former warrant lesser scrutiny than the latter. *Zauderer,* 471 U.S. at 650; *see Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 796 n.9 (1988) (observing, in reference to securities regulations, that "[p]urely commercial speech is more susceptible to compelled disclosure requirements"). Applying that level of scrutiny, *Zauderer* upheld a requirement that compelled the disclosure of "purely factual and uncontroversial information" about a commercial endeavor. 471 U.S. at 650-51.

15

Petitioners erroneously argue that the disclosure at issue here is "not commercial speech" because it does not "propose[] a commercial transaction."  Br. 27.  Such transactional proposals merely represent one type of commercial speech, which the Court has defined more broadly as encompassing "expression related solely to the economic interests of the speaker and its audience."  *Central Hudson*, 447 U.S. at 561 (1980); *White Buffalo Ventures, LLC v. University of Texas at Austin*, 420 F.3d 366, 374 (5th Cir. 2005) (same).  As discussed, "the exchange of information about securities" is subject to regulation as commercial speech. *Ohralik*, 436 U.S. at 456; *supra* 14; *see also United States v. Wenger*, 427 F.3d 840, 848 (10th Cir. 2005) (non-transactional securities disclosures are commercial speech).  The disclosure at issue here is thus reviewed under *Zauderer*.[3]

## 1.    The rule requires "purely factual" disclosure.

As the Commission found, and petitioners concede, issuers engage in repurchases for many reasons, and the actual objectives or rationales for a particular repurchase—for example, returning excess capital to shareholders or

---

[3] In the decision petitioners cite, *Serafine v. Branaman*, 810 F.3d 354 (5th Cir. 2016), this Court employed a narrower definition of commercial speech in distinguishing speech proposing an economic transaction from "speech for profit" in the form of psychological services.  *Id.* at 365.  But that decision did not address, much less cast doubt upon, *Central Hudson*'s broader definition of commercial speech, which this Court has continued to apply.  *See, e.g.*, *White Buffalo*, 420 F.3d at 374; *Express Oil Change, LLC v. Miss. Bd. of Licensure*, 916 F.3d 483, 487 n.2 (5th Cir. 2019).

providing short-term price support for the issuer's stock—is significant

information for investors evaluating the issuer, its securities, and the repurchase.

*See supra* 5-6, 9. The disclosure of this information thus concerns purely factual

information about specific market activity in which an issuer has engaged.

Comparable factual disclosures about the purpose of commercial activity are

required under countless regulations.[4]

Petitioners miss the point when they assert that "[a] company's reason for

repurchasing its stock is not a rote fact" but rather "the company's subjective

opinion about the business benefits of its actions and the market's estimation of its

stock price." Br. 24. Nothing in the rule requires issuers to opine on the merits of

a share repurchase, the issuer's stock price, or any other topic; the rule is directed

only at the *factual* disclosure of a particular repurchase's purpose. To be sure, in

disclosing that factual information, the issuer may choose language that reflects a

subjective opinion. For example, if an issuer discloses that it undertook a

repurchase "to stabilize the price" of its shares (Br. 7), that disclosure may reflect

the issuer's opinion as to the "correct" price of its shares. But that possibility does

---

[4] *See, e.g.*, 17 C.F.R. § 227.201(i) ("purpose"); 17 C.F.R. § 229.10(e)(1)(i)(C) ("reasons"); 17 C.F.R. § 229.303(b) ("reasons"); 17 C.F.R. § 229.407(h) ("why"); 17 C.F.R. § 229.1006(a) ("purposes"); 17 C.F.R. § 240.13d-101 ("purpose or purposes"); 17 C.F.R. § 22.17(c)(2)(ii) ("reasons").

not make it any less factual that the issuer undertook the repurchase to achieve the stated objective.

Indeed, the factual nature of the disclosure here is even more apparent than in *NetChoice*, 49 F.4th 439—which petitioners ignore—where this Court concluded that a commercial activity's purpose is factual information under *Zauderer*. *NetChoice* involved a First Amendment challenge to a Texas statute requiring, among other things, that social media platforms "explain their content removal decisions" by notifying users of "the reason the content was removed." *Id.* at 485 (first quote); Tex. Bus. & Com. Code § 120.103(a)(1) (second quote). This Court held that the law "require[d] commercial enterprises to disclose 'purely factual and uncontroversial information' about their services," which "is controlled by the Supreme Court's decision in *Zauderer*." 49 F.4th at 485; *accord NetChoice, LLC v. Florida*, 34 F.4th 1196, 1227 (11th Cir. 2022) (applying *Zauderer* to a Florida statute requiring disclosure of the "rationale" for moderation decisions).

This case presents an even stronger basis to apply *Zauderer*, as the disclosure does not concern decisions made in moderating online expression. Rather, issuers must merely disclose, in periodic reports that they are already required to file, the aim of certain securities transactions. Moreover, the purported connection to subjective opinion here—where the disclosure concerns purely commercial securities transactions—is more attenuated than in *NetChoice*, where

18

the disclosures conveyed subjective opinions about what content the platform believed should be excluded (*e.g.*, the view that violent content is unacceptable) and why the platform believed that specific online posts qualified as prohibited content (*e.g.*, the moderators viewed a particular statement as violent). Because this Court has already held that such disclosures are purely factual under *Zauderer*, the same is necessarily true of the more modest requirement here.

## 2. The disclosure is uncontroversial.

Petitioners also misperceive the rule's disclosure requirement when they argue that "stock buybacks have recently become one of the most controversial corporate decisions today." Br. 25-26 (cleaned up). The rule does not require issuers to wade into that debate; it applies to issuers that have already undertaken a repurchase and requires them to disclose the objectives or rationales for only that particular repurchase. Such disclosure of the reason for regulated market activity is "non-ideological" in nature (*Nat'l Ass'n of Mfrs.* ("*NAM*") *v. SEC*, 800 F.3d 518, 530 (D.C. Cir. 2015)) and does not force an issuer to take "sides in a heated political controversy" (*CTIA – The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 845 (9th Cir. 2019)). Thus, it is not "controversial within the meaning of *Zauderer*." *Id.*

Whether the broader practice of share repurchases could be viewed as controversial is beside the point. Even if true, that topic is nowhere near as

controversial as the public debate regarding social media companies' moderation policies, which is the broader context in which this Court applied *Zauderer* in *NetChoice*. Indeed, *Zauderer* itself involved restrictions on commercial speech "'link[ed] … to a current public debate'" (regarding the health hazards of a contraceptive device), which the Court held did not alter its analysis. 471 U.S. at 637 n.7 (quoting *Central Hudson*, 447 U.S. at 563).

## B. The rule satisfies *Zauderer*.

Under *Zauderer*, a required disclosure does not violate the First Amendment if it is "reasonably related to a legitimate state interest" and not "unjustified or unduly burdensome" in a way that "chill[s] protected commercial speech." *NetChoice*, 49 F.4th at 485; *Zauderer*, 471 U.S. at 651. This test is animated by the principle that required disclosure in the commercial context "furthers, rather than hinders, the First Amendment goal of the discovery of truth and contributes to the efficiency of the 'marketplace of ideas.'" *N.Y. State Rest. Ass'n v. N.Y.C. Bd. of Health*, 556 F.3d 114, 132 (2d Cir. 2009). The rule satisfies this standard.

