# JONES DAY

51 LOUISIANA AVENUE, N.W. • WASHINGTON, DC 20001.2113

TELEPHONE: +1.202.879.3939 • JONESDAY.COM

Direct Number: +1.202.879.3809
RWATSON@JONESDAY.COM

March 11, 2024

CM/ECF

Lyle W. Cayce
Clerk of the Court
United States Court of Appeals for the Fifth Circuit
600 S. Maestri Place
New Orleans, LA 70130-3408

Re: *R J Reynolds Tobacco Company, et al. v. Food & Drug Administration, et al.*,
No. 23-40076

Dear Mr. Cayce:

Plaintiffs-Appellees submit this Rule 28(j) letter regarding *Free Speech Coalition, Inc. v. Paxton*, No. 23-50627 (5th Cir. Mar. 7, 2024) ("*Coalition*") (Exhibit A). *Coalition*, which affirmed a preliminary injunction against a law requiring pornographic websites to display government-crafted health warnings, Op. 3-4, reinforces Plaintiffs-Appellees' position.

*First*, *Coalition* held that, "as in *NIFLA*," the government did not "adequately tailor the warnings" as required by *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557 (1980). Op. 32 (citing *NIFLA*, 585 U.S. 755, 766 (2018)). Like FDA here, Texas had not demonstrated "that it tried a government-funded public information campaign or that such a campaign would be ineffective." Op. 33; Appellees' Br. 43-46; ROA.10208-11. Accordingly, both here and in *Coalition*, the government has not satisfied its "burden of proving … the fit" because there are "'numerous and obvious less-burdensome alternatives' to the health warnings." Op. 31 (quoting *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 624 (1995)).

*Second*, *Coalition* underscored that the government "'must demonstrate that … its restrictions will in fact alleviate [the harms] to a material degree.'" Op. 32 (alterations in original). Here, FDA has not demonstrated that the warnings advance its stated interest at all, let alone materially. Appellees' Br. 32-40.

AMSTERDAM • ATLANTA • BEIJING • BOSTON • BRISBANE • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS
DETROIT • DUBAI • DÜSSELDORF • FRANKFURT • HONG KONG • HOUSTON • IRVINE • LONDON • LOS ANGELES • MADRID
MELBOURNE • MEXICO CITY • MIAMI • MILAN • MINNEAPOLIS • MUNICH • NEW YORK • PARIS • PERTH • PITTSBURGH
SAN DIEGO • SAN FRANCISCO • SÃO PAULO • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

JONES DAY

Lyle W. Cayce
March 11, 2024
Page 2

 *Third*, *Coalition* confirms that compelled statements are "uncontroversial" under *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985), only if their accuracy "is not subject to good-faith or evidentiary dispute and where the statement is not an integral part of a live, contentious political or moral debate." Op. 28-29. Here, the compelled statements are controversial because *FDA's own studies* demonstrated that the warnings convey an ideological message and are also subject to multiple reasonable interpretations, including misleading or false ones. Appellees' Br. 17-26; ROA.10204-08.

 *Fourth*, *Coalition* suggests that—as Plaintiffs-Appellees have argued (at 32 n.4)—strict scrutiny rather than *Central Hudson* review applies to compelled disclosures. While noting that the question is "unsettled," *Coalition* emphasizes that *Central Hudson* addressed only "*restrictions* on commercial speech, not *compelled* speech," and that "*NIFLA* suggests that compelled speech must survive, *at minimum*, intermediate scrutiny." Op. 30.

JONES DAY

Lyle W. Cayce
March 11, 2024
Page 3

Respectfully submitted,

*/s/ Ryan J. Watson*
Ryan J. Watson
Christian G. Vergonis
Alex Potapov
Amelia A. DeGory
JONES DAY
51 Louisiana Ave., N.W.
Washington, DC 20001
(202) 879-3939
rwatson@jonesday.com

*Counsel for Plaintiffs-Appellees*
*R.J. Reynolds Tobacco Company, et al.*

Philip J. Perry
Andrew D. Prins
LATHAM & WATKINS LLP
555 Eleventh Street, N.W.,
Suite 1000
Washington, DC 20004
(202) 637-2200
philip.perry@lw.com

Nicholas L. Schlossman
LATHAM & WATKINS LLP
300 Colorado Street
Austin, TX 78701
(737) 910-7300
nicholas.schlossman@lw.com

*Counsel for Plaintiff-Appellee*
*ITG Brands LLC*

Constantine Pamphilis
KASOWITZ BENSON
TORRES LLP
1415 Louisiana Street,
Suite 2100
Houston, TX 77002
(713) 220-8852
dpamphilis@kasowitz.com

*Counsel for Plaintiff-Appellee*
*Liggett Group LLC*

Enclosure

cc:    All counsel (via CM/ECF)

## CERTIFICATE OF COMPLIANCE

I hereby certify that the body of this Letter pursuant to Fed. R. App. P. 28(j), beginning with the first word after the salutation and ending with the last word before the complimentary close, contains 350 words according to the word-processing software used to prepare this Letter.  This Letter complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it was prepared in proportionally spaced typeface using Microsoft Word for Microsoft Office 365, in 14-point Garamond font.

## CERTIFICATE OF SERVICE

I also certify that on March 11, 2024, I caused a copy of the foregoing to  be served on all counsel of record by CM/ECF.

Dated: March 11, 2024

*/s/ Ryan J. Watson*
Ryan J. Watson

# EXHIBIT A

# United States Court of Appeals for the Fifth Circuit

————————

No. 23-50627

————————

United States Court of Appeals
Fifth Circuit

**FILED**

March 7, 2024

Lyle W. Cayce
Clerk

FREE SPEECH COALITION, INCORPORATED; MG PREMIUM, LIMITED; MG FREESITES, LIMITED; WEBGROUP CZECH REPUBLIC. A.S.; NKL ASSOCIATES, S.R.O.; SONESTA TECHNOLOGIES, S.R.O.; SONESTA MEDIA, S.R.O.; YELLOW PRODUCTION, S.R.O.; PAPER STREET MEDIA, L.L.C.; NEPTUNE MEDIA, L.L.C.; JANE DOE; MEDIAME, S.R.L.; MIDUS HOLDINGS, INCORPORATED,

*Plaintiffs—Appellees*,

*versus*

KEN PAXTON, *Attorney General, State of Texas*,

*Defendant—Appellant*.

————————————————————

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:23-CV-917

————————————————————

Before HIGGINBOTHAM, SMITH, and ELROD, *Circuit Judges*.

JERRY E. SMITH, *Circuit Judge*:

Texas H.B. 1181[1] was scheduled to go into effect on September 1,

—————————————

[1] *See* Publication or Distribution of Sexual Material Harmful to Minors on an

2023. It imposes new standards on commercial pornographic websites, requiring them to verify the age of their visitors and to display health warnings about the effects of the consumption of pornography. Free Speech Coalition, Incorporated, an adult industry trade association; several domestic and foreign corporations that produce, sell, and host pornography; and one individual adult content creator brought a facial challenge against the enforcement of H.B. 1181. The day before the law was scheduled to take effect, the district court granted plaintiffs' motion for a preliminary injunction in an 81-page order. *Free Speech Coal., Inc. v. Colmenero*, No. 1:23-CV-917, 2023 WL 5655712, at *30 (W.D. Tex. Aug. 31, 2023). The court concluded that: (1) both the age-verification requirement and the health warnings of H.B. 1181 likely violate plaintiffs' First Amendment rights, and (2) as to certain plaintiffs, the law likely conflicts with, and thus is preempted by, Section 230 of the Communications Decency Act, 47 U.S.C. § 230. Then the court ruled that plaintiffs had satisfied the other preliminary injunction factors.

Texas filed an emergency appeal, and this court issued an administrative stay, ordered expedited briefing, and heard oral argument two weeks later. A month after argument, this panel granted Texas's motion to stay the district court's injunction pending appeal. We now vacate that stay and rule on the merits of the preliminary injunction.

First, we vacate the injunction against the age-verification requirement based on *Ginsberg v. New York*, 390 U.S. 629 (1968), which remains binding law, even after *Ashcroft v. ACLU* (*Ashcroft II*), 542 U.S. 656 (2004).[2]

---

Internet Website; Providing a Civil Penalty, 2023 Tex. Sess. Law Serv. Ch. 676 (H.B. 1181) (codified at Tex. Civ. Prac. & Rem. Code Ann. § 129B.001 *et seq.*).

[2] *See Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 793–94 (2011) (discussing *Ginsberg*'s treatment of "*sexual* material that would be obscene from the perspective of a child").

The proper standard of review is rational-basis, not strict scrutiny. Applying rational-basis review, the age-verification requirement is rationally related to the government's legitimate interest in preventing minors' access to pornography. Therefore, the age-verification requirement does not violate the First Amendment. Further, Section 230 does not preempt H.B. 1181. So, the district court erred by enjoining the age-verification requirement.

Second, we affirm the injunction in regard to the health warnings. The district court properly applied *National Institute of Family & Life Advocates v. Becerra* (*NIFLA*), 585 U.S. 755, 766 (2018), and ruled that H.B. 1181 unconstitutionally compelled plaintiffs' speech.

## I.

H.B. 1181 regulates only certain entities, specifically, "commercial entit[ies] that knowingly and intentionally publish[] or distribute[] material on an Internet website, including a social media platform, more than one-third of which is sexual material harmful to minors." § 129B.002(a). Those regulated entities must take two actions. First, they must "use reasonable age verification methods" to limit their material to adults. *Id.* Second, they must "display notices on the landing page of the website and on all advertisements for that website in 14-point font or larger." § 129B.004(1) (cleaned up).

The newly enacted statute defines sexual material harmful to minors by adding "with respect to minors" or "for minors," where relevant, to the well-established *Miller* test for obscenity. *See Miller v. California*, 413 U.S. 15, 24 (1973).[3] It also mimics the language of 47 U.S.C. § 231, which the

---

[3] The law defines "[s]exual material harmful to minors" as material that

(A) the average person applying contemporary community standards

No. 23-50627

Supreme Court reviewed in *Ashcroft II*.[4]

Regulated entities may choose their preferred "reasonable age verification methods," including by outsourcing the process to a third party. §§ 129B.002–129B.003. The options include the use of government-issued identification. *See* § 129B.003(b)(2)(A). But the websites may alternatively require digital identification or may use other "commercially reasonable method[s]." § 129B.003(b)(1), (2)(B). Further, whoever performs the verification may not retain any of the individual's identifying information. § 129B.002(b).

The websites must also show three health warnings on their landing pages and advertisements. § 129B.004(1).[5] Additionally, the entities must

---

would find, taking the material as a whole and with respect to minors, is designed to appeal to or pander to the prurient interest;

(B) in a manner patently offensive with respect to minors, exploits, is devoted to, or primarily consists of descriptions of actual, simulated, or animated displays or depictions of [explicitly described sexual material]; and

(C) taken as a whole lacks serious literary, artistic, political, or scientific value for minors.

§ 129B.001(6).

[4] *See* Omnibus Cons. & Emergency Supplemental Appropriations Act, 1999, Pub. L. No. 105-277, §§ 1401–06 (1998) (also referred to as the "Child Online Protection Act," hereinafter "COPA").

[5] The warnings read,

TEXAS HEALTH AND HUMAN SERVICES WARNING: Pornography is potentially biologically addictive, is proven to harm human brain development, desensitizes brain reward circuits, increases conditioned responses, and weakens brain function.

TEXAS HEALTH AND HUMAN SERVICES WARNING: Exposure to this content is associated with low self-esteem and body image, eating disorders, impaired brain development, and other emotional and mental

No. 23-50627

place a notice at the bottom of every webpage.  § 129B.004(2).[6]

Should an entity either refuse or fail to comply with H.B. 1181, the Attorney General may seek injunctive relief and civil penalties of up to $10,000 for each day a company lacks age-verification; up to $10,000 for each instance of improper retention of identifying information; and up to $250,000 for a minor's accessing of sexual material harmful to minors. § 129B.006.[7]

Shortly after Texas enacted H.B. 1181 and before it took effect, plaintiffs sued. They claimed, *inter alia*, H.B. 1181 impermissibly encroaches on their First Amendment rights and, for some plaintiffs, conflicts with

_____

illnesses.

TEXAS HEALTH AND HUMAN SERVICES WARNING:  Pornography increases the demand for prostitution, child exploitation, and child pornography.

§ 129B.004(1) (internal quotation marks omitted).

[6] That notice reads,

U.S. SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES ADMINISTRATION HELPLINE:

1-800-662-HELP (4357)

THIS HELPLINE IS A FREE, CONFIDENTIAL INFORMATION SERVICE (IN ENGLISH OR SPANISH) OPEN 24 HOURS PER DAY, FOR INDIVIDUALS AND FAMILY MEMBERS FACING MENTAL HEALTH OR SUBSTANCE USE DISORDERS.  THE SERVICE PROVIDES REFERRAL TO LOCAL TREATMENT FACILITIES, SUPPORT GROUPS, AND COMMUNITY-BASED ORGANIZATIONS

§ 129B.004(2).

[7] Those penalties are strictly civil.  This law does not criminalize the publication or distribution of obscenity.  Another, longstanding Texas law already does so.  *See* Tex. Penal Code Ann. §§ 43.21–43.23.  Texas has not attempted to regulate plaintiffs under those laws, despite its apparent ability to do so.

Section 230.

The district court found that: (1) all plaintiffs have standing and that sovereign immunity does not bar the claims because *Ex parte Young* creates a carveout for suits against state officials where the plaintiffs seek prospective relief for violation of constitutional rights[8]; (2) the age-verification requirement is subject to and fails strict scrutiny under *Ashcroft II* and *Reno*[9]; (3) the health warnings compel speech, so they are subject to, and fail, strict scrutiny; and (4) Section 230 conflicts with and therefore preempts H.B. 1181 as to certain plaintiffs. Thus, the district court believed that plaintiffs were likely to succeed on the merits of their claim and to suffer irreparable harm and that the balance of harms and public interest favored a preliminary injunction under *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). So, the court issued a pre-enforcement preliminary injunction. Texas now appeals.

## II.

We review preliminary injunctions for abuse of discretion. *Ashcroft II*, 542 U.S. at 664. But such "a decision grounded in erroneous legal principles is reviewed *de novo*." *Mock v. Garland*, 75 F.4th 563, 577 (5th Cir. 2023) (quoting *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009)).

Preliminary injunctions are "extraordinary remed[ies] that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."[10] The moving party must show

> (1) a substantial likelihood of success on the merits, (2) a sub-
> stantial threat of irreparable injury if the injunction is not is-
> sued, (3) that the threatened injury if the injunction is denied

---

[8] *See Ex parte Young*, 209 U.S. 123, 159–60 (1908).

[9] *Reno v. ACLU*, 521 U.S. 844, 864–68, 874 (1997).

[10] *NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 447 (5th Cir.) (quoting *NRDC*, 555 U.S. at 22), *cert. granted*, 144 S. Ct. 275 (2023).

> outweighs any harm that will result if the injunction is granted,
> and (4) that the grant of an injunction will not disserve the pub-
> lic interest.

*Mock*, 75 F.3d at 577 (quoting *Byrum*, 566 F.3d at 445). And "[t]he govern-
ment's and the public's interests merge when the government is a party." *Id.*
(citing *Nken* v. *Holder*, 556 U.S. 418, 435 (2009)).

The key issue is whether the district court properly found a substantial
likelihood of success on the merits. So, we turn to that first.

## III.
### A.

H.B. 1181's age-verification requirements are subject to rational-basis
review. Applying that standard, we uphold them as constitutional.

#### 1.

"The State has an interest to protect the welfare of children and to see
that they are safeguarded from abuses." *Ginsberg*, 390 U.S. at 640 (cleaned
up).[11] For that reason, regulations of the distribution *to minors* of materials
obscene *for minors* are subject only to rational-basis review. *See id.* at 641; *see
also Ent. Merchs.*, 564 U.S. at 793–94 (quoting *Ginsberg*, 390 U.S. at 641).

*Ginsberg* dealt with a First Amendment challenge to a New York law
criminalizing the sale of so-called "girlie" picture magazines and applied the
then-relevant *Memoirs* obscenity standard, modified for children.[12] The
Court recognized that the magazines at issue "are not obscene for adults"

---

[11] Texas is not alone asserting this interest. Seven other states—Arkansas, Loui-
siana, Mississippi, Montana, North Carolina, Utah, and Virginia—have recently passed
similar laws.

[12] *Ginsberg*, 390 U.S. at 632–35 (citing *A Book Named 'John Cleland's Memoirs of a
Woman of Pleasure' v. Att'y Gen. of Mass.* (*Memoirs*), 383 U.S. 413, 418 (1966) (plurality
opinion) (test altered by *Miller*, 413 U.S. at 23–24)).

No. 23-50627

but ruled that, because the seller could still stock and sell them to adults, *Butler v. Michigan* did not apply. *Ginsberg*, 390 U.S. at 634–35 (citing *Butler*, 352 U.S. 380, 382–84 (1957) (holding that the state cannot "reduce the adult population of Michigan to reading only what is fit for children")). Instead, New York could criminalize the selling of those magazines to children because "it was not irrational for the legislature to find that exposure to material condemned by the state is harmful to minors." *Id.* at 641.