### 1. The disclosure requirement is reasonably related to a legitimate government interest.

The Commission undeniably has legitimate interests in "strengthening investor protection, improving market efficiency, and facilitating capital formation." R.119; *see also Wenger*, 427 F.3d at 850-51 (recognizing "the government's interest in promoting open capital markets"). As the Commission

found, "uncertainty" exists among investors as to how to interpret share repurchases, which reflects a "market failure" that may "reduc[e] investor confidence and market liquidity." R.18-19. But "[t]he current reporting regime … fails to provide enough detail for investors to draw informed conclusions about the purposes and effects of many repurchases." R.20. Disclosure of the purpose of a repurchase, the Commission found, will provide investors with "significant information that can aid investors in assessing the repurchase" and the "issuer's value." R.79-80. This goes to the heart of the Commission's mission, and petitioners do not claim otherwise; nor do they offer any basis to disregard the Commission's informed judgment about the importance of such disclosure to the market. *See Wall St. Pub. Inst.,* 851 F.2d at 373 ("In areas … like securities dealing … we do not believe the Constitution requires the judiciary to weigh the relative merits of particular regulatory objectives that impinge upon communications occurring within the umbrella of an overall regulatory scheme.").

Instead, petitioners erroneously assert that the disclosure requirement is "concededly" based on a "purely hypothetical" concern "that managers conduct improperly motivated buybacks." Br. 30; *see also* Kothari and Overdahl Amici Br. 5-14. There is nothing hypothetical about the value to investors of knowing a repurchase's rationale; indeed, petitioners concede the "signal" that repurchases send to the market about the issuer (Br. at 7), and the quality and credibility of that

signal is enhanced by the required disclosure. And petitioners ignore that the rule is also designed to address "informational asymmetries" concerning "the issuer and its future prospects" that impact even "efficient repurchases" that have no opportunistic motivation. R.24; *see infra* 37-38.

Nor is the disclosure requirement undermined because it also addresses the concern that some repurchases may be motivated by executive self-interest. The Commission found (and petitioners do not dispute) that existing research demonstrates that "personal benefit may be a factor in determining whether to undertake a share repurchase" and that, even when it is not a factor, the "uncertainty" alone has a negative impact on "investors who are attempting to assess the efficiency of, and information conveyed by, any given repurchase by a particular issuer." R.17-18, 22-23.

There is likewise no merit to petitioners' argument that the disclosure requirement is not "reasonably related" to these concerns. For one thing, their argument that disclosure should be required only for "those likely to commit misconduct" (Br. 32) ignores that the required disclosure advances important interests that do not concern the potential for opportunism. Nor do petitioners grapple with the Commission's undisputed finding that, where no opportunistic motivation exists, investors benefit when such a motivation can be ruled out. As the Commission explained, this is comparable "to disclosure requirements for

potentially self-interested financial advisors where disclosure allows a client to take into account the possibility of a conflict" of interest.  R.24 (cleaned up).  And even so, the Commission need not select the "least restrictive means" to address a problem, but rather must take an approach that is "reasonably related" to it. *Zauderer*, 471 U.S. at 651 n.14.[5]

Petitioners also incorrectly assert that "the Commission admitted it is 'unclear' how much valuable information additional disclosures would reveal 'above and beyond' what is already available."  Br. 30.  The Commission repeatedly described how the required "disclosures will allow investors to better evaluate … the efficiency, purposes, and impacts of issuer repurchases" (R.21); what the Commission said is "unclear" is the potential for disclosure of otherwise-undisclosed "sensitive information" to competitors, which the Commission properly evaluated in its economic analysis.  R.134.

Finally, petitioners err in claiming that the rule's focus on repurchases instead of other corporate decisions is "curiously narrow" for "discovering issuers' true value."  Br. 32.  The rule's purpose is not to reveal issuers' "true value," but to

---

[5] Petitioners also argue that shareholders can "bring derivative suits—a solution the Commission itself touts"—to address executive misconduct.  Br. 32.  The Commission's point was not that derivative suits are a substitute for enhanced disclosure, but that "to the extent that the disclosure raises the risk of shareholder litigation that is not frivolous, the threat of litigation may serve as a disciplinary mechanism that curtails inefficient managerial behavior."  R.136 n.477.

23

"improve the information investors receive" about repurchases in order to "enhance[e] the ability of investors to assess the efficiency, purposes, and impacts of issuer repurchases" and thus facilitate "more informed investment decisions." R.21, 90. Petitioners point to nothing that indicates that the rule cannot achieve that goal without additional disclosures concerning decisions "to issue dividends, to make significant capital investments, or to not repurchase stock." Br. 33. Nor is a disclosure requirement infirm even if "under-inclusive"; in the commercial speech context, "governments are entitled to attack problems piecemeal." *Zauderer*, 471 U.S. at 651 n.14.

### 2. The disclosure requirement is not "unjustified or unduly burdensome."

Contrary to petitioners' focus on purported financial and other business costs (Br. 31), the *Zauderer* analysis does not concern "economic[] or operations burdens" that disclosure requirements might impose; the question is instead whether requirements "unduly burden (or chill) protected speech and thereby intrude on an entity's First Amendment speech rights." *NetChoice*, 49 F.4th at 486 (cleaned up).

No such burden is imposed here: the requirement does not limit what issuers can say, impede their ability to speak about the repurchase, or "drown[] out [an issuer's] own message." *NIFLA*, 138 S. Ct. at 2378; *Am. Hosp. Ass'n v. Azar*, 983 F.3d 528, 541 (D.C. Cir. 2020) ("To prevail in a First Amendment challenge, …

the [challenger] must demonstrate a burden on *speech*.").  Moreover, by allowing issuers to make the disclosure in their own words, rather than requiring them to use government-mandated language, the rule gives issuers the flexibility to tailor the disclosures to their "individual circumstances." *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 252, (2010).

Petitioners argue that the disclosure of "objectives or rationales" will "impl[y] that repurchases are inherently suspect actions requiring a special justification."  Br. 31.  But this contradicts their repeated statement that the disclosure will show "ordinary business decisions undertaken for the good of shareholders" (*id.*), and they have no basis to suggest that the disclosure is inherently stigmatizing.  Such a proposition is not supported by the case on which they rely, *NAM v. SEC*, which did not even apply the "unduly burdensome" element of the *Zauderer* standard.  800 F.3d at 530.  There, the court struck down a portion of a rule it described as requiring a company "to confess blood on its hands" by "tell[ing] consumers that its products are ethically tainted." *Id*.  Here, by contrast, issuers are not required to convey a negative, government-drafted message confessing moral bankruptcy but merely to disclose the aim of a repurchase in their own words.