The decision in *Erznoznik v. City of Jacksonville*, 422 U.S. 205 (1975), reaffirmed a robust reading of *Ginsberg*'s principle: "It is well settled that a State or municipality can adopt more stringent controls on communicative materials available to youths than on those available to adults." *Id.* at 212 (citing *Ginsberg*, 390 U.S. 629). Crucially, the material regulated by the ordinance in *Erznoznik* was available to both youths and adults.[13] "Assuming the ordinance [was] aimed at prohibiting youths from viewing the films," the Court did not take issue with the burdens that enforcing the regulation would have on adults. *Id.* at 213. Instead, the Court questioned the regulation's targeting of material, noting that "it sweepingly forbids display of all films containing any uncovered buttocks or breasts, irrespective of context or

---

[13] The ordinance in question read,

330.313 Drive-In Theaters, Films Visible from Public Streets or Public Places. It shall be unlawful and it is hereby declared a public nuisance for any ticket seller, ticket taker, usher, motion picture projection machine operator, manager, owner, or any other person connected with or employed by any drive-in theater in the City to exhibit, or aid or assist in exhibiting, any motion picture, slide, or other exhibit in which the human male or female bare buttocks, human female bare breasts, or human bare pubic areas are shown, if such motion picture, slide, or other exhibit is visible from any public street or public place. Violation of this section shall be punishable as a Class C offense.

*Erznoznik*, 422 U.S. at 206–07 (citations and internal quotation marks omitted).

pervasiveness. Thus it would bar a film containing a picture of a baby's buttocks . . . ." *Id.*

But that is no issue here; H.B. 1181 is restricted to material obscene *for minors*. *Erznoznik* suggests that if—like H.B. 1181—Jacksonville's ordinance had been tailored to material obscene for minors, the Court stood ready to accept Jacksonville's contention that "the . . . ordinance [was] a reasonable means of protecting minors from this type of visual influence." *See id.* at 212.

*Ginsberg*'s central holding—that regulation of the distribution *to minors* of speech obscene *for minors* is subject only to rational-basis review—is good law and binds this court today. And not only this court. Years after *Reno* and *Ashcroft II*, the Supreme Court, to avoid rational-basis review, felt required to distinguish *Ginsberg* in *Entertainment Merchants*, 564 U.S. at 794. As that Court described it, *Ginsberg* "approved a prohibition on the sale to minors of *sexual* material that would be obscene from the perspective of a child" because that proscription "'was not irrational.'" *Id.* at 793–94 (quoting *Ginsberg*, 390 U.S. at 641). But the material at issue in *Entertainment Merchants* was violent, not sexual—and *Ginsberg* set out a lower standard only for regulation of certain kinds of *sexual* content. Further, the Court and its individual Justices have cited *Ginsberg* multiple other times after *Reno* and *Ashcroft II*, albeit for different propositions.[14]

In an attempt to distinguish *Ginsberg*, Plaintiffs pick at the factual dissimilarities between the world of *Ginsberg* and our world. They note that "the Supreme Court recognized that source-based restrictions on Internet

---

[14] *See Counterman v. Colorado*, 600 U.S. 66, 111 (2023) (Barrett, J., dissenting); *Iancu v. Brunetti*, 139 S. Ct. 2294, 2307 (2019) (Breyer, J., concurring in part); *Elonis v. United States*, 575 U.S. 723, 741 (2015); *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 519 (2009).

expression raise concerns categorically different from those at issue in cases such as *Ginsberg*, given the nature of cyberspace and the breadth and invasiveness of speech burdens in this context."[15] Also, plaintiffs posit that in-person age-verification creates fewer risks to privacy because "[m]any adults are never even asked for their identification in person; their appearance alone suffices."[16] We disagree with those analyses.

First, as plaintiffs admit, the statute at issue in *Ginsberg* necessarily implicated, and intruded upon, the privacy of those adults seeking to purchase "girlie magazines." But the Court still applied rational-basis scrutiny.

Second, the age-verification requirements do not impose any sort of "categorically different" burden on adults. H.B. 1181 provides that a purveyor of pornography can use "digital verification," "government-issued identification," or other "commercially reasonable method[s]." § 129B.003(b). That allows for *at least* three concrete means of age-verification: (1) government ID, (2) facial appearance, or (3) some other available information used to infer the user's age. At least one of those options will have no more impact on privacy than will in-person age verification à la *Ginsberg*. Moreover, H.B. 1181 punishes entities $10,000 for each instance of retention of identifying information, possibly yielding heavier penalties than would the failure to age-verify.[17]

Third, even were there a gap in privacy concerns as large as plaintiffs suggest, we decline to adopt their notion that such a gap matters. In short,

---

[15] Though plaintiffs' example of this supposed recognition is *Reno*, which is readily distinguishable. *See infra*.

[16] Of course, one of the allegedly commercially reasonable methods of age-verification confirms age through algorithmic analysis of the user's appearance.

[17] In that respect, H.B. 1181 is more privacy-protective than was the statute in *Ginsberg*, which provided no analogous provision. *Ginsberg*, 390 U.S. at 645–47.

no binding precedent compels us to depart from *Ginsberg* on privacy grounds, and we decline to do so.

Finally, the Supreme Court itself has declined to adopt such a distinction. If the differences between the contemporary world of the Internet and the 1960's world of in-person interaction were sufficient to distinguish *Ginsberg*, the Court would have noted as much in *Reno*. Yet none of the four "important respects" the Court notes distinguishing the statute in *Reno* from the statute in *Ginsberg* references the Internet at all. *See Reno*, 521 U.S. at 865–66.[18]

---

[18] Plaintiffs also contend that *Ginsberg* was a challenge based on the speech rights of minors rather than the speech rights of adults—and that this distinction matters. They attempt to distinguish *Entertainment Merchants* in the same way. That distinction fails for several reasons.

First, it misrepresents what was before the Court in *Ginsberg*. *Ginsberg*, unlike *Ashcroft II*, dealt not with a narrow challenge under an assumed tier of scrutiny. Instead, the challenger brought an exceedingly broad challenge framing the statute as unconstitutionally "restrain[ing] the distribution of literature." Brief for Appellant, *Ginsberg*, 390 U.S. 629 (No. 47), 1967 WL 113634, at *9–10. And the Court construed the challenge in the broadest way possible: "This case presents the question of the constitutionality on its face of a New York criminal obscenity statute . . . ." *Ginsberg*, 390 U.S. at 631 (first line). But most importantly, the Court in *Ginsberg did* have before it the appropriate level of scrutiny for a law of this sort, and it concluded that rational-basis review sufficed.

The same cannot be said for *Ashcroft II*. We will not retcon *Ginsberg*'s central holding, sixty-five years later, to narrow artificially what the Court held: Regulation of the distribution *to minors* of content obscene *for minors* is subject only to rational-basis review.

Second, as suggested at various points in this opinion, laws such as the statute in *Ginsberg* necessarily affect, to some degree, adults' access to the regulated material. A law that requires by its nature sale only to adults requires (prudent) venders to verify the age of their customers. Plaintiffs recognize as much when they try to distinguish *Ginsberg*. That H.B. 1181 similarly affects adults' access to regulated material does not place it beyond *Ginsberg*'s shelter.

Finally, *Entertainment Merchants*'s use of *Ginsberg* undercuts plaintiffs' reading. *Entertainment Merchants* held that "[e]ven where the protection of children is the object,

Instead of following *Ginsberg*, plaintiffs point to two cases that address laws like H.B. 1181 but that applied strict scrutiny: *Reno* and *Ashcroft II*. The former is readily distinguishable. There, the Court reviewed and enjoined the Communications Decency Act of 1996 ("CDA"). *Reno*, 521 U.S. at 849. In doing so, it recognized four "important respects" in which the CDA and the statute in *Ginsberg* differed. *Id.* at 865. Most of those same differences exist between the CDA and H.B. 1181—but those are not the only differences between the two laws; they include the following: (1) The CDA included prohibitions on non-sexual material; H.B. 1181 does not. *Id.* at 873.[19] (2) Parental participation or consent could not circumvent the CDA; it can circumvent H.B. 1181. *Id.* at 865. (3) The CDA did not specifically define the proscribed material; H.B. 1181 does. *Id.* at 873. (4) The CDA had no limitation to commercial activity; H.B. 1181 covers only commercial entities. *Id.*

---

the constitutional limits on governmental action apply." 564 U.S. at 804–05. But the Court distinguished *Ginsberg* because the content of the material regulated in *Ginsberg* was sexual in nature. *Id.* at 793. Thus, *Entertainment Merchants* helps confirm our understanding that within "the constitutional limits on governmental action" that apply where "protection of children" is the "object" of a regulation, there is ample room for regulation, subject to rational-basis review, of the distribution of materials obscene *for minors to minors*. *Id.* at 804–05.

[19] The Court specifically referred to the CDA's language on "excretory activities." *Reno*, 521 U.S. at 846. A keen reader will note that H.B. 1181 also refers to excretion, but that reference to "excretory functions" is fairly read to mean something else. H.B. 1181 in part defines "sexual material harmful to minors" as "excretory functions . . . or any other sexual act." § 129B.001(6)(B)(iii). In light of *noscitur a sociis*, "excretory functions" in H.B. 1181 probably refers to excretory functions *as* sexual acts (which are too crude to describe here). By contrast, the CDA set up "excretory activities" *in opposition to* "sexual . . . activities." *See Reno*, 521 U.S. at 860 (The CDA reads "sexual or excretory activities.") Moreover, the term "excretory" in H.B. 1181 appears in a definition of "sexual material harmful to minors," § 129B.001(6), but the term "excretory" in the CDA works to define "offensive" material, *see Reno*, 521 U.S. at 873. Moreover, H.B. 1181 covers only materials "*designed* to appeal to or pander to the *prurient* interest." § 129B.001(6)(A) (emphasis added). *See infra* note 22. This is but one of multiple serious distinctions between the CDA and H.B. 1181.

at 865.[20]  (5) In enjoining the CDA, the Court relied at least in part on "the absence of a viable age verification process," but that process is the central requirement of H.B. 1181.  *Id.* at 876.  Finally, (6) the Court's decision was fundamentally bound up in the rudimentary "existing" technology of twenty-seven years ago, but technology has dramatically developed.  *Id.* at 876–77.

Indeed, only one distinction appears to work against our analysis here. The Court noted that "the New York statute defined a minor as a person under the age of 17, whereas the CDA, in applying to all those under 18 years, includes an additional year of those nearest majority."  *Id.* at 865–66.  Given that this is the sole mention of that distinction, and that the rest of the distinctions still align with H.B. 1181, it beggars belief that the Supreme Court meant that to be an essential component in triggering the *Ginsberg* framework.  That is especially true where the Court relied principally on the CDA's overbreadth and lack of adherence to the *Miller* standard.  *See id.* at 873.[21]

Nor does other seemingly contradictory language in *Reno* impede our analysis.  For example, *Reno* says that the interest in protecting children, for which it cites *Ginsberg*, "does not justify an unnecessarily broad suppression of speech addressed to adults."  *Id.* at 875.  As noted above, the reach of the

---

[20] Notably, the Court emphasized that the statute in *Ginsberg* "applied only to commercial transactions."  *Reno*, 521 U.S. at 865.  Texas similarly limited H.B. 1181 to "commercial entit[ies]."  § 129B.002(a).  We recognize that language is not one-to-one, but the distinction is of no import for two reasons.  First, we are sufficiently convinced that the activity here is a commercial activity.  *See infra* Section III.B.i.  Second, the CDA contained no limitation to commerce at all.  In that sense, H.B. 1181 tracks the law in *Ginsberg* much more than it does the CDA.

[21] We do not suggest that each of the distinctions here is necessary for a law to receive rational-basis review under *Ginsberg* instead of strict scrutiny under *Reno*.  We list them in full merely to illustrate how different the CDA is from H.B. 1181.

CDA was well beyond *Ginsberg*'s safe harbor and included even non-sexual material.[22]  Moreover, *Reno* makes that point, referring to *Sable Communications, Inc. v. FCC*, 492 U.S. 115 (1989).  *See Reno*, 521 U.S. at 875.  *Sable* addressed "an outright ban on indecent as well as obscene interstate commercial telephone messages."  492 U.S. at 117.  That too is well outside *Ginsberg*'s safe harbor for regulations on distribution *to minors* of material obscene *for minors*.[23]

On the other hand, *Ashcroft II* supplies plaintiffs' best ammunition against H.B. 1181.  After all, despite Texas's protestations, H.B. 1181 is very similar to COPA.  Sure, COPA was criminal, and H.B. 1181 is civil.  And COPA allowed age-verification as an affirmative defense, yet H.B. 1181 requires it upfront.  But those changes do not affect our analyses here.[24]  *Ashcroft II*, finding that COPA probably failed the narrow tailoring component of strict scrutiny, sent the case back down for trial.  542 U.S. at 673.  One might read *Ashcroft II* for the proposition that COPA (and consequently H.B. 1181)

---

[22] The dissent complains: "Like the CDA, H.B. 1181 regulates more than just 'sexual conduct.'"  That is plainly not so.  *Inter alia,* H.B. 1181 applies only to matter "*designed* to appeal to or pander to the *prurient* interest."  § 129B.001(6)(A) (emphasis added).  In this context, "prurient" plainly limits the statute's applicability to content designed to excite sexual arousal.  *See Miller*, 413 U.S. at 24.  This contrasts sharply with the CDA's bar on plainly non-sexual activities.  *See supra* note 19.

[23] *Sable* is distinct for two reasons.  First, like the CDA, the statute in *Sable* swept in a much larger swath of speech than the speech targeted here.  *See Sable*, 492 U.S. at 117.  Second, *Sable* dealt with an outright ban.  Plaintiffs repeatedly emphasize that "content-based burdens must satisfy the same rigorous scrutiny as its content-based bans."  *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 812 (2000).  But, read in context, that proposition is not as broad as it seems.  Indeed, *Playboy* seems to have cited favorably *Ginsberg*'s narrower approach when it discussed *Sable*.  *See id.* at 814 (comparing cases where bans were struck down to cases where restrictions were upheld).

[24] That is not to say that such distinctions could never matter.

fail strict scrutiny. We can even assume that here.[25]

But that assumption does not end our analysis. Though *Ashcroft II* concluded that COPA *would* fail strict scrutiny, it contains startling omissions. Why no discussion of rational-basis review under *Ginsberg*? And why no analysis of intermediate scrutiny under *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986)? We find those omissions particularly surprising considering that the Court in *Reno* felt the need to distinguish those at length. *See Reno*, 521 U.S. at 865–68.

We see only one answer and therefore only one way to read *Ashcroft II* consistently with *Ginsberg*: *Ashcroft II* did not rule on the appropriate tier of scrutiny for COPA. It merely ruled on the issue the parties presented: whether COPA would survive strict scrutiny. Indeed, the petitioner's brief in *Ashcroft II* made two claims:

> I. COPA is narrowly tailored to further the government's compelling interest in protecting minors from harmful material on the World Wide Web.
>
>     . . .
>
> II. The court of appeals erred in holding that COPA is not narrowly tailored.

Brief for Pet'r, *Ashcroft II*, 542 U.S. 656 (2004) (No. 03-218), 2003 WL 22970843, at *iii. In other words, the petitioners did not challenge the applicable standard of review. Because that is not a jurisdictional argument, the Court did not have to correct them *sua sponte*.[26]

---

[25] To be clear: Although we comment on the facial similarities between COPA and H.B. 1181, we do not mean to express any opinion on how H.B. 1181 would fare under any other tier of scrutiny.

[26] This explains the need for the Third Circuit to clarify, in the follow-on proceed-

It is true that, in passing and without reference to *Ginsberg*, the Court said, "[w]hen plaintiffs challenge a content-based speech restriction, the Government has the burden to prove that the proposed alternatives will not be as effective as the challenged statute." *Ashcroft II*, 542 U.S. at 657. But that is the closest that opinion comes to ruling on the appropriate standard of review.[27] Given our circuit's respect for the Court's *dicta*, we cannot brush that comment aside as such; yet, it is inapposite for two reasons: First, read in context, it is most readily seen as an explanation of how strict scrutiny works generally and not as a clear articulation of its appropriateness for COPA. Second, and more importantly, it is inconsistent with the proposition that *Ginsberg* remains good law.[28]

*Ginsberg* undeniably upholds a content-based restriction on speech

---

ings from *Ashcroft II*, that strict scrutiny "appl[ied] in this case inasmuch as COPA is a content-based restriction on speech." *ACLU v. Mukasey*, 534 F.3d 181, 190 (3d Cir. 2008) (citing *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994)).