### C.    The rule would survive more exacting scrutiny.

#### 1.    The rule satisfies *Central Hudson*.

Even if *Zauderer* did not apply, "commercial speech enjoys lesser, intermediate-scrutiny constitutional protection" under the "framework established in *Central Hudson*."  *RTM Media L.L.C. v. City of Houston*, 584 F.3d 220, 224 (5th Cir. 2009).  Contrary to petitioners' claim (Br. 26-27), where a commercial disclosure requirement "does not fall within … *Zauderer*, … *Central Hudson* is the appropriate standard."  *R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205, 1217 (D.C. Cir. 2012), *rev'd in part on other grounds*, *Am. Meat Inst. v. Dep't of Agric.*, 760 F.3d 18, 23 (D.C. Cir. 2014); *see also Zauderer*, 471 U.S. at 637 ("*Central Hudson*" applies to "[w]hatever else the category of commercial speech may encompass").

In *Central Hudson*, the Court held that a restriction on commercial speech is permissible if it "directly advances" a "substantial" governmental interest and is "not more extensive than is necessary to serve that interest."  447 U.S. at 566.  This standard does not require that a restriction be the "single best disposition" or "least restrictive means" of achieving that end, but rather requires a "fit" between the "ends and the means" that is "reasonable" and "in proportion to the interest served."  *Board of Trs. of the State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989).

The Commission's interests in strengthening investor protection, improving market efficiency, and facilitating capital formation (*see supra* 20-21) are more than substantial, and petitioners do not argue otherwise. Requiring disclosure of a repurchase's aim "directly advances" those interests by addressing a market failure that affects investors' ability to assess repurchases, and there is a "reasonable" fit between ends and means that is "in proportion to the interest served." *Fox*, 492 U.S. at 480. The rule's modest requirements, in service of the Commission's important regulatory goals, would thus withstand such scrutiny.

> **2.  Petitioners are wrong in arguing that *Central Hudson* is inapplicable and, in any event, misstate what strict scrutiny would require.**

Commercial disclosures do not lose their character as "commercial speech" or receive more than the "limited measure of protection" afforded to such speech (*Pub. Citizen Inc.*, 632 F.3d at 217) simply because they do not qualify as "purely factual and uncontroversial" under *Zauderer*. Petitioners offer no justification for subjecting such disclosures to higher scrutiny than "outright prohibitions on [commercial] speech" or treating them like compelled speech mandates that "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Zauderer*, 471 U.S. at 650-51. Nor do petitioners cite a single case applying strict scrutiny to a disclosure requirement that, as here, is content-neutral and "related

27

solely to the economic interests of the speaker and its audience." *Central Hudson*, 447 U.S. at 561.[6]

The cases on which petitioners do rely (Br. 21-22) only underscore the distinction between the disclosure requirement here and compelled speech mandates that are subject to strict scrutiny. In *303 Creative*, the Court struck down a statute compelling "pure speech" on "a question of political and religious significance," the "very purpose" of which was "to excise certain ideas or viewpoints from the public dialogue." 143 S. Ct. at 2312, 2318, 2340. The Court held that such a restriction is "nothing like" the "commercial" speech to which *Zauderer* applies. *Id.* at 2318. In *NIFLA*, which evaluated a requirement that health clinics opposed to abortion "inform women how they can obtain state-subsidized abortions" from other providers, the Court similarly distinguished such "content-based laws that regulate … noncommercial speech" from commercial disclosure requirements. 138 S. Ct. at 2371, 2374.

---

[6] Petitioners cite dicta from the split decision in *Discount Tobacco City & Lottery, Inc. v. United States*, but the court there held that the challenged requirement satisfied *Zauderer* and did not apply strict scrutiny. 674 F.3d 509, 554 (6th Cir. 2012). And that dicta was based on a decision that did not consider *Central Hudson*, but applied strict scrutiny instead of *Zauderer* to a requirement that video-game makers label certain games with the "subjective and highly controversial message … that the game's content is sexually explicit" per the government's definition. *Ent't Software Ass'n v. Blagojevich*, 469 F.3d 641, 652 (7th Cir. 2006).

The other cases petitioners cite similarly address content-based restrictions on purely expressive, noncommercial speech. *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557, 573 (1995) (requirement forced parade organizers to "alter the expressive content of their parade" by including expression of "a particular point of view" on the "unqualified social acceptance of gays and lesbians"); *Pac. Gas & Elec. Co. v. Public Utils. Comm'n*, 475 U.S. 1, 13 (1986) (requirement "discriminate[d] on the basis of the viewpoints of the selected speakers" and forced "appellant to associate with speech with which appellant may disagree," including "political messages"); *Wooley v. Maynard*, 430 U.S. 705, 715 (1977) (statute forced individuals to "use their private property as a 'mobile billboard' for the State's ideological message" that they found "morally objectionable").[7]

By contrast, the "objectives or rationales" disclosure is content-neutral, as it does not "restrict expression because of its message, its ideas, its subject matter, or its content" (*NIFLA*, 138 S. Ct. at 2371) (cleaned up) but rather applies without regard to the specifics of the information to be disclosed. And it is not designed "to excise certain ideas or viewpoints from the public dialog" (*303 Creative*, 143 S.

---

[7] Nor is petitioners' argument supported by the two Ninth Circuit decisions they cite (Br. 25), which concerned warning labels forcing food manufacturers to label products with disparaging messages whose factual accuracy was itself in significant doubt.

Ct. at 2340) or to force issuers to propound an "ideological message" (*Wooley*, 430 U.S. at 715) or "particular point of view" (*Hurley*, 515 U.S. at 573) favored by the government.  Instead, the disclosure concerns "information regarding securities" and is thus subject to lesser scrutiny.  *Wall St. Pub. Inst.*, 851 F.2d at 373; *see also Central Hudson*, 447 U.S. at 561.

Moreover, petitioners misstate the standard for strict scrutiny in suggesting that the rule is not "narrowly tailored to serve compelling state interests."  Br. 22. "In order to survive First Amendment strict scrutiny, a content neutral restriction on speech must be narrowly tailored to a significant state interest and must leave open ample alternative channels of communication."  *Justice For All v. Faulkner*, 410 F.3d 760, 769 (5th Cir. 2005).  As discussed, the requirement here is content-neutral (*see supra* 29-30), and petitioners do not argue otherwise.  The rule also does not limit any alternative channels of communication:  issuers make the disclosure in their own words and are not restricted from conveying any information about the repurchase (or anything else).  And petitioners' only arguments as to the tailoring of the rule stand (and fall) on their misconception of its purpose and scope (*see supra* 21-24).

### D.  The First Amendment challenge does not implicate any other disclosure requirements of the rule.

Petitioners err in arguing that the Court would be required to vacate the rule's quantitative data disclosure requirement if they were successful in their First

Amendment challenge to the "objectives and rationales" disclosure requirement. The Commission assessed the two requirements independently and concluded that—while investors will benefit most from both disclosure categories in combination—the quantitative data disclosure on its own "will assist investors in understanding the purposes and effects of repurchases" (R.25) by "providing important disclosures that address the informational deficiencies in current reporting that we have identified" (R.45). *See also* R.45 ("Investors will be able to use the granular daily quantitative data to evaluate an issuer's repurchases in more detail, including in the context of other point-in-time disclosures, such as executive compensation and financial statement disclosures."). And the Commission assessed the costs and benefits specific to the quantitative data disclosure requirements. R.24-27, 135-40. That the Commission found that investors would benefit from the combination of this disclosure with the "objectives and rationales" disclosure does not render the quantitative data disclosure requirement unjustified on its own.