[27] Plaintiffs urge us to rely on the Court's observation that "the District Court concluded only that the statute was likely to burden some speech that is protected for adults, which petitioner does not dispute." *Ashcroft II*, 542 U.S. at 665 (citation omitted). But that does not constitute a holding, or even *dictum*, that strict scrutiny is applicable for the same reason as the passage distinguished in the paragraph in which this footnote sits. Instead, it supports our reading that that the appropriate standard of review was not in dispute in *Ashcroft II*. Nor does the Court's later note that it "affirm[s] the District Court's decision to grant the preliminary injunction for the reasons relied on by the District Court," *id.*, constitute a wholesale adoption of the district court's reasoning so as to make an opinion from the Eastern District of Pennsylvania—*ACLU v. Reno*, 31 F. Supp. 2d 473 (E.D. Pa. 1999)—binding on us. In context, that passage is better read to explain the Court's decision to "decline to consider the correctness of the other arguments relied on by the Court of Appeals," and no more. *Ashcroft II*, 542 U.S. at 665.

[28] Or *Erznoznik*, 422 U.S. at 212–14 (indicating that but for overbreadth, a content-based regulation of protected speech would be subject to rational-basis review), or *Renton*, 475 U.S. at 50 (applying a form of intermediate scrutiny to content-based regulations of protected speech), or *FCC v. Pacifica Found.*, 438 U.S. 726, 748–51 (1978) (similar), or *Cent. Hudson*, 447 U.S. at 566 (similar).

under a rational-basis framework. But reading that passage from *Ashcroft II* in a vacuum is irreconcilable with that proposition. Because the Court makes clear that *Ginsberg* is good law after *Ashcroft II*, *Ginsberg*'s on-point framework must take pride of place. *See Ent. Merchs.*, 564 U.S. at 793.

In short, the question of the appropriate standard of review in *Ashcroft* is a "[q]uestion[] which merely lurk[s] in the record, neither brought to the attention of the court nor ruled upon" and consequently is not "to be considered as having been so decided as to constitute precedent[]." *Cooper Indus., Inc. v. Aviall Servs. Inc.*, 543 U.S. 157, 170 (2004) (quoting *Webster v. Fall*, 266 U.S. 507, 511 (1925)).[29] *Ashcroft II* does not control.

Plaintiffs point to *Playboy* to counter Texas's suggestion that *Reno* and *Ashcroft* do not supply the standard of review here. *Playboy* dealt with a statute that "required cable television operators who provide channels primarily dedicated to sexually-oriented programming either to fully scramble or otherwise fully block those channels or to limit their transmission to hours when children are unlikely to be viewing." 529 U.S. at 806 (cleaned up). To

---

[29] *Webster*, whence that quotation originates, offers a helpful example. The question there was whether the Court could entertain a suit in which a superior that needed to be joined for relief had not been joined. The Court had previously ignored that question in other cases, assumed it could, and gotten to the merits. But in *Webster*, the Court took issue with it. The Court essentially said: In those previous cases, joining the superior was not the issue at hand, it was just a "question which merely lurks in the record," so those cases are not binding precedent.

The Eighth Circuit recently relied on *Webster* to resolve another contentious issue the Court has assumed but never decided. *Cf. Ark. State Conf. NAACP v. Ark. Bd. Of Apportionment*, 86 F.4th 1204, 1215 n.6 (8th Cir. 2023) (citing *Webster*, 266 U.S. at 511). And our circuit regularly takes it a step further, employing a similar framework to some jurisdictional questions. *See, e.g.*, *United States v. Garcia-Ruiz*, 546 F.3d 716, 718 n.1 (5th Cir. 2008) ("The failure of the earlier panels, . . . to discuss mootness does not yield an implication that those panels decided the cases were not moot, and we are not bound by any *sub silentio* determinations there.").

plaintiffs' credit, *Playboy* seems to have the clearest language supplying a standard of review: "As we consider a content-based regulation, the answer should be clear: The standard is strict scrutiny." *Id.* at 814. Moreover, *Playboy* dealt with a law the purpose of which was to protect children from incidentally consuming pornographic material. *See id.* at 806. Further, even after acknowledging the difference in "degree," the Court held that "content-based burdens must satisfy the same rigorous scrutiny as . . . content-based bans." *Id.* at 812.

But *Playboy* cannot surmount the rock that is *Ginsberg*. As we have discussed, *Ginsberg* is good law.[30] So it must have some minimum content.

H.B. 1181 is plainly more like the regulation in *Ginsberg* than like the regulation in *Playboy*. H.B. 1181 allows adults to access as much pornography as they want whenever they want. The law in *Playboy* did not. The burden in *Playboy*, although not a ban, is different in kind from whatever "burden" arises from the same type of age-verification required to enter a strip club, drink a beer, or buy cigarettes. The law in *Ginsberg*, like H.B. 1181, targeted distribution *to minors*; the law in *Playboy* targeted distribution *to all*. That is, once certain an individual is not a minor, H.B. 1181 does nothing further.[31] The same cannot be said of the law in *Playboy*, which imposed substantial burdens even after an individual established his or her majority.

Moreover, *Playboy* preceded not only *Entertainment Merchants* but also *Reno*. If we should read *Playboy* as broadly as plaintiffs suggest, it renders *Reno*'s distinguishing of *Ginsberg* inexplicable.[32] *See Reno*, 521 U.S. at 864–

---

[30] Consider especially that *Entertainment Merchants* cited *Ginsberg* eight years after *Playboy*.

[31] Insofar as concerns the age-verification requirement at issue.

[32] Let alone *Playboy*'s own treatment of *Ginsberg*. *See supra* note 23.

66. Likewise, broadcast media has always raised medium-specific considerations that meaningfully diminish the guidance that First Amendment cases concerning broadcast media can provide in other technological contexts—such as regulations to combat "signal bleed," *Playboy*, 529 U.S. at 806.[33]

Finally, an appeal to H.B. 1181's "content-based" nature is insufficient because the law in *Ginsberg* was content-based.[34] *Ginsberg* carves out an exception to heightened scrutiny of content-based speech restrictions. If *Ginsberg* is no longer good law, we await that instruction, but until that day it must stand for something.

We agree with the dissent's laudable conclusion that "Texas has the right—and . . . the obligation—to protect its minors, and in doing so, it must have the means to frustrate their access to pornographic materials consistent with the First Amendment." But the dissent's read of *Reno*, *Ashcroft*, *Playboy*, *Sable*, and *Ginsberg* would strangle the state's ability to do just that.

Because it is never obvious whether an internet user is an adult or a child, any attempt to identify the user will implicate adults in some way. In the dissent's view, any attempt to protect children will be subject to strict

---

[33] *Cf. Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 101 (1973) ("[T]he broadcast media pose unique and special problems not present in the traditional free speech case."); *Pacifica*, 438 U.S. at 748 ("We have long recognized that each medium of expression presents special First Amendment problems." (citation omitted)); *Sable*, 492 U.S. at 127–28. We recognize that in other cases the difference between broadcast media and other forms of media may have led to a lower standard of scrutiny for government regulation of broadcast. But, the uniqueness of broadcast media has the opposite effect here. Because broadcast media has comparatively no ability to discriminate between consumers of broadcast content, broadcast caselaw has little import for a medium that can make—and a regulation that forces it to make—that distinction.

[34] As in at least *Erznoznik*, *Renton*, and *Central Hudson*, *see supra* note 28.

scrutiny, often a death knell in and of itself.[35] To suggest protecting children would be so difficult is inconsistent with *Ginsberg*, where rational basis review was sufficient *even though* adults would presumably have to identify themselves to buy girlie magazines. In other words, the dissent's reading implies that the invention of the Internet somehow reduced the scope of the state's ability to protect children. That is a dubious principle without support in existing Supreme Court caselaw.[36]

Plaintiffs proffer a few more reasons why strict scrutiny applies. None convinces. First, they emphasize that the law does not just regulate speech obscene to minors. Instead, because of the "one-third threshold," the act regulates even "content . . . benign for people of any age." Plaintiffs assert that means that "a substantial number of its applications are unconstitutional," so the statute is facially unconstitutional. *United States v. Stevens*, 559 U.S. 460, 473 (2010) (internal quotation marks and citation omitted).

That averment fails for two reasons. First, it very well might be appropriate in this context to evaluate plaintiffs' websites as a whole.[37] And sec-

---

[35] To be fair, the dissent gestures that the states might "requir[e] electronic filters on devices" on the consumer end. *Quaere* whether that is consistent with the rest of the dissent. But the dissent performs only a perfunctory analysis, so we respond in kind.

[36] Indeed, the opposite is true. The Court has clearly indicated that the principles underpinning *Ginsberg* are not limited by the advance of technology. *Cf. Pacifica*, 438 U.S. at 750 ("The ease with which children may obtain access to broadcast material, coupled with the concerns recognized in *Ginsberg*, amply justify special treatment of indecent broadcasting.")

[37] The *Ashcroft* litigation left open the question of whether websites should be evaluated as a whole. *See Ashcroft v. ACLU (Ashcroft I)*, 535 U.S. 564, 592–93 (2002) (Kennedy, J. concurring in the judgment) ("The notion of judging work as a whole is familiar in other media, but more difficult to define on the World Wide Web. It is unclear whether what is to be judged as a whole is a single image on a Web page, a whole Web page, an entire multipage Web site, or an interlocking set of Web sites."). Indeed, Justice Kennedy ac-

ond, the magazines at issue in *Ginsberg* were similarly situated to the websites captured by H.B. 1181. Indeed, the "girlie magazines" of *Ginsberg*'s day had a substantial amount of content that was non-sexual in its entirety.[38] The inclusion of some—or even much—content that is *not* obscene for minors does not end-run *Ginsberg* where the target of the regulation contains a substantial amount of content that *is* obscene for minors.

Second, plaintiffs assert that "the Act's vagueness further chills protected speech." In particular, they contend that the phrase "with respect to minors" has no fixed meaning.[39] That was not a problem for the law in *Ginsberg*, and it is no problem here.

Third, plaintiffs maintain that strict scrutiny applies because "the Act discriminates based on speaker and viewpoint." They point to both what they deem H.B. 1181's "underinclusiveness" and its health-warnings requirement as evidence that Texas is really engaged in speaker discrimination "to stigmatize the 'porn industry' and deter all patronage of such disfavored speech." The under-inclusivity in question is the exemption of "search engines . . . and social-media platforms . . . that display the same content."

On this, there is no issue. First, under-inclusivity (in the speaker/-viewpoint discrimination context) only serves as a signal that the state *may* be engaged in viewpoint discrimination. *See, e.g., City of Ladue v. Gilleo,*

---

knowledged that this question dropped out of that litigation between the district court and the court of appeals. *Id.* at 599 (citation omitted).

[38] *See, e.g.,* Meg Dalton, *Hugh Hefner's* Playboy *did a lot of great journalism. Here are a few highlights.*, COLUM. JOURNALISM REV., tinyurl.com/ynn3yz2d (Sept. 28, 2017).

[39] They also note that the "one-third" requirement itself is vague. Even if that were the case, that strikes us as a consideration were we to evaluate the law under strict scrutiny. But, plaintiffs do not demonstrate why that would be sufficient to trigger strict scrutiny here.

512 U.S. 43, 52 (1994) (under-inclusivity "diminish[es] the credibility of the government's rationale for restricting speech in the first place"). Where, as here, the exemptions are driven by something else, though—such as making a reasonable policy choice to avoid the legal concerns that accompany attempts to regulate the "entire universe of cyberspace," *Reno*, 521 U.S. at 868—the state is not pursuing viewpoint discrimination. Second, under-inclusivity is typically not an issue where the state chooses to regulate a specific medium. *See, e.g.*, *Gilleo*, 512 U.S. at 52 (discussing "[e]xemptions from an otherwise legitimate regulation of *a medium* of speech" (emphasis added)).

And plaintiffs' examples fall into line with this reasoning.[40] Plaintiffs suggest that under *R.A.V. v. City of St. Paul*, under-inclusivity "alone [is] enough to render the ordinance presumptively invalid[.]" 505 U.S. 377, 394 (1992). But the sort of "[s]electivity" at issue in *R.A.V.* was between different sorts of *messages*, not different *mediums*. *See id.* In short, where a state chooses to regulate a specific kind of medium, that selection does not necessarily implicate strict scrutiny based on viewpoint discrimination.[41]

Thus, bound by *Ginsberg* and the Supreme Court's application of it in *Entertainment Merchants* and *Erznoznik*, we apply rational-basis review.

---

[40] *See, e.g.*, *Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 591 (1983). There the Court enjoined not just "an" ink and paper tax, but one which targeted large but not small newspapers. *See id.* The other major issues raised in that opinion are specific to both the nature of taxation and the nature of the press, neither of which is at issue here. "There is substantial evidence that differential taxation of the press would have troubled the Framers of the First Amendment." *Id.* at 583. Quaere whether raising barriers to distributing pornography to minors would have concerned the Founders in the same way.

[41] *See, e.g.*, *Ginsberg*, 390 U.S. at 647 (singling out print but not broadcast material); *Pacifica*, 438 U.S. at 750 (singling out broadcast and noting the "differences between radio, television, and perhaps close-circuit transmissions").

2.

Under rational-basis review, H.B. 1181 easily surmounts plaintiffs' constitutional challenge. As the Court in *Ginsberg* puts it, we need "only . . . be able to say that it was not irrational for the legislature to find that exposure to material condemned by the statute is harmful to minors." 390 U.S. at 641.

We do that easily. The record is replete with examples of the sort of damage that access to pornography does to children. One study finds that earlier use of adult pornography was correlated with an increased likelihood of engagement "with deviant pornography (bestiality or child)." A review of literature from 2013–2018 finds a correlation between "frequent use of online pornography" and "distorted gender orientations, insecurities and dissatisfaction about one's own body image, depression symptoms, assimilation to aggressive models," and more. Another review of scientific literature finds that "internet pornography addiction fits into the addiction framework and shares similar basic mechanisms with substance addiction." Further, a study finds that "[t]he more boys used sexually explicit internet content, the poorer their school grades were six months later." That is far more than what is necessary to demonstrate that the legislature did not act irrationally.[42]

Thus, H.B. 1181's age-verification requirement likely passes constitutional muster under the rational-basis standard in *Ginsberg*.[43] We offer no

_____

[42] This might not be enough to move this issue beyond controversy, *see infra* Section III.B.2, but it is more than enough for us to say that the legislature was "not irrational."

[43] We do not foreclose the possibility that the content on plaintiffs' sites might be entirely unprotected by the First Amendment. Texas contends that much of plaintiffs' content fits within *Miller*'s "plain examples" of what a state could regulate as unprotected obscenity. 413 U.S. at 25. That is certainly possible. Yet, although Texas might be able to regulate plaintiffs' websites solely under *Miller*, it might also be that a substantial amount of the material elsewhere on the Internet that H.B. 1181 covers is obscene only for minors and thus outside of *Miller*'s grasp. Because this case resolves more clearly under *Ginsberg*, we decline to rule on Texas's *Miller* defense. *Cf. supra* note 7.

No. 23-50627

opinion as to how it would fare under any other standard of review.

B.

We turn to plaintiffs' likelihood of success in challenging the health warnings. Concluding that the health warnings unconstitutionally compel speech, we uphold the injunction in that regard only.

H.B. 1181 regulates only commercial entities. It is well established that the First Amendment protects commercial speakers.[44] Further, it protects both the "right to speak and the right to refrain from speaking."[45] Yet, it is equally settled that the government may regulate commercial speech more heavily than non-commercial speech.[46] So, the constitutionality of the required warnings turns on both (1) whether the speech is commercial and (2) the applicable level of scrutiny.

As with the age-verification requirements, the parties dispute the standard of review. Plaintiffs claim the warnings are content-based regulations of non-commercial speech—so strict scrutiny applies.[47] Texas responds by asserting that the warnings compel only commercial speech, so we should review deferentially under *Zauderer*.[48] Alternatively, the state sug-

---

[44] *See Va. State Bd. of Pharmacy*, 425 U.S. at 770 (1976); *303 Creative LLC v. Elenis*, 600 U.S. 570, 593–94 (2023).

[45] *Wooley v. Maynard*, 430 U.S. 705, 714 (1977); *see also Riley v. Nat'l Fed'n of the Blind, Inc.*, 487 U.S. 781, 796–97 (1988).

[46] *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 562 (1980) (citing *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 455–56 (1978)); *see also Chamber of Com. v. SEC*, 85 F.4th 760, 768 (5th Cir. 2023).

[47] Particularly, they point to *303 Creative*, 600 U.S. at 588–90, alleging that this is compelled speech that eliminates dissenting ideas and is thus barred by the First Amendment. H.B. 1181, they contend, presents them with an offer they cannot refuse: Speak the government's message or let their websites sleep with the fishes.

[48] *See Zauderer v. Off. of Disciplinary Couns. of Sup. Ct.*, 471 U.S. 626 (1985).

gests that if *Zauderer* does not apply, this court should use *Central Hudson*'s intermediate scrutiny.[49]

### 1.

We answer first whether H.B. 1181 regulates commercial or noncommercial speech. The district court offered several reasons that this speech is not commercial. First, it found that plaintiffs' speech goes "beyond proposing a commercial transaction." 2023 WL 5655712, at *21 (cleaned up) (quoting *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983)). Second, it ruled that this speech is not commercial because the "paid access that makes speech commercially viable is 'inextricably intertwined' with the speech itself." *Id.* at *21 (quoting *Riley*, 487 U.S. at 796). But both justifycations misconstrue the nature of these websites.