Furthermore, the Commission expressly determined that "[i]f any of the provisions of [the rule] is held to be invalid, such invalidity shall not affect other provisions … that can be given effect without the invalid provision or application." R.97. Because "a Court should adhere to the text of [a] severability or nonseverability clause," *Barr v. Am. Ass'n of Political Consultants*, 140 S. Ct.

31

2335, 2349 (2020), any remedy for a finding that the "objectives and rationales" disclosure requirement is unlawful should be limited to that requirement.

## II. The Commission reasonably considered the rule's costs, benefits, and overall economic effects.

The Commission conducted a reasonable analysis of the rule's likely economic effects, considering affected parties (R.99-102); the economic baseline (R.102-19); benefits (R.119-33); costs (R.133-43); efficiency, competition, and capital formation (R.143-46); and reasonable alternatives (R.146-55).   In so doing, the Commission complied with its obligations both to consider whether the rule "will promote efficiency, competition, and capital formation" (15 U.S.C. §§ 78c(f), 80a-2(c); *see also* 15 U.S.C. § 78w(a)(2)) and to conduct a "reasonable and reasonably explained" analysis, "which is all the APA requires." *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 452 (5th Cir. 2021) (cleaned up).

### A. The Commission's qualitative analysis was reasonable.

While the Commission must conduct an economic analysis in promulgating a rule, that duty "does not necessarily require a precise cost-benefit analysis." *Nasdaq Stock Mkt. LLC v. SEC*, 34 F.4th 1105, 1111 (D.C. Cir. 2022). Accordingly, "the Commission need not base its every action upon empirical data, and may reasonably conduct a general analysis based on informed conjecture." *Id.* And when the Commission "[does] not have the data necessary to quantify" economic effects, its "discussion of unquantifiable [economic effects] fulfills its

statutory obligation," *Lindeen v. SEC*, 825 F.3d 646, 658 (D.C. Cir. 2016), as it

need only make "a reasonable predictive judgment based on the evidence it ha[s],"

*FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1160 (2021).

In line with these principles, the Commission surveyed all available data,

including the studies identified by commenters, and, "wherever possible, attempted

to quantify the economic effects expected from" the rule.  R.98.  Because the

Commission found that "many" of the "economic effects" of the rule "cannot be

quantified," however, "much of the [economic analysis] remains qualitative in

nature."  R.97-98.  Contrary to petitioners' suggestion (Br. 41), the Commission

explained that the basis for that determination was the limited data available as a

result of current disclosure requirements, among other complicating factors.  R.104

& n.390.

Petitioners do not dispute that existing data is limited or point to any data

that the Commission failed to consider; they instead complain (Br. 40-41) that the

Commission did not follow the Chamber's recommendation to conduct new

studies that the petitioners contend might produce useful data.  But "[t]he APA

imposes no general obligation on agencies to conduct or commission their own

empirical or statistical studies" (*Prometheus Radio*, 141 S. Ct. at 1160), and the

Commission reasonably conducted the qualitative analysis that was warranted.

Because petitioners do not "identify any specific [data]" already available that the

Commission should have used, "simply criticiz[ing] the [Commission] for not obtaining and evaluating more data" fails to undermine the Commission's analysis. *Nat'l Ass'n for Surface Finishing v. EPA*, 795 F.3d 1, 12 (D.C. Cir. 2015)*; see Chamber of Com. of U.S. v. SEC*, 412 F.3d 133, 142 (D.C. Cir. 2005) ("The Commission's decision not to do an empirical study does not make [the resulting decision] an unreasoned decision.").[8]

## B.     The Commission reasonably identified the rule's potential costs.

Petitioners muster only two (meritless) objections to the Commission's comprehensive analysis (R.133-43) of the rule's potential costs.  Petitioners first claim that the Commission "did not try to estimate the magnitude" of the costs of "the loss of economically efficient buybacks and increased litigation costs for issuers." Br. 41.  But the Commission did just that:  after discussing those and other potential costs, the Commission rejected the notion that there would be "a large cost impact … on each individual issuer" and found that such costs "may be only incremental because issuers are already reporting share purchases by month in their periodic reports." R.45, 137.  With respect to specific cost concerns raised in connection with the proposed daily reporting frequency, the Commission found

---

[8] Although petitioners suggest that the Commission erred in not responding to the Chamber's study suggestions, "[c]omments . . . require response[] only if they raise points which, if true and which, if adopted, would require a change in an agency's proposed rule," and recommending a potential study does not reach that threshold.  *Huawei*, 2 F.4th at 449, 454.

that such costs—including potential "inefficient changes to … repurchase programs"—will "considerably decrease" and be "significantly more modest" after the change to periodic reporting.  R.137, 139.  The Commission also found that the "legal costs" of compliance "should be relatively modest" because periodic reporting will allow ample time for obtaining and verifying the data.  R.137-38.  Because petitioners do "not identify relevant cost data the agency ignored," their challenge fails.  *Huawei*, 2 F.4th at 453.

Petitioners also incorrectly argue (Br. 41-44) that, while the Commission gave "a dollar estimate of certain direct costs of preparing the disclosures," the Commission failed to "take those estimates into account when weighing the Rule's costs and benefits."  The Commission explicitly considered these direct costs in its economic analysis, citing the specific analysis that petitioners reference (R.133 & n.469) and evaluated the potential impacts of those costs on different issuers (R.136-37).  The Commission also determined that "the direct costs of preparing disclosures … will likely be relatively small."  R.175.

### C.    The Commission reasonably identified the rule's benefits.

#### 1.    The Commission explained that the rule will strengthen investor protection, improve market efficiency, and facilitate capital formation.

To begin, the Commission found that the Repurchase Rule will enable investors "to value the issuer's securities more accurately, resulting in better

35

informed investment decisions." R.119. Specifically, as the Commission

explained, the required disclosures will "remedy … market failures" that currently

"frustrate[] the ability of investors to separate out and assess the different

motivations and impacts of share repurchases." R.20. "Information about past

repurchases is valuable to investors" in assessing an issuer and its securities, the

Commission observed, and the "more comprehensive and disaggregated, granular

information" provided under the rule "should be useful to investors in inferring the

management's evolving beliefs about the company's underlying value and, in

conjunction with other disclosures, improving price discovery." R.107, 109.

Investors can use the information to gain "clearer insights into how and why the

issuers undertake repurchases and the extent to which they are related to temporary

undervaluation of issuer shares, temporary cash windfalls that cannot be deployed

to positive-net present value (NPV) investment projects, or other objectives."

R.109.

    The Commission also found that the rule will help investors "better evaluate

whether a share repurchase was intended to increase the value of the firm" or,

alternatively, "represented an inefficient deployment of capital, such as by either

providing additional compensation to management or impacting accounting

metrics in ways that were not intended to increase overall firm value." R.21. The

Commission found that the structure of some executive compensation packages, as

36

well as the relationship between certain "accounting targets" on "promotion, retention, or creditor preferences," can create the "opportunity" and "incentives" for repurchases, and after considering available studies, concluded that "personal benefit may be a factor in determining whether to undertake a share repurchase." R.17, 23, 50, 54.