Though courts have not settled "the precise bounds of the category of expression that may be termed commercial speech, . . . it is clear enough that [some of] the speech at issue in this case—advertising pure and simple—falls within those bounds." *Zauderer*, 471 U.S. at 637.[50] That suffices for the part of the statute that covers advertisements.

Along with warnings on advertisements, though, H.B. 1181 also requires warnings on the landing page and on each subsequent page of the regulated websites. So, we must resolve whether those webpages also propose commercial transactions.[51]

---

[49] *See Cent. Hudson*, 447 U.S. at 571–72.

[50] *See also Cent. Hudson*, 447 U.S. at 561 (defining commercial speech as "expression related solely to the economic interests of the speaker and its audience"); *Bolger*, 463 U.S. at 66.

[51] *See Bolger*, 463 U.S. at 66 (defining the "core notion of commercial speech" as "speech which does no more than propose a commercial transaction" (quotation marks and citations omitted)).

As always, we begin with the text of the statute. H.B. 1181 regulates "commercial entit[ies]" and defines such as "a corporation, limited liability company, partnership, limited partnership, sole proprietorship, or other legally recognized business entity." § 129B.001(1).[52] The text's focus on business and corporate forms reads most naturally as an indication that the statute reaches only those entities that publish or distribute sexual material harmful to minors *for commercial or business purposes*. Thus, the landing page and other pages of those subscription-based and paid websites are proposing "no more than" a commercial transaction—*e.g.*, "you give us money and we give you porn."[53] Indeed, to the degree that the websites purport to offer educational speech; they only offer it as an add-on to their primary purpose, exchanging far-from-core First Amendment entertainment for money.[54] Therefore, the webpages communicate commercial speech.[55]

We also conclude that H.B. 1181 regulates commercial speech on free

---

[52] *Bolger*, 463 U.S. at 66; *see also* § 129B.005(a) (exempting news or public interest broadcasters).

[53] We disagree with the district court's analysis of subscriptions as past transactions not subject to traditional commercial speech analysis. *See Free Speech Coal.*, 2023 WL 5655712, at *21. After someone has bought a subscription, the use of that subscription is part of the same, ongoing, commercial transaction. *Cf. Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 762 (1985) (applying commercial-speech standards to ongoing subscriptions for credit reports); *Hood v. Dun & Bradstreet, Inc.*, 486 F.2d 25, 29–30 (5th Cir. 1973) (same).

[54] Specifically—unlike most books, newspapers, movies, or other forms of core-protected speech or entertainment—they offer that prurient entertainment without "serious literary, artistic, political, or scientific value for minors." § 129B.001(6)(c).

[55] *See Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 473 (1989) (quoting *Va. State Bd. of Pharmacy*, 425 U.S. at 762)). We do not view this as akin to a newspaper's selling information for money because, here, the interests are in the sellers' economic gain, and the buyers' entertainment or pleasure, not the spread of information relevant to the public. In other words, their speech falls far from the core of the First Amendment's protections. *See also supra* note 54.

websites because they too propose a commercial transaction: They offer pornography in exchange for data; then, they monetize that data, primarily through advertisements. That series of transactions is explicitly commercial, just as was the case in *NetChoice*. *See* 49 F.4th at 485–88.[56]

Finally, we reject the contention that *Riley*'s "inextricably intertwined" analysis controls here. That the websites might offer non-obscene sexual education or expressive obscenity "no more convert[s]" the act of selling pornography and bartering for data into protected speech than does "teaching home economics . . . convert[] [Tupperware parties] into educational speech."[57] Indeed, instead of being closer to a paywall on a newspaper—core, protected speech—the landing pages are more like the entrance to a strip club—commercial activity with a speech element.[58]

Therefore, we review these speech regulations under the commercial

---

[56] The "Platforms" at issue in *NetChoice* included "Facebook, Twitter, and YouTube." 49 F.4th at 445. Users may access those Platforms without paying, but each sells advertising and other user data. *NetChoice* never expressly called such transactions sufficient to make the compelled speech of H.B. 20 compelled commercial speech, but such an understanding is necessary for any application of *Zauderer*. So we make that inference.

[57] *Fox*, 492 U.S. at 474–75.

[58] *Id.* at 474; *see also id.* (In *Riley*, "of course, the commercial speech (if it was that) was 'inextricably intertwined' because the state law *required* it to be included. By contrast, there is nothing whatever 'inextricable' about the noncommercial aspects of these presentations. No law of man or of nature makes it impossible to sell housewares without teaching home economics, or to teach home economics without selling housewares. Nothing in the resolution prevents the speaker from conveying, or the audience from hearing, these noncommercial messages, and nothing in the nature of things requires them to be combined with commercial messages.").

Similarly here, no law requires a pornographic website to operate as a commercial entity (the only kind H.B. 1181 regulates), nor does any "law of man or of nature make[] it impossible to sell" pornography without teaching sexual education or otherwise expressing oneself through indecent-but-not-obscene speech. *Id.*

speech doctrine.

### 2.

We next consider whether the law qualifies for *Zauderer*'s relaxed scrutiny.

In *Zauderer*, the Court upheld lawyer advertising regulations because the requirements mandated lawyers "include in [their] advertising purely factual and uncontroversial information about the terms under which [their] services will be available." 471 U.S. at 651. The Court reasoned that a lawyer's "constitutionally protected interest in *not* providing any particular factual information in his advertising is minimal" because "disclosure requirements trench much more narrowly on an advertiser's interests than do flat prohibitions on speech . . . ." *Id.* Recent decisions have distilled that language to apply *Zauderer* scrutiny where a state compels "commercial enterprises to disclose purely factual and uncontroversial information about their services . . . ." *Chamber of Comm.*, 85 F.4th at 768 (quotation marks and citations omitted).[59] In other words, Texas must show that the warnings are both (1) purely factual and (2) uncontroversial. Because the state has not met its burden on the uncontroversial nature of the warnings on the record before us, *Zauderer* is inapplicable.[60]

Assuming the statements are factual, a compelled statement is "uncontroversial" for purposes of *Zauderer* where the truth of the statement is not subject to good-faith scientific or evidentiary dispute and where the state-

---

[59] *See also NetChoice*, 49 F.4th at 485.

[60] We do not rule on whether the statements are factual, focusing instead on the controversial nature of the scientific statements.

ment is not an integral part of a live, contentious political or moral debate.[61] That standard does not mean that whenever the compelled speaker dislikes or disagrees with the message he must convey, the statement is controversial. Nor does it mean that that controversy exists solely because an expert can be found who disagrees with a predominant view. It means only that there must be some widespread, good-faith dispute over the topic or the facts.

We need not determine the outer limits of what establishes "controversy" because Texas has failed to rebut plaintiffs' challenges in such a way that we are comfortably within its boundaries. Thus, *Zauderer* is inapplicable. We supply two of the many examples of the dueling experts and studies[62]: First, Texas cites a study finding a negative correlative relationship between (1) time spent watching porn and (2) gray-matter volume and brain function in 21-to-45-year-old men. Second, the state's experts describe the "host of mental health afflictions" that they link to viewing pornography.

But plaintiffs respond with similarly credentialed and persuasive experts who, on review of "the last several decades of research," find "no generally accepted, peer-reviewed research studies or scientific evidence which indicate that viewing adult-oriented erotic material causes physical,

---

[61] *Cf. Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n*, 475 U.S. 1, 8–9 (1986) (Appellant's newsletter "thus extends well beyond speech that proposes a business transaction and includes the kind of discussion of '*matters of public concern*' that the First Amendment both fully protects and implicitly encourages." (emphasis added) (citations omitted)); *NIFLA*, 585 U.S. at 769 ("The notice in no way relates to the services that licensed clinics provide. Instead, it requires these clinics to disclose information about *state*-sponsored services—including abortion, anything but an 'uncontroversial' topic. Accordingly, *Zauderer* has no application here.").

[62] Although we only highlight these two, the record is replete with disputed claims and counterclaims, each allegedly supported by scientific study and analysis. These two exemplify the controversy, but we do not suggest that one study on each side and competing experts necessarily make a statement controversial.

neurological, or psychological damage such as 'weakened brain function' or 'impaired brain development.'" And the plaintiffs' experts refute Texas's first point—which casts that correlative relationship as causal—by proffering that, to the degree there are causal findings, they typically "run the opposite way of Texas's claims, i.e., porn viewing is an effect, not a cause of mental issues."

We are not scientific journal editors, much less social scientists, behavioral experts, or neurologists. The courts generally are not the place to hash out scientific debate, particularly not on so contentious a topic as the impacts of engaging with pornography. Experts must do that in academic journals, studies, and presentations. Therefore, the record leaves us with no option but to declare that the health impacts of pornography are currently too contentious and controversial to receive *Zauderer* scrutiny. *See NIFLA*, 585 U.S. at 769.[63]

### 3.

It is unsettled precisely which standard of scrutiny applies to compelled commercial speech that is not subject to *Zauderer* scrutiny. On the one hand, *Central Hudson* applied a form of intermediate scrutiny. On the other, *Central Hudson* dealt only with *restrictions* on commercial speech, not *compelled* speech. Yet, *NIFLA* suggests that compelled speech must survive, *at minimum*, intermediate scrutiny. *See* 585 U.S. at 773. So, because H.B. 1181 fails *Central Hudson*'s intermediate scrutiny, we need not decide that issue

---

[63] Of course, on a record containing more robust scientific support, Texas might be able to demonstrate the level of scientific agreement necessary to receive *Zauderer* review. As the district court pointed out, though, Texas never showed that Texas's Health and Human Services Commission made the findings contained in the health warnings, despite the three-time use of the Commission's name. *Free Speech Coal.*, 2023 WL 5655712, at *24. That alone might make the warnings controversial.

here.[64]

Under *Central Hudson*, courts apply "a four-part analysis" to government-compelled restriction of commercial speech. 447 U.S. at 566. First, the court "must determine whether the expression concerns lawful activity and is not misleading." *Id.* (cleaned up). Second, the court asks "whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest." *Id.*; *see also City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 416 (1993).

That standard is stricter than rational-basis, but it is not a least-restrictive-means test. Instead, we ask whether it is a reasonable fit, "one whose scope is in proportion to the interest served." *Fox*, 492 U.S. at 480 (internal quotation marks and citation omitted). The "government goal [must] be substantial, and the cost . . . carefully calculated." *Id.* And the governmental entity bears the burden of proving both the interest and the fit.

Because we address here only the application of H.B. 1181 to speech deemed (1) not obscene for adults but (2) obscene for minors, the expression at issue is lawful, meeting the first prong of *Central Hudson*. Next, we agree that Texas has a substantial—and even compelling[65]—interest in preventing

---

[64] We do note that in *Riley*, the Court acknowledged that there "is certainly some difference between compelled speech and compelled silence," but the Court went on to apply exacting scrutiny to compelled speech because, "in the context of protected speech [i.e., non-commercial speech], the difference is without constitutional significance . . . ." 487 U.S. at 796; *see also id.* at 797 (discussing *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 256 (1974)).

[65] *See Reno*, 521 U.S. at 863 n.30.

minors from accessing pornography, meeting the second prong.[66]

But Texas fails the third and fourth prongs.

The health warnings, taken as a whole, might advance the state's stated interests. The warnings declare the potential harm of minors' engaging with pornography, and they do so in a noticeable fashion—in a way likely to discourage minors from using and adults from allowing their children to use the websites. But Texas must meet a higher standard than "might." "[A] governmental body seeking to sustain a restriction on commercial speech must demonstrate that . . . its restrictions will in fact alleviate [the harms] to a material degree."[67] Because Texas has not made such a showing, we adopt the approach recently taken by the Ninth Circuit: "[C]ompelling sellers to warn consumers of a potential 'risk' never confirmed by any regulatory body—or of a hazard not 'known' to more than a small subset of the scientific community—does not directly advance" the government's interest. *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1283 (9th Cir. 2023). Therefore, Texas fails to satisfy the third prong.

Further, as in *NIFLA*, Texas does not adequately tailor the warnings to the interest. As the district court noted, because of the age-verification requirements, those warnings displayed on the landing page and subsequent

---

[66] Texas has not asserted an interest in preventing adult access to obscenity. Even to the degree the warnings would help achieve that legitimate interest, we cannot "supplant the precise interests put forward by the State with other suppositions." *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 624 (1995) (quoting *Edenfield v. Fane*, 507 U.S. 761, 768 (1993)).

[67] *Went For It*, 515 U.S. at 626 (quoting *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 487 (1995)); *see also Am. Acad. of Implant Dentistry v. Parker*, 860 F.3d 300, 309 (5th Cir. 2017) (discussing the third *Central Hudson* prong). To provide an example, Texas might have met this prong with studies finding the warnings caused minors not to watch pornography, regardless of the truthfulness of the warnings. But Texas has not provided such studies.

pages will presumably not reach any minors. To the degree that minors do see the warnings, the warnings' language seems beyond the average child's reading comprehension ability: They use multisyllabic, scientific words and phrases such as "biologically addictive," "desensitizes brain reward circuits," and "conditioned responses." Therefore, the warnings are too broad reasonably to fit the interest.[68]

Further, even if scientific findings supported the warnings, *but see supra* note 63, Texas has made no showing that they will discourage minors who have circumvented the age restrictions from accessing pornography. Additionally, the inclusion of a helpline for "mental health or substance use disorders" cannot be connected directly to *preventing* children from viewing pornography. § 129B.004(2).[69] Finally, Texas has not made any showing that it tried a government-funded public information campaign or that such a campaign would be ineffective. In other words, we see "numerous and obvious less-burdensome alternatives" to the health warnings. *Went For It*, 515 U.S. at 633 (quoting *Discovery Network*, 507 U.S. at 417 n.13). Thus, Texas fails the fourth prong of *Central Hudson*, making the health warnings unconstitutionally compelled commercial speech.

## C.

Finally, Plaintiffs contend that 47 U.S.C. § 230(c) preempts

---

[68] We do not mean to imply that *any* backup or safeguard would mean Texas has not adequately tailored the warnings to its interest. However, *this* backup strikes us as uniquely insufficiently tailored.

[69] Not only do plaintiffs dispute Texas's connection of pornography viewing to mental health issues, but also the helpline would presumably help only those children who have already viewed pornography. Therefore, it could not possibly be preventative. *Cf. NIFLA*, 585 U.S. at 769 ("The notice in no way relates to the services that licensed clinics provide. Instead, it requires these clinics to disclose information about state-sponsored services . . . .").

H.B. 1181. We conclude that it does not.

We start with the text of Section 230(c). Congress entitled Subsection (c) "Protection for 'Good Samaritan' blocking and screening of offensive material." Thus, Texas correctly suggests that Congress enacted § 230 to shield against liability for removal, but not promulgation, of "offensive material." Indeed, the text of § 230(c)(2) makes that clear.[70] Both provisions protect "providers" of "interactive computer service[s]" from liability stemming from attempts to "restrict" unwanted material. *Id.*

Subsection 230(c)(1), however, lacks that one-way language.[71] But, on its face, it still does not protect plaintiffs for two reasons. First, the act's context clarifies the subsection's open-ended language. *Cf. Yates v. United States*, 574 U.S. 528, 531–32 (2015) (plurality) (A fish is obviously a "tangible object," but it is not in the context of the Sarbanes-Oxley Act.). Indeed, Texas convincingly suggests that (c)(1) was meant to abrogate the holding in *Stratton Oakmont, Inc. v. Prodigy Services Co.*, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995). That court held an online service provider trying to filter out

---

[70] The subsection says,

No provider or user of an interactive computer service shall be held liable on account of—

(A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

(B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1) [subparagraph (A)].

47 U.S.C. § 230(c)(2).

[71] That subsection reads, "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1).

profane content liable for the remaining defamatory contents on a financial bulletin board.[72] But plaintiffs seek to turn that meaning on its head and make (c)(1) a shield for purposefully putting "offensive material" onto the Internet.

Second, particularly in light of that context, making plaintiffs liable under H.B. 1181 would not be "treat[ing them] as the publisher or speaker" of the underlying content. 47 U.S.C. § 230(c)(1). This is where *Doe v. MySpace, Inc.*, 528 F.3d 413 (5th Cir. 2008), complicates the analysis. There we held that § 230 shielded MySpace from negligence liability for publishing communications between a minor and an adult who later sexually assaulted her. *See id.* at 417–18. But that case is readily distinct.

In *MySpace*, "[p]arties complain[ed] that they were harmed by a Web site's publication of user-generated content." *Id.* at 419. And that is the point of Section 230: to immunize web service providers for harm caused by unremoved speech on their website. Like cellphone service providers, inter-active computer service providers cannot be held liable for harmful communications that they fail to remove. But liability under H.B. 1181 is not like liability under a negligence claim. It is not reliant on the harm done by third-party content. It imposes liability purely based on whether plaintiffs comply with the statute, independently of whether the third-party speech that plain-tiffs host harms anybody. As Texas puts it "if a minor circumvents age veri-fication, ignores the health warnings, and is subsequently harmed by third-party content or resulting offline conduct," Section 230 would kick in and bar liability. That is the nature of Section 230's protections: to protect a provider from speaker-liability stemming from the speech it hosts. Liability

---

[72] *See* Danielle Keats Citron & Benjamin Wittes, *The Internet Will Not Break: Deny-ing Bad Samaritans § 230 Immunity*, 86 Fordham L. Rev. 401, 405 (2017).

under H.B. 1181 is plainly different.