The Commission determined that the required disclosures "will serve to alert investors" to situations in which repurchases may be motivated by managerial self-interest.  R.18.  And even when repurchases are aimed at enhancing shareholder value, the disclosures will help the market avoid uncertainty about the issuers' motivations.  As the Commission found, "investors cannot currently be certain that any given repurchase in fact conveys information about the issuer's fundamental value," and "this uncertainty" can "have adverse effects on investors and markets" by "reduc[ing] the credibility of … signals" sent by efficient repurchases.  R.22-23; *see supra* 20-21.

Finally, the Commission found that the rule will help "overcome" certain additional "informational asymmetries between issuers and their managers on the one hand and investors on the other."  R.20.  As the Commission explained, "even efficient repurchases have the potential to negatively affect investor confidence" because "issuers … repurchasing their own securities … will typically have significantly more, as well as more detailed, information about the issuer and its

future prospects" than investors.  R.24, 50.  This can make investors "more reluctant to trade" because of concerns that a repurchase was made "while the relevant decision makers are aware of material nonpublic information."  R.24. While current aggregate reporting requirements "[i]n many instances … may not be precise enough to reveal patterns in repurchases" to this effect, the disclosures required by the rule will be able to "reveal patterns" between repurchase plans and "the release of material nonpublic information by the issuer," which investors can "consider … in making future investment decisions with respect to a given issuer," "thereby increasing investor confidence."  R.21, 25-26, 50.

> **2.  Petitioners' arguments are premised on their misperception that the rule is intended solely to expose opportunistic repurchases.**

Petitioners' claim that the Commission failed to substantiate the rule's benefits rests on their erroneous assumption that its sole purpose is "to ferret out improperly motivated buybacks."  Br. 43.  The Commission found that the rule's "information benefits are *not* limited to instances where share repurchases are not aligned with shareholder value maximization."  R.127 (emphasis added).  As the Commission explained, the rule's disclosures will help investors "value the issuer's securities more accurately, resulting in better informed investment decisions," whether or not a particular repurchase is motivated by opportunism.  R.119; *see supra* 21-22, 36-38.

38

Petitioners thus miss the point when they claim that the Commission failed to show that "improperly motivated buybacks regularly occur" in "significant numbers" (Br. 43-44), as the rule was explicitly *not* premised on that notion. Indeed, the Commission addressed this misconception directly, observing that such a view "misconstrue[s] the nature of the concern" the rule seeks to address.  R.17. "[I]t is not necessary to find that opportunism drives the timing of most issuer share repurchases," the Commission explained—or that it is "the only, or even the most important, factor"—"to conclude that it is appropriate for investors to have more useful information about such repurchases."  R.17-18.

### 3. The Commission substantiated its conclusions concerning the potential for opportunistic behavior.

Petitioners similarly err in asserting that the Commission "never substantiated the threshold proposition that improperly motivated buybacks are actually a problem."  Br. 43.  The "problem" addressed by the rule is not rampant opportunism, but that investors currently lack sufficient information to assess repurchases, which is significant market activity bearing on the value of issuers and their shares.  *See supra* 5-6, 9-10, 21-24, 36-38.  As discussed, the potential for opportunistic repurchases is one subset of that issue, as to which the Commission found that there are opportunities for repurchases to benefit management personally, there is "evidence that some repurchases do so" (R.23) and that, even

when repurchases are not motivated by opportunistic reasons, investors can be negatively impacted by uncertainty over whether that is so.  *See supra* 5-6, 22, 37.

**4. The Commission appropriately considered the impact of the Rule 10b5-1 amendments.**

There is likewise no basis for petitioners' argument (Br. 45-47) that the Commission "ignore[d]" whether recent amendments to Rule 10b5-1 concerning trading by insiders "obviated the need" for the disclosures required by the Repurchase Rule.  *See Insider Trading Arrangements and Related Disclosures*, Rel. No. 33-11138 (Dec. 14, 2022), 87 Fed. Reg. 80362 (Dec. 29, 2022) ("Insider Trading Rule").  The Insider Trading Rule provisions identified by petitioners concern stock trading by insiders, not share repurchases by issuers.  And whether insiders engage in personal trading based on material nonpublic information does not bear on whether they use issuer repurchases to reach salary incentive targets or whether the *issuer* is making repurchases in light of material nonpublic information.  Moreover, the Commission expressly considered the Insider Trading Rule where it is in fact relevant to the Repurchase Rule—an *issuer's* adoption and termination of Rule 10b5-1 trading arrangements —and adopted Item 408(d), which the Commission found is "[c]onsistent with" the Insider Trading Rule. R.90.

40

### 5. The Commission's analysis of information asymmetries addressed by the rule is sound.

Multiple errors underlie petitioners' assertion (Br. 47-54) that the Commission "failed to substantiate the Rule's purported benefit of reducing information asymmetries between issuers and investors." *See also* Kothari and Overdahl Amici Br. 13-14. For one thing, petitioners identify a phantom contradiction (Br. 48-49) between the Commission's finding that investors will gain information benefits from the rule and its finding that issuers will face "relatively modest" indirect costs from the risk that the disclosures might "reveal[] significant proprietary information … above and beyond competitive information that may be revealed by other disclosures." R.134. That disclosed information may be of low competitive significance to *issuers* does not preclude that information from being significant to *investors* assessing a particular issuer and repurchase.

Petitioners also incorrectly claim that the Commission found the "objectives and rationales" disclosure unjustified because investors can already infer that information and will get little specificity from the disclosure. Br. 30, 49. What the Commission actually said is that the benefits of the disclosure "could be limited" in specific situations (R.128) and that the possibility of those isolated occurrences does not undermine the justifications for the Rule. R.52 (while "these kinds of informed conclusions based on existing quarterly data are possible, existing

41

disclosures are inadequate to provide investors with the information needed to fully

understand the actual impact of a repurchase"); R.78 ("disagree[ing]" with notion

that issuers will provide "boilerplate disclosure" instead of "sufficiently detailed

information to evaluate an issuer's repurchase").  For the same reason, petitioners'

assertion (Br. 49-50) that the Commission's "only" "defense" of the disclosure

requirement was that it would provide standardized disclosures is incorrect.