Plaintiffs reject that harm-based theory based on a misreading of *MySpace*. Their contention fails for two reasons. First, it relies on a misrepresentation of the court's characterization of the Third Circuit's holding in *Green v. AOL*, 318 F.3d 465 (3d Cir. 2003). *Green* reasoned that Section 230 barred the following tort claim: "AOL was *negligent* in promulgating *harmful* content and in failing to address certain *harmful* content on its network." *Id.* at 471 (emphasis added). Of course, that parallels the claim in *MySpace*, but it is not analogous here, *see supra*. Second, even if we accepted plaintiffs' generous characterization of our court's characterization of the *Green* court's "recharacterization" of the *Green* plaintiffs' claims as applicable here, plaintiffs still do not meet their own standard: "If recharacterizing the plaintiff's claims shows that the theory of liability is based, e.g., on decisions relating to the *monitoring, screening, and deletion* of content, the claims are barred and preempted." Brief for Appellee at 54 (emphasis added, internal citations and quotations omitted). But liability here is not based on "monitoring, screening, [or][73] deletion of content." Instead, it is based on a failure to age-verify or to include health warnings.

Plaintiffs continue by quoting *MySpace*, 528 F.3d at 420, to claim that the Act "force[s] upon [plaintiffs] a responsibility 'quintessentially related to a publisher's role,' to filter their audience . . . ." But publishers do not filter audiences; they filter content. And in *Green*, the court says exactly that. "[A]ctions quintessentially related to a publisher's role" refers to "monitoring, screening, and deletion of content." *MySpace*, 528 F.3d at 420 (quoting *Green*, 318 F.3d at 471). Plaintiffs mislead the reader.

Plaintiffs make several other claims as to why *MySpace* controls. First,

---

[73] We will charitably read plaintiffs' "and" as disjunctive.

they cite our statement in *MySpace* that "Congress provided broad immunity under the CDA to Web-based service providers for *all claims* stemming from their publication of information created by third parties . . . ."  523 F.3d at 418 (emphasis added by plaintiffs).  That misses the point.  The emphasis, properly placed, would read, "Congress provided broad immunity under the CDA to Web-based service providers for all claims stemming from their *publication of information created by third parties* . . . ."  *Id.* (emphasis added).  H.B. 1181 is not the sort of liability "stemming from their publication" of pornography that Section 230 immunizes.  In fact, plaintiffs' reliance on that passage is belied immediately by the next quote they select:  "Parties complaining that they were *harmed by a Web site's publication* of user-generated content . . . may sue the third-party user who generated the content."  *Id.* at 419 (emphasis added).  This underscores the importance of the harm analysis above.

Finally, plaintiffs also note that, in *MySpace* we mentioned in passing MySpace's failure to provide "age-verification software."  *See id.* at 422.  But that does not impact the analysis.  It merely means that Section 230 shields from liability interactive computer service providers that do not age verify despite some putative obligation arising from tort law.

Therefore, Section 230 does not preempt H.B. 1181.

IV.

We conclude with the remaining equitable factors for preliminary injunctions.  Although plaintiffs are unlikely to succeed on the merits of their challenge against H.B. 1181's age-verification requirement, they are likely to succeed against the health warnings.  So, we turn to those.

The remaining factors favor the preliminary injunction against the health warnings.  Texas challenges plaintiffs' assertion of irreparable harm, claiming first that the foreign plaintiffs have no constitutional rights that

Texas could infringe and second that plaintiffs have not shown H.B. 1181 will negatively impact viewership. Plaintiffs respond by pointing out that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitute irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion) (citing *N.Y. Times Co. v. United States*, 403 U.S. 713 (1971)).[74]

Plaintiffs' position is compelling. Contrary to Texas's claims, all plaintiffs have First Amendment rights, insofar as they are speaking in the United States. We have never held that because of their lack of citizenship, non-Americans have no rights under the First Amendment when they speak in the United States, and we will not do so here. The district court properly distinguished *USAID v. Alliance for Open Society International, Inc.*, as applying to "foreign organizations operating abroad." 140 S. Ct. 2082, 2088 (2020). Here, we have foreign organizations speaking in the United States. In fact, because H.B. 1181's health warnings compel only speech to visitors from Texas, the organizations are effectively *only* speaking in Texas. Thus plaintiffs, domestic and foreign, would suffer irreparable harm without this injunction against the health warnings.

Next, we turn to the balance of harms and public interests. The state's interests and the public's have merged here. Texas asserts that the harm to the public interest of not enforcing a state's law tips the balance of equities in Texas's favor. Plaintiffs respond by explaining that, should plaintiffs ultimately prevail, Texas's sovereign immunity will prevent them from recovering compliance and litigation costs.

But the government suffers no injury when a court prevents it from

_____

[74] *See also Book People, Inc. v. Wong*, 91 F.4th 318, 340–41 (5th Cir. 2024).

No. 23-50627

enforcing an unlawful law.[75] Thus, the balance of harms and the public interest weigh in plaintiffs' favor as to the health warnings.

\*     \*     \*     \*     \*

For the above reasons, we VACATE the stay, VACATE the injunction as to the age-verification requirement, and AFFIRM the injunction as to the health warnings.

---

[75] *All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 251–52 (5th Cir.) (citation omitted), *cert. granted sub nom. Danco Laboratories, L.L.C. v. All. for Hippocratic Med.*, 144 S. Ct. 537, *and cert. granted sub nom. FDA v. All. for Hippocratic Med.*, 144 S. Ct. 537, *and cert. denied*, 144 S. Ct. 537 (2023); *see also Book People*, 91 F.4th at 341.

No. 23-50627

Patrick E. Higginbotham, *Circuit Judge*, dissenting in part and concurring in part:

Advocate that he was, James Madison penned the Amendments to the work of the constitutional convention, ordering them in his perceived scale of value to their adoption by the States. Its valence in ratification aside, inherent in the First Amendment's seminal collage of religion, speech, press, assembly, and petition lie the seeds of a signal commitment to individual autonomy, yet to be realized, and in many ways a child itself until the 20th century when the sense of its embrace of individual worth soon became palpable.

The years that followed vindicated Madison's placement of the First Amendment with its rails for the paths of government, married to the individual's right of identity and self-expression in their myriad forms. At its core, the right of free speech moves with and finds expression in changes of technology, with accompanying efforts by Congress and state legislatures to find accommodation. In this dynamic mix, Texas has the right—indeed, the obligation—to protect its children. And consistent with this task, it is a given that the State enjoys great latitude in identifying and addressing injury to persons and institutions. Yet implicit in this legal churn remains the core principle that state power must operate within the sinews of the First Amendment, ever a challenge to all of government, a challenge requiring government to attend to its defense, ever faithful to Madison's gage of the reluctance of the States to relinquish their sovereign interests to the forming of the Union, a concern he further responded to with the assuring language that "*Congress* shall make no law."[1]

---

[1] The swirl of the history of Madison's day and its contemporaries produces a rich flow of scholarship, *see e.g.*, David A.J. Richards, *Free Speech and Obscenity Law: Toward a Moral*

## I.

On August 4, 2023, a group of online pornography websites, performers, and advocates sued the State of Texas to enjoin H.B. 1181 from going into effect on September 1, 2023, contending that the law violated the First Amendment of the United States Constitution and was preempted by § 230 of the Communications Decency Act.[2]

The district court determined H.B. 1181 was subject to strict scrutiny as a content-based restriction on speech because it applies only to websites that contain "sexual material harmful to minors." All parties acknowledged the State's compelling interest in protecting minors, but the court held that H.B. 1181 likely failed strict scrutiny review because the statute was neither narrowly tailored nor the least restrictive means of advancing the State's interest. The district court concluded that Plaintiffs demonstrated a substantial likelihood of success on the merits of their claim and granted the preliminary injunction.

Texas appealed the district court's order, arguing the court erred in applying strict scrutiny and finding that Plaintiffs demonstrated a substantial likelihood of success on the merits. In my view, H.B. 1181 is subject to strict scrutiny, and finding no error in the district court's factual findings, I would affirm and allow the parties to develop the factual record in the proper forum—trial.

---

*Theory of First Amendment*, 123 U. Pa. L. Rev. 45, 65 (1974); Martin H. Redish, *The Value of Free Speech*, 130 U. Pa. L. Rev. 591, 593–94 (1982). I frame this writing with this brief evoking of history only to remind that the path behind informs the path forward, confronting but never losing the core values of speech and press with their changing raiment of modes and mediums.

[2] 47 U.S.C. § 230 ("CDA").

No. 23-50627

## II.

First we ask whether the district court applied the appropriate level of scrutiny in finding a substantial likelihood of success on the merits, a question of constitutional law reviewed de novo.[3] The State argues the district court erred in applying strict scrutiny because H.B. 1181 applies only to speech that is "obscene" for minors undeserving of First Amendment protection and, relying on *Ginsberg v. New York*, that rational basis is the appropriate metric.[4] The majority agrees, concluding that rational basis review applies because the State's compelling interest in protecting children justifies regulating "the distribution *to minors* of materials obscene *for minors*." I disagree.

To these eyes, H.B. 1181 cannot be reasonably read to reach only obscene speech in the hands of minors. Although the statute incorporates *Miller v. California*'s definition of obscenity, H.B. 1181 limits access to materials that may be denied to minors but remain constitutionally protected speech for adults. It follows that the law must face strict scrutiny review because it limits adults' access to protected speech using a content-based distinction—whether that speech is harmful to minors.

### A.

"At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence."[5] It is well established that, except for several narrow categories of speech deemed unworthy of First

---

[3] *Ortiz v. Quarterman*, 504 F.3d 492, 496 (5th Cir. 2006); *United States v. Guidry*, 456 F.3d 493, 506 (5th Cir. 2006) ("We review questions of constitutional law *de novo*.").

[4] *Ginsberg v. New York*, 390 U.S. 629 (1968).

[5] *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 641 (1994).

Amendment protection, all speech is protected by the First Amendment and infringement upon protected speech receives heightened scrutiny.

No government can "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion,"[6] nor can our government regulate speech "because of disapproval of the ideas expressed."[7] Content-based regulations are then presumed invalid, and the courts must apply heightened scrutiny to laws that disadvantage speech because of its content, those that compel speech, and statutes that infringe upon adults' constitutionally protected speech.[8]

The Supreme Court affirmed these principles in four cases since *Ginsberg*: *Sable Communications of California, Inc. v. F.C.C.*, *Reno v. American Civil Liberties Union*, *United States v. Playboy Entertainment Group, Inc.*, and *Ashcroft v. American Civil Liberties Union* ("*Ashcroft II*").[9] Each of these cases recognized the government's compelling interest in protecting children from obscene materials but nevertheless evaluated the laws at issue under strict scrutiny because the law infringed constitutionally protected speech or imposed distinctions based on content.[10] Stepping past this precedent, the

---

[6] *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

[7] *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992).

[8] *Id.* ("Content-based regulations are presumptively invalid.") (citation omitted); *Turner*, 512 U.S. at 642 ("Laws that compel speakers to utter or distribute speech bearing a particular message are subject to the same rigorous scrutiny.") (citation omitted); *Sable Commc'ns of Calif., Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989) ("Under our precedents, § 223(b), in its present form, has the invalid effect of limiting the content of adult telephone conversations to that which is suitable for children to hear.") (citation omitted).

[9] *Sable*, 492 U.S. 115 (1989); *Reno v. Am. C.L. Union*, 521 U.S. 844 (1997); *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803 (2000); *Ashcroft v. Am. C.L. Union* ("*Ashcroft II*"), 542 U.S. 656 (2004).

[10] *See generally Sable*, 492 U.S. at 126 (considering 1988 amendments to § 223(b) of the

majority's new rule unjustifiably places the government's interest upon a pedestal unsupported by Supreme Court precedent.

## B.

I turn now to the question of whether H.B. 1181 applies only to obscene speech, one of the few categories of speech outside the umbrella of protection afforded by the First Amendment.[11] Relevant here, the law applies only to "commercial entit[ies] that knowingly and intentionally publish[] or distribute[] material on an Internet website, including a social media

---

Communications Act of 1934 which "sought to restrict the access of minors to dial-a-porn," recognizing the "Government has a legitimate interest in protecting children from exposure to indecent dial-a-porn messages," and concluding "[t]he Government may serve this legitimate interest, but to withstand constitutional scrutiny, it must do so by narrowly drawn regulations designed to serve those interests without unnecessarily interfering with First Amendment freedoms") (internal quotation and citation omitted); *Reno*, 521 U.S. at 860, 868–76 (considering § 223(a), (d) of Title V of the Communications Decency Act of 1996, which prohibited the transmission of "[any] communication which is obscene or indecent, knowing that the recipient of the communication is under 18 years of age," recognizing "the governmental interest in protecting children from harmful materials," and applying strict scrutiny because § 223(a) imposed a content-based distinction); *id.* at 876 ("It is true that we have repeatedly recognized the governmental interest in protecting children from harmful materials. But that interest does not justify an unnecessarily broad suppression of speech addressed to adults.") (citing *Ginsberg*, 390 U.S. at 639; *F.C.C. v. Pacifica Found.*, 438 U.S. 726, 749 (1978)); *Playboy Ent. Grp., Inc.*, 529 U.S. at 806–12 (considering § 505 of the Telecommunications Act which regulated "channels primarily dedicated to 'sexually explicit adult programming or other programming that is indecent,'" finding § 505 implemented a content-based distinction, and applying strict scrutiny despite recognizing the "overriding justification for the regulation is concern for the effect of the subject matter on young viewers"); *Ashcroft II*, 542 U.S. at 660–65 (affirming district court's conclusion that § 231 of the Child Online Protection Act was a content-based regulation, applying strict scrutiny, and finding that COPA was not the least restrictive means of achieving the government's "interest of preventing minors from using the Internet to gain access to materials that are harmful to them").

[11] Notably, this argument was not made before the district court. There, the State argued that H.B. 1181 addressed content obscene for children and "does not place any limits whatsoever on what porn adults can watch."

platform, more than one-third of which is sexual material harmful to minors."[12] "Sexual material harmful to minors" is defined as "any material" that:

> (A) the average person applying contemporary community standards would find, taking the material as a whole and with respect to minors, is designed to appeal to or pander to the prurient interest;
>
> (B) in a manner patently offensive with respect to minors, exploits, is devoted to, or principally consists of descriptions of actual, simulated, or animated displays or depictions of:
>
>> (i) a person's pubic hair, anus, or genitals or the nipple of the female breast;
>>
>> (ii) touching, caressing, or fondling of nipples, breasts, buttocks, anuses, or genitals; or
>>
>> (iii) sexual intercourse, masturbation, sodomy, bestiality, oral copulation, flagellation, excretory functions, exhibitions, or any other sexual act; and
>
> (C) taken as a whole, lacks serious literary, artistic, political, or scientific value for minors.[13]

Although obscene speech lies outside the First Amendment's umbrella of protection, not all sexual expression is obscene.[14] Indeed, "sexual expression which is indecent but not obscene is protected by the First Amendment."[15] What Plaintiffs refer to as "exclusively 'soft core' nude

---

[12] Tex. Civ. Prac. & Rem. § 129B.002(a).

[13] *Id.* § 129B.001(6).

[14] *See Miller v. California*, 413 U.S. 15, 24 (1973); *see generally Roth v. United States*, 354 U.S. 476 (1957). It is not "literally true" that certain categories of speech, including obscenity, are outside the "protection of the First Amendment." *See R.A.V.*, 505 U.S. at 383. Instead, "these areas of speech can, consistently with the First Amendment, be regulated because of their constitutionally proscribable content (obscenity, defamation, etc.)—not that they are categories of speech entirely invisible to the Constitution." *Id.*

[15] *Sable*, 492 U.S. at 126.

modeling," for example, constitutes non-obscene sexual expression, as would many romance novels, or—to use another example from the briefing— Marlon Brando movies. And protected sexual expression encompasses materials that are appropriate for adults but inappropriate for minors. For example, scenes from the popular show "Game of Thrones," the 1985 film "The Color Purple," or the 2011 film "The Girl with the Dragon Tattoo" all contain "depictions" of sexual intercourse that may be "patently offensive" to young minors and regulated under H.B. 1181, but still offer artistic or cinematic value for adults.

While I agree with the majority that H.B. 1181's plain text applies only to "sexual material harmful to *minors*,"[16] the statute cannot be reasonably read to regulate *only* obscene content. In the words of the district court, H.B. 1181 goes "beyond obscene materials" and "regulates all content that is prurient, offensive, and without value *to minors*."[17] In doing so, the law infringes upon adults' protected sexually expressive speech.

Ultimately, the text does not support the argument that H.B. 1181 regulates only obscene speech.[18] H.B. 1181 regulates all material harmful to minors, which necessarily encompasses non-obscene, sexually expressive— and constitutionally protected—speech for adults. Thus, H.B. 1181 limits

---

[16] Tex. Civ. Prac. & Rem. § 129B.001(6) (emphasis added).