> **6.   The Commission reasonably evaluated the risk that the required disclosures could overwhelm investors.**

The Commission concluded that the required disclosures would not "result

in an overload of information for investors" and that the change from the proposed

next-day reporting to periodic reporting "should significantly reduce these

concerns."  R.55.  The Commission also found that the data tagging required by the

rule will allow "investors and other market participants … to collate … daily data

to another level of detail to suit their level of sophistication."  R.56.  And the

Commission found that the "newly available data may incentivize intermediaries,

such as investment advisers, to develop the capacity to analyze the data and

provide their analysis to retail or other clients."  *Id.*

Petitioners contend that retail investors will not know what data to look for

and thus will not benefit from the ability to collate data.  Br. 51.  But retail

investors (like all investors) already have access to share repurchase data under the

current disclosure regime, and the Commission reasonably found that retail

investors will "incrementally benefit from" access to additional data. R.55, 126-27. Moreover, petitioners ignore the Commission's reasonable explanation of how the data tags will allow retail investors to access useful data "to suit their level of sophistication": such investors can easily sort the data to find "the precise timing of repurchases" in the past and compare them to corporate events—for example, to find "whether repurchases occur before or after release of material nonpublic information." R.55. The Commission also found that retail investors will likely "benefit indirectly from the use of structured disclosure by other parties." R.132.[9]

Petitioners further claim it is "even worse" that retail investors may gain insight from intermediaries processing the data because that will mean they lack "equal access" to the data and gain "no benefit over current conditions." Br. 51. This does not follow: the Commission explained in depth how the disclosures will provide a wealth of information not currently available (R.55-56), so intermediaries (like investment advisors) processing that data will be able to

---

[9] Amici Kothari and Overdahl complain that the rule did not impose a materiality standard. But the Commission reasonably rejected that approach because "in many cases it is not only the amount, but also the timing of, repurchases that makes them informative to investors"; "[a]ssessments of materiality for every repurchase conducted by the issuer would add significant costs"; and "limiting disclosures to a volume threshold, such as relatively large aggregate daily purchases, whether a set one percent figure or otherwise, could encourage issuers that prefer to avoid disclosure to inefficiently divide their planned transactions over multiple days or weeks." R.56, 149-50.

provide a more accurate assessment.  Nor did the Commission ever state that the disclosure "is of use only to investors who can afford sophisticated intermediaries," as petitioners claim (Br. 51); as discussed, the Commission found that retail investors can benefit directly from the disclosures and indirectly through intermediaries as well as others, like media analysts.  R.55-56, 126-27, 132 & n.467.  And, as the Commission concluded, the adoption of periodic, rather than daily, disclosures should "mitigate" any advantage enjoyed by those with "greater capacity to quickly analyze information about daily repurchases."  R.56.

> **7.   The Commission reasonably considered whether reducing information asymmetries will disincentivize information collection.**

Petitioners erroneously argue (Br. 52-54) that the Commission "ignored … whether reducing asymmetries disincentivizes information collection," causing "investors to lose more informational benefits from disclosures than they gain." The Commission rejected the premise of this argument:  in response to the contention that "some level of asymmetric information" is needed to provide information-collection incentives, the Commission explained that such asymmetries will remain from the "delay in the timing of the disclosure of the issuer's repurchase trades," the issuer's "revelation of significant aspects of the repurchase program rather than … the entirety of its private information," and investors' disparate "disclosure processing costs" and "analysis of[] public

disclosures." R.122-23 & n.445. And the Commission found that "the decrease in information asymmetry as a result of the amended disclosure requirements would benefit investors, facilitating better informed investment decisions." R.122.[10]

### C. The Commission reasonably assessed the effect of the share repurchase excise tax.

The Inflation Reduction Act, which was signed into law after the Proposed Rule was published, imposes a one-percent excise tax on share repurchases by covered corporations. R.104-05. Commission staff analyzed the potential economic effects of the tax and drafted a memorandum ("Staff Memorandum") that was added to the comment file on December 7, 2022. Admin. Dkt. 182. The Commission reopened the comment period for 30 days, starting on December 12, 2022, to allow the submission of comments related to the excise tax or any other issue. Second Reopening 7-8.

The Commission then "reexamine[d] [its] approach[]" in light of the excise tax. *Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011). After

---

[10] In claiming that the rule is "against public policy because it will decrease choice available to investors without any compelling justification," amicus Investor Choice Advocates Network not only overlooks the rule's benefits but also fails to show that the Commission ignored a comment or used flawed reasoning. The Commission considered the "potential indirect cost" that the rule "may potentially discourage some issuers from repurchases that would otherwise be optimal for shareholder value," but found that, even so, the rule will allow investors to make "better informed investment decisions" overall, in addition to its other benefits. R.119, 134. The public-policy argument of the amici States fails for similar reasons.

considering all comments and the Staff Memorandum, the Commission concluded that "the effects of the excise tax are not expected to change the direction and the qualitative nature of the economic effects of the [rule]," and do not "meaningfully affect the rationale for the [rule]." R.8, 107. The Commission found that the excise tax could reduce the number of repurchases overall, but the effect of such a decline would not be "meaningfully different from a decline in repurchase activity for other reasons, such as a change in market conditions" and thus had been accounted for in the Commission's broader analysis. R.106. The Commission also found that a decline in repurchases would not affect the benefits of the disclosure concerning the repurchases that *will* occur, and that such disclosures "may be even more important" "when corporate repurchase decisions carry a new potential cost to shareholder value, in the form of an excise tax." *Id*. Accordingly, the Commission concluded, "the underlying rationale for the rule—informing investors in a more comprehensive fashion about the repurchase decisions of issuers that do continue to conduct repurchases—remains applicable." *Id.*

Petitioners argue that, because some fixed costs would remain static if repurchases decrease due to the excise tax, the rule's overall benefits would necessarily decrease more than its overall costs. Br. 55. But the Commission considered that concept and expressly factored it into its analysis, determining that if repurchases decline, the Commission expects only "the *portion* of costs and

46

benefits *that scales* with the level of repurchases"—that is, the non-fixed costs and benefits—"to decrease."  R.107 (emphasis added) (citing analysis in Staff Memorandum that "the variable portion of the direct costs" may decrease while "a fixed component" remains, such that "fixed costs … may comprise a larger portion of the costs") (Staff Memorandum at 11-12).

Petitioners next contend that the Commission ran afoul of *Business Roundtable v. SEC*, 647 F.3d 1144, 1150 (D.C. Cir. 2011), because the Staff Memorandum it considered purportedly failed to "hazard a guess" or make "tough choices" on certain issues.  Petitioners point to staff's statements that if repurchases decline, (1) certain fixed benefits of the rule "may remain" and (2) the excise tax is "equally likely" to "decrease repurchases across the board" rather than have "disproportionate impacts on 'opportunistic' versus 'optimal' repurchases."  But petitioners misinterpret *Business Roundtable*, which concerned the circumstances in which agencies must express a view on "which of … competing estimates is most plausible" or "correct."  *Id.*  Petitioners do not cite any competing data on either issue that staff, let alone the Commission, failed to consider.

Petitioners also do not explain how additional data concerning the excise tax would be significant given the Commission's conclusion that a decline in repurchases because of the excise tax would not be "meaningfully different" than declines for other reasons already factored into the Commission's analysis.  Nor is

it problematic for agencies to express uncertainty; to the contrary, "when an agency's decision is primarily predictive, …[courts] require only that the agency acknowledge factual uncertainties and identify the considerations it found persuasive." *Azar*, 983 F.3d at 536. And petitioners' characterizations of the staff analysis are, in any event, incorrect: the view that two possible scenarios are "equally likely" to occur is a definitive conclusion, and staff concluded that "the information benefits" of the disclosures "about the rationale for share repurchases and the [issuer's] policies … are likely to have a fixed component" that would remain if repurchases decline. Staff Memorandum at 11.