[17] "Because most sexual content is offensive to young minors," the district court found H.B. 1181 "covers virtually all salacious material," including "sexual, but non-pornographic, content posted or created by Plaintiffs."

[18] To the extent the State suggests H.B. 1181 would be enforced only as to obscene content, we cannot "uphold an unconstitutional statute merely because the Government promised to use it responsibly." *United States v. Stevens*, 559 U.S. 460, 480 (2010).

access to constitutionally protected speech, regardless of whether the viewer is a minor. Such action "is to burn the house to roast the pig."[19]

## C.

As the regulated speech falls under the First Amendment's umbrella of protection, the issue is whether the district court properly found H.B. 1181 subject to strict scrutiny, a question of law reviewed de novo.[20] The majority finds H.B. 1181 subject only to rational basis review. I disagree.

### 1.

Content-based restrictions on protected speech are presumptively unconstitutional, valid only if the government proves they are narrowly tailored to further a compelling interest.[21] By the statute's plain language, H.B. 1181 applies only to websites with content "more than one-third of which *is sexual material harmful to minors*."[22] Because H.B. 1181 regulates only a particular type of speech, "[t]he speech in question is defined by its content; and the statute which seeks to restrict it is content based."[23] As such, H.B. 1181 is subject to strict scrutiny.

### 2.

The district court found the State "largely concede[d]" that strict scrutiny should apply, but looking to *Ginsberg*, the State now asks this Court

---

[19] *Butler v. Michigan*, 352 U.S. 380, 383 (1957).

[20] *United States v. Richards*, 755 F.3d 269, 273 (5th Cir. 2014) (citations omitted).

[21] *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) (citing *R.A.V.*, 505 U.S. at 395).

[22] *See* TEX. CIV. PRAC. & REM. CODE § 129B.002(a) (emphasis added).

[23] *Playboy Ent. Grp., Inc.*, 529 U.S. at 811.

to find that this content-based restriction does not warrant strict scrutiny.[24] While the majority credits this argument, I cannot—for *Ginsberg* does not here call for rational basis review, and the Supreme Court has unswervingly applied strict scrutiny to content-based regulations that limit adults' access to protected speech.

In *Ginsberg*, the Supreme Court upheld a New York criminal obscenity statute prohibiting the knowing sale of obscene materials to minors.[25] Ginsberg was convicted of violating the statute after he sold two "girlie magazines" to a sixteen-year-old. Ginsberg asserted that the New York statute violated the First Amendment because "the constitutional freedom of expression secured to a citizen to read or see material concerned with sex cannot be made to depend upon whether the citizen is an adult or a minor."[26] He went on to argue "that the denial to minors under 17 of access to material condemned by [the statute], insofar as that material is not obscene for persons 17 years of age or older, constitutes an unconstitutional deprivation of protected liberty," which Ginsberg likened to the deprivations of liberty recognized in *Meyer v. State of Nebraska*, *Pierce v. Society of Sisters*, and *West Virginia State Board of Education v. Barnette*.[27]

---

[24] Both Texas and the majority gloss H.B. 1181's breadth by claiming the law applies only to "commercial pornographic websites." But as discussed, *supra* Section II.B., H.B. 1181 regulates more than commercial pornography.

[25] *See Ginsberg*, 390 U.S. at 645.

[26] *Id.* at 636.

[27] *Id.* at 637–38; *see also Meyer v. Nebraska*, 262 U.S. 390 (1923) (holding a Nebraska statute prohibiting the teaching of any subject in any language other than the English language unconstitutional); *Pierce v. Soc'y of Sisters of the Holy Names of Jesus and Mary*, 268 U.S. 510 (1925) (finding the Compulsory Education Act of 1922 unconstitutionally interfered with parents' liberty to direct the upbringing and education of their children); *Barnette*, 319 U.S. at 642 (holding that schools cannot compel children to salute the flag or state the Pledge of Allegiance without violating the First Amendment).

The Supreme Court disagreed, focusing on the fact that the prosecution concerned a single sale in Ginsberg's store to a minor. Despite observing that the magazines were "not obscene for adults," the Court held the New York regulation did not invade the "minors' constitutionally protected freedoms."[28] Explaining that "the power of the state to control the conduct of children reaches beyond the scope of its authority over adults," the Court found the law rationally related to the State's interest in protecting minors, and upheld Ginsberg's conviction.[29]

*Ginsberg*'s force here is its recognition of a state's power to regulate minors in ways it could not regulate adults. But this overriding power to protect children does not answer our essential question: whether H.B. 1181 imposes a content-based restriction or causes an "unnecessarily broad suppression of speech addressed to adults."[30] If so, "the answer should be clear: The standard is strict scrutiny."[31]

*Ginsberg* is further inapplicable because application of rational basis rested on the notion that minors have more limited First Amendment rights than adults[32] and because the statute did not infringe upon adults' access to

---

[28] *Ginsberg*, 390 U.S. at 638.

[29] *Id.* (citing *Prince v. Massachusetts*, 321 U.S. 158, 170 (1944)); *id.* at 643.

[30] *Reno*, 521 U.S. at 875.

[31] *Playboy Ent. Grp., Inc.*, 529 U.S. at 813.

[32] *Ginsberg*, 390 U.S. at 636 ("[Ginsberg] accordingly insists that the denial to minors under 17 of access to material condemned by s 484—h, insofar as that material is not obscene for persons 17 years of age or older, constitutes an unconstitutional deprivation of protected liberty."); *see also Erznoznik*, 422 U.S. at 214 n.11 ("The First Amendment rights of minors are not 'co-extensive with those of adults.'"); *Bellotti v. Baird*, 443 U.S. 622, 637 n.15 (1979) ("[T]he State has considerable latitude in enacting laws affecting minors on the basis of their lesser capacity for mature, affirmative choice, *Tinker v. Des Moines School Dist.*, 393 U.S. 503 (1969), illustrates that it may not arbitrarily deprive them of their freedom of

the same materials.[33] Notably, Plaintiffs here, unlike Ginsberg, do not seek greater access for minors to these materials. And the New York statute at issue in *Ginsberg* did not burden the free speech interests of adults, but H.B. 1181 does; H.B. 1181 requires that adults comply with the age verification procedure and view the required health disclosures before accessing protected speech. Therefore, *Ginsberg*'s justification for rational basis review—that minors have more limited First Amendment rights than adults—has no purchase here, as we are dealing with a challenge to an adult's ability to access constitutionally protected materials on the ubiquitous internet, not over-the-counter magazine sales in a drug store.

The majority cites to *Erznoznik v. City of Jacksonville* for the broad contention that more stringent regulations of content are permissible for minors *without any regard* to burdens placed on adult speech. *Erznoznik* invalidated a Jacksonville ordinance that prohibited drive-in theaters from exhibiting films showing bare buttocks or breasts.[34] In the majority's view, had the definition of obscenity been narrowed to only depictions obscene for children, the *Erznoznik* Court would have taken no issue with the burdens

---

action altogether.").

Indeed, the Supreme Court has cited *Ginsberg* for the proposition that minors have more limited First Amendment rights than adults. *See Interstate Cir., Inc. v. City of Dallas*, 390 U.S. 676, 690 (1968); *Miller*, 413 U.S. at 36 n.17; *Erznoznik*, 422 U.S. at 212–14; *Carey v. Population Servs., Int'l*, 431 U.S. 678, 692 (1977); *Pacifica*, 438 U.S. at 757 (Stewart, J., concurring in result); *Jacobellis v. Ohio*, 378 U.S. 184, 195 (1964) (opinion of Brennan, J.).

[33] Contrary to the majority's claim that "[t]he statute at issue in *Ginsberg* necessarily implicated, and intruded upon, the privacy of those adults seeking to purchase 'girlie magazines,'" *Ginsberg* came to the opposite conclusion. *Ginsberg*, 390 U.S. at 634–35 (determining the magazines at issue "are not obscene for adults," and stating that the "[New York statute] does not bar the appellant from stocking the magazines and selling them to persons 17 years of age or older, and therefore the conviction is not invalid under our decision in *Butler v. State of Michigan*").

[34] *See Erznoznik*, 422 U.S. at 207–08 (restating § 220.313 of the municipal code).

imposed on adults. With respect, the Court did consider the burdens on adults. Specifically, the Court noted that "the deterrent effect of this ordinance [was] both real and substantial," as it "applie[d] to all persons employed by or connected with drive-in theaters" and forced "the owners and operators of these theaters" to either "restrict their movie offerings or construct adequate protective fencing which may be extremely expensive of even physically impracticable" in order to avoid prosecution.[35] It also explained that the ordinance deterred theaters "from showing movies containing any nudity, however innocent or even educational." Contrary to the majority's view, and as we have aways done, *Erznoznik* requires an exacting comparison of the state interest involved (including the interest in protecting children) against the methods chosen to effectuate the state's interest and its effects on the broader adult population.[36]

It is no failure of advocacy that the State has cited to no case since *Ginsberg* in which the Supreme Court applied rational basis review to regulations impinging adults' access to protected speech.[37] No such case exists. Instead, since *Ginsberg*, the Supreme Court has consistently applied

---

[35] *Id.* at 218.

[36] The majority opines "it is never obvious whether an internet user is an adult or a child," so that "any attempt to identify the user will implicate adults in some way" and "any attempt to protect children will be subject to strict scrutiny, often a death knell in and of itself." But strict scrutiny need not sound the "death knell." The majority here begs the question of how states, parents, and websites can ensure that only adults access the materials at issue, a factual question best suited for trial. Finally, distinguishing between minor and adult viewers is within technical achievement. Plaintiffs proposed several means by which Texas could do so without impinging upon adults' constitutional rights. *See infra* Section III.A.2. A trial is the proper forum for determining whether Plaintiffs' proposal indeed presents a viable, less restrictive means to accomplish Texas's goal.

[37] The majority likewise fails to identify such a case.

strict scrutiny to content-based regulations that infringe upon adults' protected speech.

In *Sable*, the Supreme Court addressed § 223(b) of the Communications Decency Act of 1934, as amended in 1988.[38] Section 223 imposed a blanket prohibition on indecent and obscene interstate commercial telephone messages, including prerecorded "dial-a-porn" services.[39] The CDA's proscriptions were justified based on the government's interest in protecting children from harmful materials.[40]

The Supreme Court upheld § 223(b)'s ban of obscene commercial telephone messages but struck the limitations on "indecent" communications as stepping on adults' access to constitutionally protected sexual expression.[41] Citing *Ginsberg*, the Court acknowledged the federal government's compelling interest in protecting the "physical and psychological well-being of minors" but nevertheless required the statute be "narrowly drawn."[42] In short, the Court applied strict scrutiny because "the statute's denial of adult access to such messages far exceeds that which is necessary to serve the compelling interest of preventing minors from being exposed to the messages."[43]

---

[38] 47 U.S.C. § 223; *Sable*, 492 U.S. at 117.

[39] 47 U.S.C. § 223 (1988).

[40] *Sable*, 492 U.S. at 126 (describing government's interest as "legitimate interest in protecting children from exposure to indecent dial-a-porn messages").

[41] *Id.* at 131.

[42] *Id.* at 126.

[43] *Id.* at 131.

The Communications Decency Act drew challenge again in *Reno v. American Civil Liberties Union*.[44] In *Reno*, the Court engaged § 223 (a) and (d), which criminalized the "indecent transmission" and "patently offensive display" of "obscene or indecent" messages to any recipient under 18 years of age.[45] As the Supreme Court had not yet articulated a standard for restrictions on internet communications, the first question for the Court was the appropriate level of scrutiny. The government urged the Court to apply rational basis review like *Ginsberg*, or alternatively, intermediate scrutiny as the Court had done in *F.C.C. v. Pacifica Foundation* and *City of Renton v. Playtime Theatres, Inc.*[46]

The Supreme Court disagreed with the government. First, it found that the CDA had four important textual differences from the New York statute at issue in *Ginsberg*.[47] Then, the *Reno* Court held *Pacifica* inapplicable because the *Pacifica* broadcast regulation was narrower than the CDA, did not involve a punitive component, and concerned a medium which, as a historical matter, had "received the most limited First Amendment protection."[48] Finally, *Reno* found that the "time, place, and manner"

---

[44] *See Reno*, 521 U.S. at 849–85.

[45] *Id.* at 849.

[46] *See* Brief for Appellant, *Reno v. Am. C.L. Union*, 521 U.S. 844 (1997) (No. 96-511), 1997 WL 32931, 19–24.

[47] The Court found "[i]n four important respects, the statute upheld in *Ginsberg* was narrower than the CDA." These included that: (1) under the CDA "neither the parents' consent—nor even their participation—in the communication would avoid the application of the statute"; (2) the CDA extended beyond mere commercial transactions; (3) the CDA neither defined "indecent" nor contained "any requirement that the 'patently offensive' material covered by § 223(d) lack serious literary, artistic, political, or scientific value"; and (4) the CDA applied to "all those under 18 years," which was an additional year than the statute in *Ginsberg*. *Reno*, 521 U.S. at 865–67.

[48] *Id.* (internal citations omitted).

restrictions in *Playtime Theatres* were inapposite because the CDA was designed to target the "primary effects" of offensive speech and not the "secondary effects" at issue in *Playtime Theatres*.[49] The Court concluded that "these precedents, then, surely do not require us to uphold the CDA and are fully consistent with the application of the most stringent review of its provisions."[50]

The Court went on to distinguish "cyberspace" from traditional mediums of expression.[51] In particular, the Court found "the vast democratic forums of the Internet" had never been subject to the same degree of "government supervision and regulation that has attended the broadcast industry."[52] Moreover, the internet was not as "invasive" as radio, in that internet communications "do not 'invade' an individual's home or appear on one's computer screen unbidden."[53] Indeed, because internet users must take "affirmative steps" to access sexually explicit content, the Court noted that "users seldom encounter content by accident" and the "odds are slim that a user would come across a sexually

---

[49] The opinion further rejected the government's argument that the CDA was "'cyberzoning' on the Internet" equivalent to local zoning ordinances. *Id.* at 867–68. Because the CDA "applies broadly to the entire universe of cyberspace" and its purpose was to protect children from the "primary effects of indecent and patently offensive speech, rather than any secondary effects of such speech," the *Reno* Court determined that the CDA was a "content-based blanket restriction on speech, and, as such, cannot be 'properly analyzed as a form of time, place, and manner regulation.'" *Id.* at 868 (cleaned up).

[50] *Id.*

[51] *Id.*

[52] *Id.* at 868–69.

[53] *Id.* at 869.

explicit sight by accident."[54] Ultimately, the Court in *Reno* found that "our cases provide no basis for qualifying the level of First Amendment scrutiny that should be applied to this medium."[55] As a content-based regulation of speech, the CDA faced the "most stringent review of its provisions" and failed, as it was not narrowly tailored and less restrictive alternatives were available.[56]

Displeased with the *Reno* decision, Congress enacted the Child Online Protection Act ("COPA").[57] The COPA imposed a $50,000 fine or up to six months' imprisonment for anyone who knowingly used the internet to make "any communication for commercial purposes that is available to

---

[54] *Id.* (internal quotations omitted); *see also id.* at 870 (explaining that the decision in *Sable* distinguished "dial-a-porn," prerecorded sexually explicit phone calls, from broadcast radio because "the dial-it medium requires the listener to take affirmative steps to receive the communication").

[55] *Id.* at 870.

[56] *Id.* at 868.

[57] 47 U.S.C. § 231. In between *Reno* and *Ashcroft II*, the Supreme Court decided *United States v. Playboy Ent. Grp., Inc.*, and held that § 505 of the Telecommunications Act, which regulated "channels primarily dedicated to 'sexually explicit adult programming or other programming that is indecent,'" drew a content-based distinction between "indecent" and non-indecent material. *Playboy Ent. Grp., Inc.*, 529 U.S. at 811–12. The Court found its "precedent[] teach[es] these principles": first, "[w]here the designed benefit of a content-based speech restriction is to shield the sensibilities of listeners, the general rule is that the right of expression prevails, even where no less restrictive alternative exists," *id.* at 813; second, "cable television, like broadcast media, presents unique problems, which inform our assessment of the interests at stake, and which may justify restrictions that would be unacceptable in other contexts." *id.* Third, when a law regulates protected speech, even "unwanted, indecent speech that comes into the home without parental consent," "the answer should be clear: The standard is strict scrutiny," *id.* at 814. As the Court succinctly put it: "[E]ven where speech is indecent and enters the home, the objective of shielding children does not suffice to support a blanket ban if the protection can be accomplished by a less restrictive alternative." *Id.*

any minor and that includes any material that is harmful to minors."[58] The statute distinguished permissible from impermissible communications based on whether they were "harmful to minors."[59] The COPA defined "harmful to minors" by adopting *Miller*'s definition of obscenity.[60]

In *Ashcroft II*, several internet service providers, "Web speakers[,] and others concerned with protecting the freedom of speech" challenged the COPA as a content-based speech restriction.[61] As in *Sable* and *Reno*, the government asserted the COPA was constitutional given the government's interest in protecting minors from harmful materials.[62] The district court applied strict scrutiny, found the COPA was likely to deter adults from accessing protected speech, and concluded that the government could not "meet its burden to prove that COPA is the least restrictive means available to achieve the goal of restricting the access of minors to harmful material."[63] Accordingly, the district court preliminarily enjoined the statute's enforcement.[64]

The Supreme Court agreed and affirmed the district court.[65] In doing so, *Ashcroft II* restated *Reno*'s rule that strict scrutiny applied to statutes that "effectively suppress[] a large amount of speech that adults have a

---

[58] 47 U.S.C. § 231(a)(1).