Finally, petitioners mistakenly claim (Br. 57-58) that, because the Staff Memorandum considered the effects of the excise tax on the Proposed Rule, the Commission failed to account for the changes in the Repurchase Rule that "materially decreased both the benefits and the costs of the Rule." While the Commission considered the analysis of staff as well as commenters, the Commission conducted its own analysis of the impact of the excise tax on the Repurchase Rule and the rule's costs and benefits (R.104-07); evaluated the impacts of the changes from the Proposed Rule (*see, e.g.*, R.119-43); and, as discussed, determined that the excise tax would not have a unique impact on those costs and benefits compared to other market conditions considered by the Commission (R.107).

48

**D.**     **The Commission reasonably evaluated the rule's overall economic effects.**

In challenging the Commission's broader economic analysis, petitioners seize on a typo in the release (Br. 58-59), which states that a discussion of certain mitigating factors could be found in Section V.C.1, when that discussion is actually a few pages later in V.C.2.  R.139-40 (cost of "inefficient reductions in share repurchases" mitigated by the change to periodic reporting, which will impose "more modest" costs on issuers, leading to "far fewer" inefficient reductions than the proposal).  Petitioners do not challenge that analysis, which is not impacted by the typo.

Petitioners next argue (Br. 59) that, in stating that the change to periodic reporting would "significantly alleviate" any loss of efficient repurchases as "compared to the proposal," the Commission failed to consider the current baseline.  But the Commission did so, concluding that "a potential indirect cost of the [rule] is the possibility that issuers inefficiently decrease repurchases."  R.146. And in the statement petitioners cite, the Commission responded to "[s]everal commenters" who "asserted that the proposed daily repurchase disclosures … may encourage issuers to act inefficiently to mitigate the negative consequences of daily disclosure."  R.32.  The Commission did not err in explaining how the changes made to the rule alleviated those concerns.  And after taking those costs (and others) into account, the Commission found that the rule "may have positive

49

overall effects on efficiency, competition, and capital formation" compared to the baseline of existing disclosure requirements.  R.143.

Petitioners also mistakenly argue (Br. 59) that the Commission failed to "account for the direct costs of completing the disclosures or other identified indirect costs, such as the exposure of proprietary information."  *See also* Kothari and Overdahl Amici Br. 15-16.  The Commission considered the "direct (compliance-related) costs to compile and report" the data, concluding that they "may be considerable in the aggregate" but that there "is not necessarily going to be a large cost impact … on each individual issuer."  R.133, 137.  The Commission also considered numerous "indirect costs," including "the risk of sharing sensitive information," which it found would "be relatively modest for most issuers," and, as to the "revelation of the issuer's repurchase strategy to other traders," would be "largely eliminated" by the change to periodic disclosures.  R.134, 139-40 & n.485.

Finally, petitioners assert (Br. 60) that when the Commission found that the rule "could result in adverse effects on competition" for smaller issuers (R.146), the Commission was required to find that these adverse effects were "necessary or appropriate" in furtherance of the purposes of the Exchange Act.  But petitioners misunderstand the governing statute, which provides that "[t]he Commission … shall not adopt any … rule … which would impose a burden on competition not

necessary or appropriate in furtherance of the purposes of this chapter." Exchange Act Section 23(a)(2), 15 U.S.C. § 78w(a)(2). The Commission did not find that the Repurchase Rule burdens competition; to the contrary, the Commission concluded that "we expect that the [rule] may have positive overall effects on … competition." R.143. No additional justification was required.[11]

### E. The Commission complied with all other statutory requirements in promulgating the rule.

There is no merit to the claim by amicus Manhattan Institute that the Commission lacks statutory authority to require issuers to disclose share repurchase information. Among other statutory bases, Section 13(a) of the Exchange Act provides the Commission with express authority to "prescribe, as necessary or appropriate for the proper protection of investors and to insure fair dealing in the security," "rules and regulations" concerning the disclosures issuers are required to make in their periodic and annual reports. 15 U.S.C. § 78m(a).[12]

---

[11] Amici Kothari and Overdahl claim that the Commission failed to explain why it rejected commenters' proposal that it avoid imposing certain costs of mandatory disclosure by instead "providing interpretive guidance" on certain issues. Admin. Dkt. 70. But the Commission explained that the adoption of periodic (rather than next-day) disclosure would mitigate those costs (*supra* 34-35).

[12] The Commission also has general rulemaking authority under Section 23(a) to implement the provisions of the Exchange Act, as well as specific rulemaking authority regarding disclosures by issuers under Section 12, which work in concert with Section 13(a)(1). Other provisions cited by the Commission as statutory authority (R.178) concern specific aspects of the rule; for example, the citations to

Indeed, Manhattan Institute acknowledges the applicability of this provision, but pivots to the merits argument that the rule is unjustified based on the arguments that "[p]etitioners have well explained" (Manhattan Inst. Amicus Br. 8-9), which have already been refuted, or new arguments that were not presented to the Commission in comments and are thus waived. *See, e.g., Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554, 562 (D.C. Cir. 2002) ("It is well established that issues not raised in comments before the agency are waived and this Court will not consider them.").

## III. The Commission provided sufficient opportunity to comment on the Proposed Rule.

### A. The comment period was more than adequate.

Under the APA, an agency must provide "interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. 553(c). While the APA does not specify a minimum comment period, this Court has held that it "generally requir[es] … a minimum thirty-day period for participation in the rulemaking through comment." *Chem. Mfrs. Ass'n v. EPA*, 899 F.2d 344, 347 (5th Cir. 1990); *see also Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1117 (D.C. Cir. 2019) (same).

---

provisions of the Investment Company Act relate to the rule's application to listed closed-end funds.

The comment period for the Proposed Rule was more than adequate. The comment period first closed 107 days after the Commission published the proposal on its website and 45 days after it was published in the Federal Register. *See supra* 8. The Commission then reopened the comment period twice—first for 14 days, then for an additional 30 days—allowing comment on any issue relating to the rule. *See supra* 8-9. Moreover, the Commission "considered all comments received since December 15, 2021" until the Rule was adopted, which was a span of 504 days. R.8. The Commission's call for comments yielded over 170 unique comments, including six from the Chamber, and over 3,200 form comments. *See supra* 9. The Chamber also met with Commissioners and/or Commission staff five times to discuss the Proposed Rule. Admin. Dkt. 184, 185, 190, 194, 197. This extensive comment period provided petitioners and other interested parties a meaningful opportunity to comment on the Proposed Rule.

Petitioners contend (Br. 61-62) that the "initial 45-day comment period" was insufficient. They are incorrect: a 45-day comment period provides ample time for meaningful comment, as evidenced by the extensive comments received from the Chamber and thousands of others. But their argument also ignores the additional 44 days by which the comment period was subsequently extended, which could be used to comment on any issue. While petitioners erroneously assert that the 14-day reopening was "solely to allow 'resubmission' of any

53

comments" that were not received because of a technical glitch (Br. 64), the Commission actually "reopen[ed] the comment period[]" without limitation "[t]o further ensure that interested persons, *including* any affected commentators, have the opportunity *to comment* on the releases *or to resubmit* comments." First Reopening at 4 (emphasis added). The later 30-day reopening likewise permitted comment on any issue. Second Reopening at 7-8.