[59] *Id.*

[60] *Compare* 47 U.S.C. § 231(e)(6), *with Miller*, 413 U.S. at 24–25.

[61] *Ashcroft II*, 542 U.S. at 656 (capitalization in original).

[62] *Id.* at 659–60.

[63] *Id.* at 664 (cleaned up).

[64] *Id.*

[65] *Id.* at 670 ("The reasoning of *Playboy Entertainment Group* and the holdings and force of our precedents require us to affirm the preliminary injunction.").

constitutional right to receive and to address to one another."[66] *Ashcroft II* reiterated that "content-based restrictions on speech [are] presumed invalid, and that the Government bear[s] the burden of showing their constitutionality."[67] Ultimately, the Court upheld the preliminary injunction after finding a number of plausible, less restrictive alternatives, including blocking and filtering software.[68]

The Supreme Court has consistently applied strict scrutiny to content-based restrictions that impair adults' access to protected speech. Contrary to the majority's views, *Ginsberg* is distinguishable and does not change this analysis. H.B. 1181 imposes a content-based restriction on speech that burdens adults' access to that speech. Bound by *Sable*, *Reno*, and *Ashcroft II*, this Court must apply strict scrutiny.

### 3.

In an effort to escape the Supreme Court's insistence upon strict scrutiny for content-based restrictions, the majority—and the State—would differentiate H.B. 1181 from the CDA in *Reno* and the COPA in *Ashcroft II*. These distinctions are unpersuasive.

### i.

First, the State attempts to distinguish this case from *Reno*, arguing that H.B. 1181 is narrower than the CDA and more closely tracks *Miller*'s definition of obscenity.[69] Indeed, *Reno* found the CDA's definition of

---

[66] *Id.* at 665 (citing *Reno*, 521 U.S. at 874).

[67] *Id.* at 660 (internal citations omitted).

[68] *Id.* at 667–70.

[69] The State argues the CDA was unconstitutionally overbroad because "it omitted *Miller*'s element that obscenity must relate to 'sexual conduct'" but that H.B. 1181 "neither

obscenity to be impermissibly broader than *Miller*'s for several reasons: *Miller*'s definition of obscenity was limited to conduct defined by state law, while the CDA's was not; and *Miller*'s definition was limited to sexual conduct, whereas the CDA also covered excretory activities and "organs of both a sexual and excretory nature."[70]

H.B. 1181 is strikingly similar to the CDA and, in some ways, goes even further. Like the CDA, H.B. 1181 does not limit regulated speech to conduct proscribed by Texas law.[71] Like the CDA, H.B. 1181 regulates more than just "sexual conduct."[72] The CDA prohibited speech regarding "excretory activities" as well as "organs" of both a sexual and excretory nature,[73] and H.B. 1181 similarly restricts depictions of "pubic hair" and "the nipple of the female breast."[74] By its text, H.B. 1181 goes further than the CDA regarding the format of depictions it covers, as it applies to "*descriptions* of actual, *simulated, or animated* displays or depictions" of specified body parts, conduct, and undefined "exhibitions,"[75] while the CDA applied, *inter alia*, to "image[s]."[76] In essence, Texas's contention that H.B. 1181 closely tracks *Miller* fails to persuade.

Lastly, the majority discounts *Reno* on the basis that it did not

_____

criminalizes pornography nor omits this crucial element; it only takes steps to limit its distribution to children and warn of associated risks."

[70] *Reno*, 521 U.S. at 871–73; *Miller*, 413 U.S. at 16 n.1 (cleaned up).

[71] TEX. CIV. PRAC. & REM. CODE § 129B.001(6) (omitting reference to state law).

[72] *Id.*

[73] 47 U.S.C. § 223 (1996).

[74] TEX. CIV. PRAC. & REM. CODE § 129B.001(6).

[75] *Id.* (emphasis added).

[76] 47 U.S.C. § 223 (d), (h); *Reno*, 521 U.S. at 860; TEX. CIV. PRAC. & REM. CODE § 129B.001(6).

distinguish the internet from in-person communications, to which I say: read *Reno*. The opinion reviewed the levels of scrutiny applied across numerous cases and mediums—including those applied in *Ginsberg*, *Pacifica*, *Playtime Theatres*, and *Sable*—before concluding "our cases provide no basis for qualifying the level of First Amendment scrutiny that should be applied to this medium [the internet]."[77]

### ii.

Texas's attempt to distinguish *Ashcroft II* is similarly flawed. As an initial matter, the State understates the similarities between H.B. 1181 and the COPA. Where the COPA distinguished content "harmful to minors," H.B. 1181 uses the phrase "sexual material harmful to minors." The statutory definitions of "harmful to minors" and "sexual material harmful to minors" are, however, functionally identical.[78] These similarities are not superficial, they are substantive. Therefore, as in *Ashcroft II*, strict scrutiny applies.

Moreover, Texas's argument that *Brown v. Entertainment Merchants Association* reaffirmed *Ginsberg*, while condoned by the majority, stretches *Brown*'s holding.[79] Texas is correct that *Brown* affirmed that a state has a compelling interest in protecting minors from obscenity.[80] But that is where

---

[77] *Reno*, 521 U.S. at 870.

[78] *Compare* 47 U.S.C. § 231(e)(6), *with* Tex. Civ. Prac. & Rem. § 129B.001(6).

[79] *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786 (2011).

[80] *Id.* at 794 ("No doubt a State possesses legitimate power to protect children from harm . . . but that does not include a free-floating power to restrict the ideas to which children may be exposed.") (citing *Ginsberg*, 390 U.S. at 640–641; *Prince*, 321 U.S. at 165).

*Brown* heard a challenge to California Assembly Bill 1179 (2005), Cal. Civ. Code §§ 1746–1746.5 (2009), which prohibited the sale or rental of "violent video games" to minors and required packaging to indicate "18" as the appropriate age level for players. The

the similarities to *Ginsberg* end. The *Brown* Court did not apply *Ginsberg*'s rational basis review. Instead, the Court found the California statute at issue constituted a content-based restriction of protected speech and applied strict scrutiny.[81]

Finally, the majority's critique that *Ashcroft II* contained "startling omissions" regarding its analytical framework ignores that the Supreme Court itself previously found that strict scrutiny applied.[82] In *Ashcroft II*, the Supreme Court simply treated it as a self-evident proposition that strict scrutiny applied. This Court cannot fault *Ashcroft II* for applying the level of scrutiny clearly established by *Sable* and *Reno*, or for declining to engage in repetitive analysis. And the majority's implication that the Supreme Court knowingly applied the wrong level of scrutiny merely because the issue was not "jurisdictional" needs no response.

\* \* \*

The majority's attempts to distinguish *Ginsberg* from *Sable*, *Reno*, and *Ashcroft II* are unconvincing. H.B. 1181 implements a content-based distinction: it applies only if over one third of an entity's commercial content

---

statute defined "violent" games as those that permitted users to kill, maim, dismember, or sexually assault an "image of a human being" while playing if a "reasonable person, considering the game as a whole, would find [it] appeals to a deviant or morbid interest of minors," is "patently offensive to prevailing standards in the community as to what is suitable for minors," and that "causes the game, as a whole, to lack serious literary, artistic, political, or scientific value for minors." *See* CAL. CIV. CODE § 1746(d)(1) (defining "violent video game").

[81] *Brown*, 564 U.S. at 799 (finding the law "imposes a restriction on the content of protected speech, it is invalid unless [the government] can demonstrate that it passes strict scrutiny— that is, unless it is justified by a compelling government interest and is narrowly drawn to serve that interest").

[82] Texas similarly contends that the *Ashcroft II* "Court never addressed whether strict scrutiny was the proper standard because the government conceded the point."

is "harmful to minors." While the majority claims "the statute in *Sable* swept in a much larger swath of speech than the speech targeted here," it fails to explain how § 224(b)'s ban on "indecent" material is broader than that regulated by H.B. 1181. Further, the Supreme Court has rejected the majority's contention that there is a difference between regulatory burdens and bans: "It is of no moment that the statute does not impose a complete prohibition. The distinction between laws burdening and laws banning speech is but a matter of degree."[83]

In sum, I agree with the majority that *Ginsberg* remains good law and indubitably recognizes the government's power to protect children from age-inappropriate materials. But content-based laws that infringe upon protected speech receive strict scrutiny. H.B. 1181 imposes a content-based restriction on speech that burdens adults' access to that speech and is subject to strict scrutiny.

### III.

To prevent minors from accessing potentially harmful speech, H.B. 1181 "suppresses a large amount of speech that adults have a constitutional right to receive and to address to one another."[84] Under strict scrutiny, the statute must be narrowly drawn to further Texas's compelling interest and the restriction must amount to the "least restrictive means to further the articulated interest."[85]

There was no challenge before the district court to the State's compelling interest in protecting minors from inappropriate, explicit content.

---

[83] *Playboy Ent. Grp., Inc.*, 529 U.S. at 812.

[84] *Id.* at 874.

[85] *Sable*, 492 U.S. at 126.

Rather, the district court held that H.B. 1181 failed strict scrutiny review because it was neither narrowly tailored nor the least restrictive means of achieving the State's interest. Hence, the district court concluded Plaintiffs demonstrated a substantial likelihood of success on the merits of their claim and granted the preliminary injunction. We review these findings for clear error.[86]

### A.

First, the age verification component of H.B. 1181 requires regulated commercial entities to implement "reasonable age verification methods" to ensure that all website users are over the age of 18.[87] "Reasonable age verification methods" include requiring website viewers to either "provide digital identification" or "comply with a commercial age verification system that verifies age" using either government-issued identification or "a

---

[86] *Google, Inc. v. Hood*, 822 F.3d 212, 220 (5th Cir. 2016); *see also Atchafalaya Basinkeeper v. U.S. Army Corps of Engineers*, 894 F.3d 692, 696 (5th Cir. 2018) ("A grant of a preliminary injunction is reviewed for abuse of discretion. Factual determinations within the preliminary injunction analysis are reviewed for clear error[.]") (internal citation omitted).

[87] Tex. Civ. Prac. & Rem. § 129B.002(a). "Reasonable" age verification methods, set out in § 129B.003, provides:

> (b) A commercial entity that knowingly and intentionally publishes or distributes material on an Internet website or a third party that performs age verification under this chapter shall require an individual to:
>> (1) provide digital identification; or
>> (2) comply with a commercial age verification system that verifies age using:
>>> (A) government-issued identification; or
>>> (B) a commercially reasonable method that relies on public or private transactional data to verify the age of an individual.

*Id.* § 129B.003(b). The statute does not define a "commercially reasonable method that relies on public or private transactional data."

commercially reasonable method that relies on public or private transactional data to verify the age of an individual."[88]

The district court found that this provision of the statute was not narrowly tailored, as it was underinclusive, vague, and overbroad in its regulation of adults' protected speech. I agree.

### 1.

### i.

The district court found H.B. 1181's age verification mandate "severely underinclusive" because the law does not regulate sites that are "most likely to serve as a gateway to pornography use." This conclusion rested on expert declarations that highlighted the types of entities left unregulated by H.B. 1181. These reports emphasized that internet service providers are explicitly exempt from the statute.[89] Consequently, this exemption "ignores visual search[es], much of which is sexually explicit or pornographic," and could be easily accessed by children after a simple "misspelled search." Further relying on the experts' reports, the district court concluded that social media platforms are also implicitly exempted from the statute because "they likely do not distribute at least one-third sexual material." The district court found this exemption problematic

---

[88] *Id.* § 129B.003(b). "Digital identification" refers to "information stored on a digital network that may be accessed by a commercial entity and that serves as proof of the identity of an individual." *Id.* § 129B.003(a). Although companies must require such verification, the statute prohibits commercial entities from retaining this information. *See id.* § 129B.002(b) ("A commercial entity that performs the age verification required by Subsection (a) or a third party that performs the age verification required by Subsection (a) may not retain any identifying information of the individual.").

[89] *Id.* § 129B.005(b) (internet service provider exemption). However, this exemption exists "to the extent the provider or search engine is not responsible for the creation of the content that constitutes sexual material harmful to minors." *Id.*

because some social media sites, like Reddit or Tumblr, contain "entire communities and forums . . . dedicated to posting online pornography with no regulation under H.B. 1181." Likewise, the district court found that social media websites like Instagram and Facebook "can show material which is sexually explicit for minors without compelled age verification." Ultimately, the district court concluded that, because of these exceptions, H.B. 1181 "fails to reduce the online pornography that is most readily available to minors."

At this juncture, Texas has failed to persuade that this finding was clearly erroneous. The State argues the age verification requirement is not underinclusive but, instead, only targets sites "whose business model is significantly driven by distributing sexual material harmful to minors," unlike search engines and social media websites that have either taken steps to protect minors or "do not seek profit from peddling depictions of bestiality and sexual assault." This argument fails at the starting gate because it was not made before the district court and is thus forfeited on appeal. Equally important, the State offered no evidence that the Texas legislature tailored H.B. 1181 to address pornography websites *because* their "business model" is tailored to selling pornography to minors. Without evidence in the record, this argument cannot stand.

Rather, the present record supports the district court's conclusion that while H.B. 1181 will regulate adult video companies, it "will do little else to prevent children from accessing pornography." The district court evaluated the provided expert reports and based its conclusions on the evidence before it. I am not left with a "definite and firm conviction that a mistake has been committed,"[90] a conclusion reinforced by the "great

---

[90] *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

deference" owed to "the findings of the trial court with respect to duly admitted expert testimony."[91]

## ii.

Turning to vagueness, the district court further held that the age verification component of H.B. 1181 was "problematic because of several key ambiguities" in the statutory language. To begin, the court evaluated § 129B.002 and found that by lumping together young minors with those near the age of majority, the statute overlooked the reality that material "harmful to a younger minor is vastly different . . . than material that is harmful to a minor just shy of" majority.[92] Similar problems stemmed from the statute's failure to define "serious literary, artistic, political, or scientific value for minors."[93] As such value varies with age group, the district court found that H.B. 1181 would chill constitutionally protected speech.

Additionally, the district court found H.B. 1181's scope was "subject to multiple interpretations as to the scope of its liability" because it was unclear whether the "one-third" requirement modified "material" or "website." Finally, the court was concerned that H.B. 1181 did not define a "commercially reasonable method" of age verification. The district court indicated these vague provisions were problematic and spoke "to the statute's broad tailoring."[94] In response to these challenges, the State asserts

---

[91] *McClain v. Lufkin Indus., Inc.*, 519 F.3d 264, 279 (5th Cir. 2008) (citing *Cleveland ex rel. Cleveland v. United States*, 457 F.3d 397, 407 (5th Cir. 2006)).

[92] *Am. C.L. Union v. Ashcroft*, 322 F.3d 240, 268 (3d Cir. 2003), *aff'd and remanded*, 542 U.S. 656 (2004).

[93] Tex. Civ. Prac. & Rem. § 129B.001(6)(C) (noting, without explanation, that "[s]exual material harmful to minors" must "taken as a whole, lack[] serious literary, artistic, political, or scientific value for minors").

[94] The district court noted: "Overall because the Court finds the law unconstitutional on

that "one-third" modifies "website" and argues any problems with vagueness could be resolved through "certification."[95]

Even if we accepted this interpretation, the State does not address the district court's remaining concerns regarding the definitions of a "commercially reasonable method" of age verification or "serious literary, artistic, political, or scientific value for minors." More to the point, the district court did not rest its holding on a vagueness challenge. The purchase of its observations was that H.B. 1181 was not narrowly tailored.

### iii.

In granting the preliminary injunction, the district court found that the age verification requirements were impermissibly broad and would infringe upon adults' constitutionally protected speech. The court determined that the statute was "largely identical" to the COPA, found unconstitutional in *Ashcroft II*; likely to chill substantial speech for adults, as it does not require the government to delete user data and "risk[ed] forcing individuals to divulge specific details of their sexuality to the state government to gain access to certain speech"; and effectively "reduce[d] the adult population to only what is fit for children."[96] The State disputes these conclusions and argues that the statute "does not prohibit *any* speech, only [requires] that

---

other grounds, it does not reach a determination on the vagueness question. But the failure to define key terms in a comprehensible way in the digital age speaks to the lack of care to ensure that this law is narrowly tailored." *See also Reno*, 521 U.S. at 871–72 ("The vagueness of such a regulation raises special First Amendment concerns because of its obvious chilling effect on free speech.").

[95] The State also maintains that the "one-third" ambiguity is "hardly relevant" because "Pornographers make their money selling pornography" and "will meet the one-third trigger regardless of how the Court measures the denominator."

[96] *See also Reno*, 521 U.S. at 875 (cleaned up) (citation omitted); *Ashcroft II*, 542 U.S. at 665–70; 47 U.S.C. § 231(e)(6).