Petitioners also ignore that they had two months of additional notice from the December 15, 2021 publication of the Proposed Rule on the Commission's website. *See Omnipoint Corp. v. FCC*, 78 F.3d 620, 629-30 (D.C. Cir. 1996) (evaluating sufficiency of comment period based on when "appellants had actually received notice prior to the … date when the proposed federal regulations were published in the Federal Register"). Indeed, the Chamber used that additional time, meeting twice with Commissioners and staff during that period to discuss the Proposed Rule. Admin. Dkt. 184, 185.

Nor do petitioners have any support for their claim that the rule—which simply builds on existing repurchase disclosure requirements—was a "complex, first-of-its-kind rulemaking" posing "difficult empirical questions" that could not be addressed within the time available. They submit a declaration with their brief claiming that the declarant and his colleague "could have conducted" new studies "ourselves" with more time, but, because they lacked time, they instead suggested

study ideas to the Commission.  Br. Ex. C; *see also* Br. 40-41; *supra* 33-34.  But

not only is that claim unsubstantiated, the declarant did not make (or substantiate)

that representation to the Commission at the time (Admin. Dkt. 70 at 10, 16-17)—

depriving the Commission of the opportunity to consider it.  That is precisely why

such extra-record assertions, prepared after the rule was adopted to support a

litigation position, should not be considered.  *See, e.g.*, *Hill Dermaceuticals, Inc. v.

FDA*, 709 F.3d 44, 47 (D.C. Cir. 2013) ("[I]t is black-letter administrative law that

in an APA case, a reviewing court should have before it neither more nor less

information than did the agency when it made its decision.") (cleaned up).

    Petitioners also offer no basis for their claim that the 30-day reopening in

response to the shareholder repurchase excise tax was insufficient to allow

comment on that issue.  While the Chamber suggested a delay of "at least two

years … to properly gather data" concerning the impact of the excise tax (Admin.

Dkt. 168, Addendum at 4), the Commission considered that suggestion before

concluding that such a delay would not yield meaningful data for the reasons

discussed above (R.104-05; *see supra* 45-48)—and petitioners raise no challenge

to that analysis.  As 30 days generally suffices to permit comment on an entire

proposed rule (*see supra* 52), it was more than enough to allow comment on a

single issue concerning a proposed rule that had already had 59 days of comment, with or without the two federal holidays included in that period.[13]

Petitioners also argue that more time was needed because of "other SEC proposals undergoing comment simultaneously," and they cite a handful of statements by others supporting a lengthier comment period.  Br. 62-64.  But in its comments the Chamber requested "a 45-day comment period extension" to address those scheduling concerns—almost exactly the amount of additional time that was subsequently added.  Admin. Dkt. 26.  Other statements that they cite (Br. 62-64) also predated the additional extensions, which nearly doubled the length of the comment period.

This case thus does not involve any of the extraordinary circumstances present in the district court decision on which petitioners rely, in which "numerous intertwined proposed rules" involving "extensive changes to the immigration court system that altered long-established policy and practice" were "promulgated at different times, including after the close of the comment period" and "a number of

---

[13] Petitioners cite *Pangea Legal Servs. v. U.S. Dep't of Homeland Sec.*, 501 F. Supp. 3d 792 (N.D. Cal. 2020), for the proposition that those two days are a factor, but that case involved a rule with 30-day total comment period—not the 89 days provided here—and applied a functional approach looking at whether the proposal had been "previously published in any form."  *Id.* at 820.  Under that approach, the period would actually be 35 days, measured from the day the Commission published the notice of reopening.  *See supra* 8-9.

significant policy and regulatory changes were announced in the final days of the

comment period or after the comment period had closed, and those changes

directly intersect with [the challenged rule] in a variety of ways." *Centro Legal de*

*la Raza v. Exec. Off. for Immigr. Review*, 524 F. Supp. 3d 919, 962 (N.D. Cal.

2021).[14]

### B.     Any deficiency in the comment period was harmless.

Even if the comment period had been insufficient, petitioners fail to show

any prejudice.  An agency's mistake is harmless when it "clearly had no bearing on

the procedure used or the substance of decision reached." *City of Arlington, Tex. v.*

*FCC*, 668 F.3d 229, 244 (5th Cir. 2012) (cleaned up).  Applying this principle in

the context of inadequate notice and comment, this Court has explained that such a

deficiency is harmless if "it is clear that the lack of notice and comment did not

prejudice the petitioner." *Id.* (cleaned up).

No such prejudice exists here.  The Chamber made extensive use of the time

available for comment, submitting three comment letters following Federal

Register publication, one letter in each of the two extended periods, and one

between those periods.  *See supra* 9.  The Chamber also met with Commissioners

---

[14] Petitioners also cite (Br. 65) a second district court decision addressing the same
rule and circumstances.  *See Cath. Legal Immigr. Network, Inc. v. Exec. Off. for*
*Immigr. Review*, 2021 WL 3609986 (D.D.C. Apr. 4, 2021).

and/or Commission staff regarding the Proposed Rule five times, starting after the proposal was published on the Commission's website. *See supra* 53. Indeed, the Commission elected to forgo requiring next-day disclosure of repurchase data—a provision that the Chamber opposed. *See* R.30 n.74.

Petitioners' "fail[ure] to identify any substantive challenges [they] would have made had [they] been given additional time" further confirms that any error was harmless. *Omnipoint*, 78 F.3d at 630; *see also United States v. Johnson*, 632 F.3d 912, 933 (5th Cir. 2011) (no prejudice where challenger did not identify any additional "comments he would have made"); *U.S. Telecom Ass'n v. FCC*, 400 F.3d 29, 41 (D.C. Cir. 2005) (no prejudice where "every challenge to the [agency action] that [petitioners] have raised in their appellate briefs was also made during the comment period").

## CONCLUSION

The petitions for review should be denied.

<div style="margin-left:auto">

Respectfully submitted,

MEGAN BARBERO
*General Counsel*

MICHAEL A. CONLEY
*Solicitor*

DOMINICK V. FREDA
*Assistant General Counsel*

THEODORE J. WEIMAN

</div>

*Senior Appellate Counsel*

*/s/ Ezekiel L. Hill*
EZEKIEL L. HILL
*Appellate Counsel*

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
202.551.7724 (Hill)
hillez@sec.gov

August 9, 2023

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,969 words, excluding the parts exempted by Fed. R. App. P. 32(f).

I further certify that the foregoing brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced, Roman-style, 14-point typeface.

*/s/ Ezekiel L. Hill*
Ezekiel L. Hill

Dated: August 9, 2023

## CERTIFICATE OF SERVICE AND FILING

I certify that on August 9, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Fifth Circuit through the Court's CM/ECF system.  Service on counsel of record will be accomplished through the Court's CM/ECF system.

I further certify that this electronic filing is an exact copy of the paper document, that any privacy redactions have been made, and that this electronic filing was scanned for, and found to be free of, viruses.

/s/ Ezekiel L. Hill
Ezekiel L. Hill

Dated: August 9, 2023