[Plaintiffs] check the ages of their customers," and will not chill speech because the age verification requirements "preserve[] online anonymity."

These arguments fail for four reasons. First, that H.B. 1181 "does not prohibit *any* speech" but merely restricts access to speech is an empty argument because "[t]he distinction between laws burdening and laws banning speech is but a matter of degree."[97] Second, H.B. 1181 encompasses nearly all salacious material because it may be harmful to young minors, *see supra* Section II.B, and as such, the statute restricts adults' access to both obscene *and* non-obscene speech. Third, the State does not address the district court's concerns that government entities and third-party intermediaries are not required to delete users' data. H.B. 1181 prohibits commercial entities and third parties performing age verification from retaining identifying information, but the bill imposes no burden on governmental entities nor "any intermediary between the commercial websites and the third-party verifiers" to do the same.[98] Simply claiming that the "age verification preserves online anonymity" does not make it so. Finally, this response ignores the "special First Amendment concerns" of the chilling effects on speech when the state government can log and track adults' access to sexual material.[99] It is canon that overbroad regulations "have the potential to chill, or deter, speech outside their boundaries."[100]

---

[97] *Playboy Ent. Grp., Inc.*, 529 U.S. at 812.

[98] *See* TEX. CIV. PRAC. & REM. CODE § 129B.002(b).

[99] *Reno*, 521 U.S. at 871–72. The district court specifically identified privacy concerns regarding accessing homosexual material. Because the State has not repealed its criminal sodomy laws, despite the Supreme Court's ruling in *Lawrence v. Texas*, 539 U.S. 558 (2003), the court found "it is apparent that people who wish to view homosexual material will be profoundly chilled from doing so if they must first affirmatively identify themselves to the state."

[100] *Counterman v. Colorado*, 600 U.S. 66, 75 (2023). The threat of self-censorship is present

The risk of censorship is particularly high for regulations of obscenity and sexual expression, which are "often separated . . . only by a dim and uncertain line."[101]

Here, the record supports the district court's conclusion that the age verification mandate will chill protected speech; moreover, it suggests the majority's claim that H.B. 1181 has a "*de minimis* effect on privacy" understates the privacy issues at play. The mandate requires adults to affirmatively identify themselves by providing government identification before accessing desired content. This requirement "deters adults' access to legal sexually explicit material" and goes "far beyond the interest of protecting minors." Because neither the government nor "any intermediary" is required to delete information obtained, the district court found that adults would be "particularly concerned about accessing controversial speech when the state government can log and track that access." Texas provides no persuasive rebuttal.

**2.**

A content-based statute that impermissibly burdens adults' protected speech "is unacceptable if less restrictive alternatives would be at least as effective in achieving the legitimate purpose that the statute was enacted to serve."[102] The State bears the burden of proving its chosen method is

---

in all regulations on speech, not merely those that threaten criminal prosecution. *See United States v. Hansen*, 599 U.S. 762, 810–11 (2023) (Jackson, J., dissenting) ("Moreover, criminal prosecutions are not the only method by which statutes can be wielded to chill free speech . . . . There can be no doubt that this kind of Government surveillance—targeted at journalists reporting on an important topic of public concern, no less—tends to chill speech, even though it falls short of an actual prosecution.").

[101] *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 66 (1963).

[102] *Ashcroft II*, 542 U.S. at 665 (citing *Reno*, 521 U.S. at 874).

constitutional,[103] which often requires proof that the legislature considered alternative, less restrictive means.[104] The State has offered no evidence on this latter point and failed to meet its burden.

Before the district court, Plaintiffs offered two less restrictive methods to shield children from inappropriate sexual content: (1) requiring internet service providers, or ISPs, to block specified content until adults opt-out of the block; and (2) "content filtering" by implementing adult controls on children's devices. The district court found that Plaintiffs' proposed alternatives were less restrictive of adult speech, citing the State's own exhibits that indicated "content filtering" was the "most effective method of limiting any harm to minors." The district court concluded that content blocks would address the "under-inclusivity issue" and "comport[] with the notion that parents, not the government, should make key decisions on how to raise their children."

On appeal, Texas contends that content blocking and filtering are not effective, less restrictive alternatives to age verification. It argues that the proposed age verification methods do not require the disclosure of sensitive information and that companies could use techniques such as "selfie matching" or age estimation.[105]

---

[103] *Id.*

[104] *Id.* ("When plaintiffs challenge a content-based speech restriction, the burden is on the Government to prove that the proposed alternatives will not be as effective as the challenged statute."); *see, e.g.*, *Reno*, 521 U.S. at 879 ("The breadth of this content-based restriction of speech imposes an especially heavy burden on the Government to explain why a less restrictive provision would not be as effective as the CDA . . . . Particularly in the light of the absence of any detailed findings by the Congress, or even hearings addressing the special problems of the CDA, we are persuaded that the CDA is not narrowly tailored if that requirement has any meaning at all.").

[105] In its briefing, Texas cites an expert report stating parents are unaware of content-

No. 23-50627

This argument effectively asks the Court to reweigh the evidence and review the district court's findings de novo. We may not do so. The State made these arguments before the district court, which, in its opinion, discussed the State's expert report and explained why it found the contents unpersuasive. The district court considered and rejected these arguments, and I would find no clear error in its determination that the Texas legislature failed to consider less restrictive means to accomplish its goals.

**B.**

Next, I turn to H.B. 1181's health warnings provision. H.B. 1181 requires regulated commercial entities to post three warnings purportedly authored by Texas Health and Human Services, as well as a phone number for the U.S. Substance Abuse Mental Health Services Administration.[106] I would affirm the district court's enjoining of the health warnings for the reasons articulated by the district court. Although I would apply strict scrutiny, I concur with the majority's judgment that the compelled disclosures do not survive scrutiny. At this junction, the notice requirements are unenforceable.

**IV.**

The district court held that the Plaintiffs who merely host third-party content—MG Freesites LTD, WebGroup Czech Republic, NKL Associates, s.r.o., and MediaMe SRL—are entitled to an injunction under Section 230 of

---

blocking or that children "know how to use it or have circumvented it some other way." The State also asserts that "age verification has proven an ineffective mechanism to limit exposure to adult content by minors" and directs the Court to its expert report on the topic. However, given that the State *proposes* age verification as an essential component of the statute, the Court presumes that this is a typographical error. The State's cited expert report states that "*filtering* has proven an ineffective mechanism[.]"

[106] Tex. Civ. Prac. & Rem. § 129B.004.

the CDA. Specifically, the district court explained that Section 230 immunizes these Plaintiffs against H.B. 1181's enforcement because the statute purports to penalize them for hosting sexual content created by others.[107] This analysis is sound, faithful to the statutory text of the CDA and binding case law.

Relevant here, the CDA states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."[108] The law further provides that "no cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."[109] The CDA is intended "to promote rather than chill Internet speech. . . . [paving] the way for a robust new forum for public speech as well as a trillion-dollar industry centered around user-generated content."[110]

The State first asserts Section 230 does not preempt H.B. 1181 because the statute "neither holds Pornographers liable for third-party content . . . nor imposes liability for good-faith measures to restrict access to offensive material." Second, the State argues Plaintiffs cannot take advantage of the immunity provision because they are "responsible, in whole or in part, for the creation or development of information provided through the Internet." Third, the State contends foreign corporations may not assert First Amendment claims because they do not have constitutional rights.

---

[107] The district court noted that "[t]o the extent that domestic website Plaintiffs and foreign website Plaintiffs create or develop the content they themselves post, they are not entitled to immunity."

[108] 47 U.S.C. § 230(c)(1).

[109] *Id.* § 230(e)(3).

[110] *Bennett v. Google, LLC*, 882 F.3d 1163, 1166 (D.C. Cir. 2018) (cleaned up) (citations omitted).

Lastly, the State argues that to the extent Section 230 protects Plaintiffs, they cannot assert First Amendment claims.

The State's first two arguments are foreclosed be *Doe v. MySpace*, wherein this Court noted that "Congress provided broad immunity under the CDA to Web-based service providers for *all* claims stemming from their publication of information created by third parties[.]"[111] Although "[p]arties complaining that they were harmed by a Web site's [sic] publication of user-generated content . . . may sue the third-party user who generated the content," they may not sue "the interactive computer service that enabled them to publish the content online."[112]

In *Doe*, the plaintiff sued MySpace for negligence in allegedly failing to take precautions to prevent sexual predators from communicating with minors and specifically complained that MySpace failed to implement age-verification software.[113] But this Court held that the CDA barred the claim: "notwithstanding [plaintiff's] assertion that they only seek to hold MySpace liable for its failure to implement measures that would have prevented" the plaintiff from communicating with the sexual predator, the "allegations are merely another way of claiming that MySpace was liable for publishing the communications."[114]

The State tries to distinguish this case from *Doe*, but its arguments are meritless. First, it asserts that "H.B. 1181 seeks to hold pornographic sites responsible for failing to protect minors from content *they generate and*

---

[111] *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir.), *cert. denied*, 555 U.S. 1031 (2008) (emphasis added).

[112] *Id.* at 419.

[113] *Id.* at 416, 422.

[114] *Id.* at 420.

*promote*, not just third-party content." However, the district court considered thoroughly the various Plaintiffs' business models and found that some of the Plaintiffs, including "WebGroup, which operates XVideos, only host[] third-party content, and therefore [are] entitled to Section 230 protection." These findings of fact are to be upheld unless they are clearly erroneous. I find no error.

Second, the State argues that after Plaintiffs "use the age-verification methods . . . their job is done," implying that H.B. 1181 does not directly penalize parties for hosting sexual content. But this Court held explicitly in *Doe* that requiring websites that only host third-party content to implement age-verification measures violates Section 230. The CDA immunizes platforms from *all* liability associated with hosting third-party content and it preempts all statutes inconsistent with this mandate. H.B. 1181 imposes severe civil liability, mandatory disclosures, and age verification requirements based on the presence of third-party content. That websites will be safe from H.B. 1181's significant civil penalties *if* they implement the required age-verification system is no answer.

Third, the State argues Plaintiffs are still "responsible" for the content they host such that they lose Section 230 protection. Specifically, the State asserts that Plaintiffs are not entitled to immunity under Section 230 because they "promote content in special parts of their websites" and "affirmatively license and advertise rather than passively host content." But this argument is also unpersuasive. That licensing and promoting content created by third parties causes developers to lose Section 230 immunity is not supported by any precedent of this Court. It would also swallow the CDA's rule of immunity and undermine Congress's clear goals to insulate website owners and developers from liability stemming from the publication of third-party content.

No. 23-50627

Next, the State's argument that foreign corporations do not have constitutional rights, such that the foreign Plaintiffs cannot benefit from First Amendment protections, fails to persuade. The State bases its argument on *Agency for International Development v. Alliance for Open Society International* ("*AOSI II*"), which held that foreign organizations operating outside the United States are not entitled to the protections of the United States Constitution.[115] But *AOSI II* has no bite in this case where "the recipients of [Plaintiffs'] speech and speech-related conduct" are in the United States.[116] Instead, "[a]s the [Supreme] Court has recognized, foreign citizens *in the United States* may enjoy certain constitutional rights."[117] Moreover, this argument overlooks Plaintiffs' abilities to vindicate the First Amendment rights of their U.S. site visitors.[118]

Lastly, I cannot agree with the State's argument that those parties asserting Section 230 immunity cannot also bring First Amendment claims. The State relies on this Court's language in *NetChoice* to support its contention: "§ 230 reflects Congress's judgment that the [websites] are not acting as speakers or publishers when they host user-submitted content."[119] The State argues Plaintiffs' attempt to assert a Section 230 claim on behalf of themselves and First Amendment claims on behalf of their customers fails

---

[115] *Agency for Int'l Dev. v. Alliance for Open Soc. Int'l, Inc.* ("*AOSI II*"), 140 S. Ct. 2082, 2086 (2020).

[116] *Thunder Studios, Inc. v. Kazal*, 13 F.4th 736, 743 (9th Cir. 2021), *cert. denied sub nom. David v. Kazal*, 142 S. Ct. 1674 (2022).

[117] *AOSI II*, 140 S. Ct. at 2086 (emphasis in original) (citations omitted).

[118] And as the district court noted, *AOSI II* also differs from the case at hand because that ruling focused on challenging rules or policymaking with extraterritorial effect, whereas Plaintiffs here "seek to exercise their First Amendment rights only as applied to their conduct inside the United States and as a preemptive defense to civil prosecution."

[119] *NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 468 (5th Cir. 2022).

because "the challenge to HB [sic] 1181's notice requirement is not asserted on behalf of customers [] and the age-verification claim is not limited to the First Amendment rights of their customers."

As an initial matter, the district court never discussed whether the health notices requirement was barred by Section 230. So, I will not address that question. With regard to the age-verification requirement, I would find no error in the district court's analysis. First, the district court found that Plaintiff Free Speech Coalition has associational standing; thus, Plaintiffs may bring a First Amendment facial challenge to H.B. 1181 and argue that it is an overbroad content-based regulation.[120] Second, although Plaintiffs entitled to Section 230 immunity are "carriers" and not "creators" of speech, they may still assert First Amendment claims on behalf of adults wishing to view protected sexual content. As the district court explained:

> Beyond their own First Amendment injuries, Plaintiffs have standing for their overbreadth challenge. *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973) ("Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally

_____

[120] As the district court described:

> An association has standing to bring claims on behalf of its members when "(1) individual members would have standing, (2) the association seeks to vindicate interests germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the individual members' participation." *Students for Fair Admissions, Inc. v. Univ. of Tex. at Austin*, 37 F.4th 1078, 1084 (5th Cir. 2022). Free Speech Coalition's members would have standing to sue in their own right, as they suffer the same injuries as the named Adult Video Companies. These interests fall within Free Speech Coalition's mission, which is to advocate for the distribution of adult videos and the First Amendment rights of its performers and producers.

protected speech or expression."); *Sec. of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 956 (1984) ("[W]hen there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged.").

The district court did not err when it held those Plaintiffs that only hosted third-party content were entitled to Section 230 immunity, nor did it err when it held that the First Amendment claims regarding H.B. 1181's age verification requirement may exist alongside Section 230 liability claims. Both rulings comport with the text of Section 230 and *Doe v. MySpace*.

## V.

It is significant to note that H.B. 1181 fails exacting scrutiny at this stage in large part for want of evidence. Aside from a single "Bill Analysis" completed by the Texas Senate Research Center—which the State did not provide to the district court but can nonetheless be considered—the record is bereft of evidence responsive to the burdens of strict scrutiny.[121] That is not to say that the legislature did not consider alternatives or that the State will be unable to provide this and other evidence at trial. At this junction and with this record, however, I would not upset the district court's finding that Plaintiffs have a substantial likelihood of success on the merits.

That H.B. 1181 now fails strict scrutiny does not foreclose further attempts by the State to legislate on this issue. To the contrary, Texas has the

---

[121] *See* Fed. R. Evid. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); *United States v. Herrera-Ochoa*, 245 F.3d 495, 501 (5th Cir. 2001) ("An appellate court may take judicial notice of facts, even if such facts were not noticed by the trial court.") (citing Fed. R. Evid. 201(b)); Texas Bill Analysis, H.B. 1181, 5/15/2023.

right—and to these eyes, the obligation—to protect its minors, and in doing so, it must have the means to frustrate their access to pornographic materials consistent with the First Amendment and Section 230. The State may decide that the first step of this march is to place the onus on parents to monitor their children's viewing habits and provide them the tools to do so. Indeed, to quote the State: "parents are the first line of defense." Implicit in this reality is that educating parents addresses the State's concern that children "are often more adept at circumventing such software than [parents] are at issuing it"[122] without infringing adults' access to protected speech.

Continuing on that path, the State can look again to requiring electronic filters on devices, as considered in the "Bill Analysis" conducted by the Senate,[123] such as blocking software or shared-data applications that provide parents with affordable access to their children's devices. While the decision to travel a particular legislative pathway is beyond this Court's compass, illuminating both the available legal options and their outer rails is not. At the end of the day, the goals of H.B. 1181 will not be thwarted. Rather, legal pathways for its eventual success will be laid. For now, I see the pathways to statutory protection inevitably turning the focus to parents, arming them with means of protecting their children.

The interest of the sellers of pornography and the interest of the State here converge—both seek the benefit of technology that will enable websites to bypass the eyes of children in their passage of material to adult purchasers. The sellers of the product have powerful incentives to find the means, and

---

[122] Like COPA, H.B. 1181 "presumes that parents lack the ability, not the will, to monitor what their children see. By enacting programs to promote use of filtering software, Congress could give parents that ability without subjecting protected speech to severe penalties." *Ashcroft II*, 542 U.S. at 670.

[123] Texas Bill Analysis, H.B. 1181, 5/15/2023.

we have the proper forum for their display—a trial. Whether such technology exists and its utility are questions of fact for trial. I note only that the websites' ability—or lack thereof—to provide such a product would be telling.

As I am persuaded that, on the record before him, the able veteran district judge did not err in finding a likelihood of success on the merits, I would affirm the grant of a preliminary injunction and return the case to the district court for further proceedings. Facts matter. Facts decide cases and trial is their proper forum.